# In the United States Court of Appeals for the Tenth Circuit

HOBBY LOBBY STORES, INC., MARDEL, INC., DAVID GREEN, BARBARA GREEN, STEVE GREEN, MART GREEN, AND DARSEE LETT,

*Appellants,*

v.

KATHLEEN SEBELIUS, Secretary of the United States Department of Health and Human Services, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, HILDA SOLIS, Secretary of the United States Department of Labor, UNITED STATES DEPARTMENT OF LABOR, TIMOTHY GEITHNER, Secretary of the United States Department of the Treasury, and UNITED STATES DEPARTMENT OF THE TREASURY,

*Appellees.*

**On Appeal from the United States District Court
for the Western District of Oklahoma, No. 5:12-cv-01000
Judge Joe Heaton, Presiding**

## BRIEF OF APPELLANTS

S. Kyle Duncan
Luke W. Goodrich
Mark L. Rienzi
Eric S. Baxter
Lori H. Windham
Adèle Auxier Keim
THE BECKET FUND FOR RELIGIOUS LIBERTY
3000 K Street, N.W., Suite 220
Washington, D.C. 20007
(202) 349-7209
kduncan@becketfund.org
*Attorneys for Appellants*

Dated: February 11, 2013

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for Appellants states the following:

Appellant Hobby Lobby Stores, Inc. is a privately-held company wholly owned by trusts controlled by the Green family. No publicly-held corporation owns 10% or more of its stock.

Mardel, Inc. is a privately-held company wholly owned by trusts controlled by the Green family. No publicly-held corporation owns 10% or more of its stock.

 s/ Adèle Auxier Keim   
Adèle Auxier Keim
*Attorney for Appellants*

Dated: February 11, 2013

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ............................................................................ ii

TABLE OF AUTHORITIES ........................................................................ iv

PRIOR AND RELATED APPEALS .................................................................. xiii

JURISDICTIONAL STATEMENT ..................................................................... xiv

STATEMENT OF THE ISSUES ........................................................................ xv

STATEMENT OF THE CASE ......................................................................... xvi

INTRODUCTION ...................................................................................... 1

FACTUAL BACKGROUND ........................................................................... 2

    I.     The Green family and Hobby Lobby ........................................................ 2

    II.    The HHS Mandate ........................................................................ 5

    III.   Procedural history ......................................................................... 9

LEGAL STANDARDS ................................................................................. 11

    I.     Standard of Review ...................................................................... 11

    II.    Preliminary Injunction Standard ........................................................ 12

SUMMARY OF ARGUMENT ........................................................................ 15

ARGUMENT ........................................................................................... 17

    I.     The Greens and Hobby Lobby are likely to succeed on their RFRA claims. ....................................................................................... 17

          A.    It is undisputed that the Greens sincerely exercise religion by excluding certain drugs and devices from their insurance plan. ......... 18

          B.    The Mandate substantially burdens the Greens' religious exercise. ............................................................................ 20

1.  The district court erred when it applied a substantial burden standard unknown in this Circuit. ..................................................22

2.  The district court erred by re-writing the Greens' religious beliefs. ............................................................................................26

3.  The corporate form of the Greens' business does not render the burden insubstantial. ..............................................................32

C.  Hobby Lobby and Mardel are "persons" protected by RFRA. ...........36

D.  The government is unlikely to justify the Mandate under strict scrutiny. ..............................................................................................39

1.  The government has not shown a compelling interest in the narrow class of emergency contraceptives at issue. ......................40

2.  The government has numerous less restrictive means of furthering its interest. ..................................................................45

II.  The Greens and Hobby Lobby are likely to succeed on their Free Exercise claim. ........................................................................................49

A.  The Mandate is not generally applicable. ...........................................49

B.  The Mandate is not neutral. ................................................................53

III.  The Greens and Hobby Lobby will suffer irreparable harm absent an injunction. ..............................................................................................54

IV.  The balance of equities tips decidedly in the Greens' and Hobby Lobby's favor. ..........................................................................................55

V.  An injunction is in the public interest. .......................................................56

CONCLUSION ..............................................................................................58

ORAL ARGUMENT STATEMENT .......................................................................59

CERTIFICATE OF SERVICE ..............................................................................60

CERTIFICATES OF COMPLIANCE .....................................................................61

# TABLE OF AUTHORITIES

**Cases**

*Abdulhaseeb v. Calbone*,
  600 F.3d 1301 (10th Cir. 2010) .................................................. passim

*Adkins v. Kaspar*,
  393 F.3d 559 (5th Cir. 2004) ...........................................................23

*Am. Pulverizer Co. v. U.S. Dep't of Health & Human Servs.*,
  No. 12-cv-3459, 2012 WL 6951316 (W.D. Mo. Dec. 20, 2012) ............... 20, 31

*Annex Med., Inc. v. Sebelius*,
  No. 13-1118 (8th Cir. Feb. 1, 2013) ..................................... 20, 23, 32

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004)........................................................................18

*Autocam Corp. v. Sebelius*,
  No. 12-2673 (6th Cir. Dec. 28, 2012)........................................ 20, 32

*Awad v. Ziriax*,
  670 F.3d 1111 (10th Cir. 2012) .........................................................14

*Axson-Flynn v. Johnson*,
  356 F.3d 1277 (10th Cir. 2004) .........................................................52

*Beerheide v. Suthers*,
  286 F.3d 1179 (10th Cir. 2002) .........................................................24

*Blackhawk v. Pennsylvania*,
  381 F.3d 202 (3d Cir. 2004) ..............................................................52

*Braunfeld v. Brown*,
  366 U.S. 599 (1961)................................................................. 34, 35

*Brown v. Entm't Merchs. Ass'n*,
  131 S. Ct. 2729 (2011)............................................................. 44, 45

*Cal. Democratic Party v. Jones*,
  530 U.S. 567 (2000).........................................................................41

*Cheema v. Thompson*,
  67 F.3d 883 (9th Cir. 1995) ..............................................................14

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993).................................................................... passim

*Citizens United v. Federal Elections Comm'n*,
   130 S. Ct. 876 (2010)...........................................................36

*City of Boerne v. Flores*,
   521 U.S. 507 (1997).............................................................39

*Civil Liberties for Urban Believers v. City of Chicago*,
   342 F.3d 752 (7th Cir. 2003) ............................................... 23, 24, 25

*Colorado Christian Univ. v. Weaver*,
   534 F.3d 1245 (10th Cir. 2008) ............................................53

*Conestoga Wood Specialties Corp. v. Sebelius*,
   No. 13-1144 (3d Cir. Feb. 7, 2013) ....................................... 20, 32

*Davis v. Mineta*,
   302 F.3d 1104 (10th Cir. 2002) ............................................ 12, 13

*EEOC v. Hosanna-Tabor Evangelical Lutheran Church and Sch.*,
   597 F.3d 769 (6th Cir. 2010) ...............................................37

*EEOC v. Townley Eng'g & Mfg. Co.*,
   859 F.2d 610 (9th Cir. 1988) ...............................................34

*Elrod v. Burns*,
   427 U.S. 347 (1976).............................................................55

*Employment Div., Dept. of Human Res. of Ore. v. Smith*,
   494 U.S. 872 (1990)............................................................. 19, 29, 39

*First Nat. Bank of Boston v. Bellotti*,
   435 U.S. 765 (1978).............................................................36

*Fraternal Order of Police v. City of Newark*,
   170 F.3d 359 (3rd Cir. 1999) ............................................... 49, 50, 51

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
   546 U.S. 418 (2006)................................................... passim

v

*Grace United Methodist Church v. City of Cheyenne*,
    451 F.3d 643 (10th Cir. 2006) ..................................................................... 24, 52

*Grote v. Sebelius*,
    No. 13-1077, 2013 WL 362725 (7th Cir. Jan. 30, 2013) .......................... passim

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) ...........................................................................................49

*Guru Nanak Sikh Soc'y v. Cnty. of Sutter*,
    456 F.3d 978 (9th Cir. 2006) .............................................................................23

*Hartmann v. Stone,*
    68 F.3d 973 (6th Cir. 1995) ....................................................................... 49, 54

*Hobby Lobby Stores, Inc. v. Sebelius,*
    133 S. Ct. 641 (2012) ........................................................................................11

*Hobby Lobby Stores, Inc. v. Sebelius*,
    870 F. Supp. 2d 1278 (W.D. Okla. 2012)................................................. passim

*Hobby Lobby Stores, Inc. v. Sebelius*,
    No. 12-6294, 2012 WL 6930302 (10th Cir. Dec. 20, 2012) ...................... 10, 13

*Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*,
    132 S. Ct. 694 (2012)........................................................................................37

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996) ...............................................................................14

*Kaemmerling v. Lappin*,
    553 F.3d 669 (D.C. Cir. 2008)..........................................................................21

*Kikumura v. Hurley*,
    242 F.3d 950 (10th Cir. 2001) .............................................................. 13, 17, 55

*Korte v. Sebelius*,
    No. 12-3841, 2012 WL 6757353 (7th Cir. Dec. 28, 2012) ....................... passim

*Legatus v. Sebelius*,
    No. 12-cv-12061, 2012 WL 5359630 (E.D. Mich. Oct. 31, 2012) ............. 20, 31

*Little v. Jones*,
607 F.3d 1245 (10th Cir. 2010) ........................................................11

*Lovelace v. Lee*,
472 F.3d 174 (4th Cir. 2006) ...........................................................21

*Lux v. Rodrigues*,
131 S. Ct. 5 (2010) ..........................................................................11

*Lyng v. N.W. Indian Cemetery Protective Ass'n*,
485 U.S. 439 (1988) .........................................................................24

*McKinley v. Maddox*,
No. 11-6263, 2012 WL 3292389 (10th Cir. Aug. 14, 2012) .............24

*Midrash Sephardi, Inc. v. Town of Surfside*,
366 F.3d 1214 (11th Cir. 2004) ................................................. 23, 52

*Minneapolis & St. Louis Ry. Co. v. Beckwith*,
129 U.S. 26 (1889) ...........................................................................38

*Monaghan v. Sebelius*,
No. 12-cv-15488, 2012 WL 6738476 (E.D. Mich. Dec. 30, 2012)
............................................................................. 20, 31, 35, 56

*Monell v. Dep't of Social Serv's*,
436 U.S. 658 (1978) ..........................................................................38

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964) ..........................................................................38

*Newland v. Sebelius*,
881 F. Supp. 2d 1287 (D. Colo. 2012) ...................................... passim

*NLRB v. Greater Kansas City Roofing*,
2 F.3d 1047 (10th Cir. 1993) ............................................................35

*Nova Health Sys. v. Edmonson*,
460 F.3d 1295 (10th Cir. 2006) ........................................................13

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*,
389 F.3d 973 (10th Cir. 2004) ............................................. 13, 56, 57

vii

*O'Brien v. U.S. Dep't of Health and Human Servs.*,
    __ F. Supp. 2d __, 2012 WL 4481208 (E.D. Mo. Sept. 28, 2012)........ 23, 26, 32

*O'Brien v. U.S. Dep't of Health & Human Servs.*,
    No. 12-3357 (8th Cir. Nov. 28, 2012) ....................................... 20, 23

*Pac. Frontier v. Pleasant Grove City*,
    414 F.3d 1221 (10th Cir. 2005) ........................................................56

*RoDa Drilling Co. v. Siegal*,
    552 F.3d 1203 (10th Cir. 2009) ........................................... 12, 13, 56

*Saints Constantine and Helen Greek Orth. Church, Inc. v.*
    *City of New Berlin*,
    396 F.3d 895 (7th Cir. 2005) ............................................................23

*Santa Clara Cnty. v. S. Pac. R.R. Co.*,
    118 U.S. 394 (1886)..........................................................................37

*Sharpe Holdings, Inc. v. U.S. Dep't of Health and Human Servs.*,
    No. 2:12-cv-92 (E.D. Mo. Dec. 31, 2012)................................... 20, 35

*Sherbert v. Verner*,
    374 U.S. 398 (1963)....................................................... 19, 25, 33, 46

*Shrum v. City of Coweta, Okla.*,
    449 F.3d 1132 (10th Cir. 2006) ........................................................52

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) .........................................................34

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
    309 F.3d 144 (3d Cir. 2002) ............................................................53

*Thomas v. Collins*,
    323 U.S. 516 (1945)..........................................................................41

*Thomas v. Review Bd.*,
    450 U.S. 707 (1981)................................................................. passim

*Triune Health Group, Inc. v. U.S. Dep't of Health & Human Servs.*,
    No. 12-cv-6756 (N.D. Ill. Jan. 3, 2013)............................................20

*Turner Broad. Sys. Inc. v. FCC,*
    512 U.S. 624 (1994)........................................................................41

*Tyndale House Publishers, Inc. v. Sebelius,*
    No. 12-cv-1635, 2012 WL 5817323 (D.D.C. Nov. 16, 2012)......... 20, 31, 35, 40

*United States v. Friday,*
    525 F.3d 938 (10th Cir. 2008) ......................................................42

*United States v. Hardman,*
    297 F.3d 1116 (10th Cir. 2002) ............................................... passim

*United States v. Lee,*
    455 U.S. 252 (1982).................................................................. 29, 34

*United States v. Myers,*
    95 F.3d 1475 (10th Cir. 1996) .................................................. 12, 17

*United States v. Playboy Entm't Group, Inc.,*
    529 U.S. 803 (2000).................................................................. 45, 46

*United States v. Rice,*
    52 F.3d 843 (10th Cir. 1995) .........................................................33

*United States v. Wilgus,*
    638 F.3d 1274 (10th Cir. 2011) .....................................................12

*Washington v. Klem,*
    497 F.3d 272 (3d Cir. 2007) ..........................................................21

*Westar Energy, Inc. v. Lake,*
    552 F.3d 1215 (10th Cir. 2009) ................................... 11, 12, 49, 54

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972)................................................................ 19, 26, 33

*World Outreach Conf. Ctr. v. City of Chicago,*
    591 F.3d 531 (7th Cir. 2009) .........................................................23

## Constitutional Provisions

U.S. Const., amend. I ...................................................................... passim

## Statutes

Patient Protection and Affordable Care Act,
    Pub. L. No. 111-148 ...................................................... xvi, 6

Religious Freedom Restoration Act,
    42 U.S.C. § 2000bb *et seq.* ......................................... passim

1 U.S.C. § 1 .................................................................................... 38

18 U.S.C. § 3597 ............................................................................ 28

26 U.S.C. § 4980D ................................................................... 6, 22

26 U.S.C. § 4980H ....................................................... 6, 22, 43, 51

26 U.S.C. § 5000A ................................................................... 7, 43

28 U.S.C. § 1291 ............................................................................ xiv

28 U.S.C. § 1331 ............................................................................ xiv

28 U.S.C. § 1361 ............................................................................ xiv

28 U.S.C. § 2201 ............................................................................ xiv

28 U.S.C. § 2202 ............................................................................ xiv

29 U.S.C. § 1132 ..................................................................... 6, 22

29 U.S.C. § 1185d ........................................................................... 6

42 U.S.C. § 300gg-13 .................................................................. 6, 9

42 U.S.C. § 18011 ................................................................ 7, 43, 51

18 Okl. St. Ann. § 1002 ................................................................. 38

18 Okl. St. Ann. § 1005 ................................................................. 38

**Regulations**

45 C.F.R. § 147.130 ...................................................................8

45 C.F.R. § 147.140 .................................................................51

76 Fed. Reg. 46621 ...............................................................6, 9

77 Fed. Reg. 8725 ............................................................... 41, 43

78 Fed. Reg. 8456 ................................................8, 9, 43, 46, 53

**Other Authorities**

American Medical Association, Ethics Opinion 2.06 Capital Punishment.............29

Barbara De Lollis, *Marriott takes porn off the menu at new hotels*, USA Today ...................................................................................28

Council for Christian Colleges & Universities, Profile .............................8

Drugstore.com, Plan B One Step Emergency Contraceptive ..................................47

FDA Birth Control Guide ......................................................................5

Guttmacher Inst., Facts on Publicly Funded Contraceptive Services in the United States ..............................................................48

HealthCare.gov, Keeping the Health Plan You Have................................... 7, 43, 51

HHS Grant Announcement, 2012 Family Planning Services FOA........................48

HHS, Guidance on the Temporary Enforcement Safe Harbor ..................................8

Hobby Lobby Holiday Message ...........................................................4

James Eng, *FDA OK with college's Plan B contraceptive vending machine*, MSN News.......................................................................47

Jerry Filteau, *Higher Education Leaders Commit to Strengthening Catholic Identity*, National Catholic Register ................................8

John Calvin, Commentary on Galatians and Ephesians .........................................28

KwikMed, ella Prescribed Online Legally ............................................................48

NOOCH Vegan Market, About ..............................................................................28

Rabbi Dovid Cohen, Chicago Rabbinical Council,
   Doing Business Involving Non-Kosher Food ....................................................28

Press Release, Jan. 20, 2012 Statement by U.S. Department of Health and
   Human Services Secretary Kathleen Sebelius....................................................45

Teva Women's Health, Find Plan B One-Step at Your Local Pharmacy................47

Watson Pharmacy, Understanding How Your Patients Can Get *ella*......................48

WhiteHouse.Gov, *The Affordable Care Act Increases Choice and Saving
   Money for Small Business* ............................................................................. 7, 51

# PRIOR AND RELATED APPEALS

The issues presented in this appeal are also pending in *Newland v. Sebelius*, No. 12-1380 (10th Cir.), and in the following appeals:

*Conestoga Wood Specialties Corp. v. Sebelius*, No. 13-1144 (3d Cir.)

*Autocam Corp. v. Sebelius*, No. 12-2673 (6th Cir.)

*Legatus v. Sebelius*, Nos. 13-1092, -1093 (6th Cir.)

*Korte v. U.S. Dep't of Health & Human Servs.*, No. 12-3841 (7th Cir.)

*Grote Industries v. Sebelius*, No. 13-1077 (7th Cir.)

*O'Brien v. U.S. Dep't of Health & Human Servs.*, No. 12-3357 (8th Cir.)

*Annex Medical, Inc. v. Sebelius*, No. 13-1118 (8th Cir.)

*Tyndale House Publishers, Inc. v. Sebelius*, No. 13-5018 (D.C. Cir.)

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1361, and had authority to issue an injunction under 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. § 2000bb *et seq*. JA 16a. The district court denied the motion for a preliminary injunction on November 19, 2012 and a timely notice of appeal was filed the same day. JA 228-29a; 230a. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

# STATEMENT OF THE ISSUES

A federal regulation ("the Mandate") requires employer health insurance to cover all FDA-approved contraceptives. The Greens and their business, Hobby Lobby, cannot comply with the Mandate because it would require them to violate their religious beliefs by covering certain "emergency contraceptives." Unless they comply, however, they face severe penalties.

The district court denied a preliminary injunction sought under the Religious Freedom Restoration Act ("RFRA") and the Free Exercise Clause.

The following issues are presented:

### *RFRA*

(1).   Did the district court correctly conclude that the Mandate does not "substantially burden" the Greens' religious exercise because it penalizes their business and not them personally? JA 228a.

(2).   Did the district court correctly conclude that Hobby Lobby, as a "general business corporation," cannot exercise religion under the First Amendment and so is not a "person" under RFRA? JA 228a.

(3).   If the Court finds a substantial burden, can the government justify the Mandate under strict scrutiny? JA 228-29a.

### *Free Exercise Clause*

(4).   Did the district court correctly conclude that the Mandate is neutral and generally applicable? JA 216a.

## STATEMENT OF THE CASE

This appeal arises from a challenge to agency regulation promulgated under the Patient Protection and Affordable Care Act, Pub. L. No. 111-148. Appellants moved for a preliminary injunction against the regulation on the basis of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, and the Free Exercise Clause of the First Amendment. JA 12a. The district court denied preliminary relief as a matter of law, JA 229a, and this appeal followed. JA 230a. The proceedings below have been stayed by agreement of the parties pending the outcome of this appeal. JA 10a.

# In the United States Court of Appeals for the Tenth Circuit

HOBBY LOBBY STORES, INC., *et al.*,

*Appellants,*

v.

KATHLEEN SEBELIUS, *et al.*,

*Appellees.*

## INTRODUCTION

This case asks whether religious business owners forfeit their faith as a cost of doing business. The regulation at issue ("the Mandate") forces the Green family and Hobby Lobby to offer insurance that, the Greens sincerely believe, entangles them and their business in the practice of abortion. If the Greens do not comply, they face massive fines. This would seem to be the exact situation for which our Constitution included a First Amendment and for which our Congress enacted the Religious Freedom Restoration Act.

It did not seem so to the lower court, however. The court ruled that the Mandate, at most, puts "indirect" pressure on the Greens. It added that Hobby Lobby itself cannot exercise religion at all, despite the fact that Hobby Lobby has done so openly for four decades. By this reasoning, the lower court rendered the Greens' faith invisible to our Constitution and civil rights laws.

1

The lower court erred. When the government threatens to ruin a family's business unless they renounce their faith, the pressure placed on them is unmistakable. In other words, "Your business or your religion" is just as effective a threat as "Your money or your life." By any measure of law and common sense, the Greens and Hobby Lobby are severely burdened by the government's draconian regulation, and they may seek redress under our Constitution and laws.

This Court should reverse and remand with instructions to enter a preliminary injunction on behalf of the Greens and Hobby Lobby.

## FACTUAL BACKGROUND

The material facts are based on the Verified Complaint and are undisputed. JA 12a, 206a, 208a, 214a, 221a, 237a. The court denied a preliminary injunction based on conclusions of law alone. JA 228-29a.

## I.    THE GREEN FAMILY AND HOBBY LOBBY

Appellants are David and Barbara Green, their three children Steve Green, Mart Green and Darsee Lett ("the Greens"), and the businesses they own and operate: Hobby Lobby Stores, Inc. and Mardel, Inc. ("Hobby Lobby"). JA 17-18a. Founded by David Green in 1970, Hobby Lobby has grown from a small frame company into an arts and crafts chain operating over 500 stores with over 13,000 full time employees. Hobby Lobby remains a closely-held family business. JA 13a, 17a, 20a. Steve is President, Darsee a Vice-President, and Mart the Secretary and Vice-

Chairman of the Board and the founder and CEO of Mardel, Inc., an affiliated chain of Christian bookstores. JA 17-18a, 20-21a. All policies and operations of Hobby Lobby and Mardel are controlled by the Greens. JA 21a.

Hobby Lobby and Mardel have always had express religious purposes. JA 21-24a. Hobby Lobby's statement of purpose recites the Greens' commitment to "[h]onoring the Lord in all we do by operating the company in a manner consistent with Biblical principles." JA 22-23a. Mardel, which sells exclusively Christian books and materials, describes itself as "a faith-based company dedicated to renewing minds and transforming lives through the products we sell and the ministries we support." JA 21a, 24-25a. Each of the Greens has signed a Statement of Faith and a Trustee Commitment obligating them to conduct the businesses according to their religious beliefs and to "use the Green family assets to create, support, and leverage the efforts of Christian ministries." JA 21a.[1]

The Greens actively manifest their faith through their business practices. For example, all stores close on Sundays, at a cost of millions per year, to allow employees a day of rest. JA 23a. Each Christmas and Easter, Hobby Lobby buys hundreds of full-page newspaper ads inviting people to "know Jesus as Lord and

---

[1]     Unless otherwise specified, references to "Hobby Lobby" include Mardel.

Savior." JA 24a.[2] Store music features Christian songs. JA 23a. The company pays for all employees to have cost-free access to chaplains, spiritual counseling, and religiously-themed financial courses. JA 25-26a. Company profits provide millions per year to Christian ministries around the world. JA 14a, 24-25a.

The Greens also manifest their faith by refraining from business activities forbidden by their religious beliefs. For example, they cannot promote or facilitate alcohol use, and so Hobby Lobby does not sell shot glasses. JA 23. When a liquor store offered to assume a building lease, the Greens had to refuse, costing them hundreds of thousands of dollars each month. *Id.* Similarly, the Greens cannot allow their trucks to "back-haul" beer, forcing them to forego substantial profits when they refuse offers from distributors. *Id.* As a matter of faith, the Greens cannot engage in these actions themselves or through their companies.

That religious duty impacts the insurance that can be offered in Hobby Lobby's self-funded employee health plan. The Greens believe that human life begins at conception and that it is wrong to harm a human being from that moment. JA 35-36a. Thus, the Greens cannot offer coverage for drugs or devices that could risk killing a newly-conceived human being. JA 26a. The plan therefore excludes drugs

---

[2]    The latest ad invites readers to "call Need Him Ministry at 1-888-NEED-HIM" if they "would like to know Jesus as Lord and Savior." *See* http://www.hobbylobby.com/assets/pdf/holiday_messages/current_message.pdf. (last visited Feb. 11, 2013).

and devices that can terminate a pregnancy (such as RU-486) and "emergency contraceptives" that can prevent a fertilized egg from implanting in the womb (such as Plan B, Ella, and certain intrauterine devices). JA 26-27a, 33a, 34-36a.[3] Indeed, when the Greens discovered that two of these drugs had been included—without their knowledge—in the formulary of Hobby Lobby's policy, they immediately removed them. JA 26-27a.[4] Other than this subset of drugs and devices, the Greens have no objection to other contraceptives, which Hobby Lobby's plan has always covered. JA 27a.

## II.   THE HHS MANDATE

The federal regulation at issue in this case ("the Mandate") forces the Greens and Hobby Lobby to violate their religious beliefs by including certain drugs in their insurance policies.

---

[3]   The FDA birth control guide explains that Plan B, Ella, and certain intrauterine devices (such as the copper IUD) may work by preventing "attachment (implantation)" of a fertilized egg "to the womb." *See* http://www.fda.gov/downloads/ForConsumers/ByAudience/ForWomen/FreePublications/UCM282014.apdf, at 16-18 (last visited Feb. 11, 2013). In this case, the government confirms that one of three ways "emergency contraceptive pills" act is by "inhibiting implantation." Appellees' Opp'n to *En Banc* Petition at 7 n.4 (filed Jan. 24, 2013).

[4]   The district court found this was not "due to anything other than a mistake. Upon discovery of the coverage, Hobby Lobby immediately excluded the two drugs, Plan B and Ella, from its prescription drug policy. [The government does] not dispute that the company's policies otherwise long excluded abortion-inducing drugs." *Hobby Lobby Stores, Inc. v. Sebelius*, 870 F. Supp. 2d 1278, 1286 (W.D. Okla. 2012) ("*Hobby Lobby I*"); JA 208a; Add. 1.

In the Patient Protection and Affordable Care Act ("ACA"), Congress requires employer health insurance to cover without cost-sharing women's "preventive care and screenings." 42 U.S.C. § 300gg-13(a)(4). Subsequently, HHS defined "preventive care" by regulation to encompass various items, including all FDA-approved contraceptive drugs, devices, and sterilization methods. *See* 76 Fed. Reg. 46621, 46626 (Aug. 3, 2011); JA 31-34a. FDA-approved contraceptives include the "emergency contraceptives" Plan B, Ella, and certain IUDs—drugs and devices which, the government admits, may prevent implantation of a fertilized egg. JA 33a, 203-04a.

Failure to cover these drugs and devices will expose Hobby Lobby to severe fines, regulatory action, and private lawsuits. 26 U.S.C. §§ 4980D, 4980H; 29 U.S.C. § 1185d, 1132; JA 40-41a. Under 26 U.S.C. § 4980D, if Hobby Lobby fails to comply with the Mandate, it is subject to a fine of $100 per day for each "individual to whom such failure relates." Given that over 13,000 individuals are insured under Hobby Lobby's plan, JA 41a, this fine would total at least $1.3 million per day, or almost $500 million per year.[5] If Hobby Lobby instead drops employee insurance, it will face penalties of $26 million per year. 26 U.S.C. §

---

[5]    This assumes that "individual" means each individual insured under Hobby Lobby's plan.

4980H. Nonetheless, the Greens' faith makes it impossible for them to include the mandated emergency contraceptives in Hobby Lobby's plan.

The government has allowed numerous employers and plans to avoid the Mandate. For example, plans may avoid the Mandate by not making certain changes after the ACA's effective date. 42 U.S.C. § 18011(a)(2); JA 29a. Although these "grandfathered" plans must comply with other ACA requirements, they need not cover any women's preventive services. Plans may stay grandfathered indefinitely, and the government expects plans covering over 87 million people to do so through 2013. *See* HealthCare.gov, Keeping the Health Plan You Have (June 14, 2010), http://www.healthcare.gov/news/factsheets/2010/06/keeping-the-health-plan-you-have-grandfathered.html ("Grandfathering Factsheet"). "Small employers," employing over 34 million people, need not offer health insurance at all and can therefore avoid the Mandate.[6]

Certain religious groups that object to insurance on principle and members of "health care sharing ministries" are also exempt from the ACA. 26 U.S.C. § 5000A(d)(2)(A), (B), (ii). Certain non-profit "religious employers"—essentially houses of worship under the tax code—have been specially exempted from the Mandate. 45 C.F.R. § 147.130(a)(1)(iv); JA 30a, 37a; *see also* 78 Fed. Reg. 8456,

---

[6]     WhiteHouse.Gov, *The Affordable Care Act Increases Choice and Saving Money for Small Business* at 2, http://www.whitehouse.gov/files/documents/health _reform_for_small_businesses.pdf (last visited Feb. 8, 2013) ("White House Paper").

8461 (Feb. 6, 2013) (proposing amended exemption). Other objecting non-profit organizations have been granted a one-year "safe harbor."[7] For them, the government recently proposed an "accommodation" that would attempt to route objectionable coverage through their insurer or plan administrator, seeking to "insulat[e]" and "protect" those organizations from the religious burden of having to "contract, arrange, pay, or refer for such coverage." 78 Fed. Reg. at 8462. If finalized, this accommodation could affect millions more.[8] All told, more than 49% of Americans with employer-sponsored health insurance are covered by plans that do not have to comply with the Mandate.

But Hobby Lobby does not qualify for any of these measures. Its health plan is not grandfathered. JA 27a. As a "large employer" with 50 or more employees, Hobby Lobby must offer insurance covering all mandated services. JA 20-21a; 26 U.S.C. § 4980H. As a for-profit business, Hobby Lobby is not covered by the religious employer exemption, the safe harbor, or the proposed accommodation. JA 37-39a; 78 Fed. Reg. at 8461-62. Consequently, the Greens must either violate

---

[7]    HHS, Guidance on the Temporary Enforcement Safe Harbor (Feb. 10, 2012), http://cciio.cms.gov/resources/files/prev-services-guidance-08152012.pdf.

[8]    *See, e.g.*, Jerry Filteau, *Higher Education Leaders Commit to Strengthening Catholic Identity*, National Catholic Register, Feb. 11, 2011 (estimating that "U.S. Catholic colleges and universities today have nearly 1 million students and some 65,000 teachers"); Council for Christian Colleges & Universities, Profile, https://www.cccu.org/about/profile (last visited Feb. 11, 2013) (estimating that evangelical Christian colleges have over 300,000 students and 25,000 faculty).

their faith by covering the mandated emergency contraceptives, or suffer severe fines. JA 39-41a.

## III.  PROCEDURAL HISTORY

The Greens and Hobby Lobby filed suit in the Western District of Oklahoma on September 12, 2012, challenging the Mandate under the Religious Freedom Restoration Act ("RFRA"), the First Amendment, and the Administrative Procedure Act. JA 1a, 41-51a. They simultaneously moved for a preliminary injunction on the basis of their RFRA and free exercise claims. JA 51a. At that time, the Mandate—which applies to the first plan year starting after August 1, 2012—was scheduled to take effect against Hobby Lobby on January 1, 2013. JA 37a, 39a; *see* 42 U.S.C. § 300gg-13(b); 76 Fed. Reg. at 46623. Following a hearing on November 1, the district court denied preliminary injunctive relief on November 19. JA 228-29a.

As to Hobby Lobby, the court held that a "general business corporation" does not have a right of free exercise under the First Amendment, and that such corporations are therefore not "persons" under RFRA. JA 219a. However, the Court agreed that the Greens could assert claims as individuals.

As to the Greens, the court concluded that they were unlikely to prevail under RFRA because, as a matter of law, they could not show that the Mandate "substantially burdens" their religious exercise. JA 227-28a. The court reasoned

that forcing the Greens to give up their religious exercise of excluding certain drugs from Hobby Lobby's policy imposed a burden on the Greens that was not "direct and personal" but instead "indirect and attenuated." JA 224a, 227a.

As to the Free Exercise Clause, the court concluded that the Mandate was both "neutral" and "generally applicable," and was therefore subject only to rational basis review. JA 216a.

The Greens and Hobby Lobby appealed that same day, and, the next day, asked this Court for injunctive relief pending appeal. JA 230a, Appellants' Mot. for Inj. Pending Appeal (Nov. 20, 2012). On December 20, a two-judge panel denied that motion, adopting the district court's reasoning that the burden on the Greens was "indirect and attenuated" and therefore not "substantial" under RFRA. *Hobby Lobby Stores, Inc. v. Sebelius*, No. 12-6294, 2012 WL 6930302, at *3 (10th Cir. Dec. 20, 2012) ("*Hobby Lobby II*"). The panel noted, however, that it was proceeding without full briefing and argument, and that its decision was "necessarily tentative." *Id.* at *1.

The next day, the Greens and Hobby Lobby sought emergency relief under the All Writs Act from Justice Sotomayor. She denied that relief by in-chambers opinion on December 26, stating that "whatever the ultimate merits of [the Greens'] claims, their entitlement to relief is not 'indisputably clear,'" and that they "may continue their challenge to the regulations in the lower courts." *Hobby*

*Lobby Stores, Inc. v. Sebelius,* 133 S. Ct. 641, 643 (2012) (Sotomayor, J., in chambers) (quoting *Lux v. Rodrigues*, 131 S. Ct. 5, 6 (2010) (Roberts, C.J., in chambers)).

Subsequently, in consultation with their ERISA attorneys, the Greens learned they could delay the effective date of the Mandate by retroactively modifying Hobby Lobby's health plan, so that it would now run on a July-to-July schedule instead of a January-to-January schedule. The effect of this modification is that the Mandate will now take effect against Hobby Lobby on July 1, 2013.

After the appeal was filed, the government moved to hold oral argument jointly with *Newland v. Sebelius*, No. 12-1380 (10th Cir.). The Greens and Hobby Lobby opposed that motion, and, believing that this appeal presents issues of exceptional importance, they also filed a petition for initial hearing *en banc*, which is still pending.

## LEGAL STANDARDS

### I.    STANDARD OF REVIEW

This Court reviews the denial of a preliminary injunction for abuse of discretion. *Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010). A district court abuses its discretion by denying a preliminary injunction based on an error of law. *Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009). A district court also abuses its discretion when it "applies the wrong legal standard" in deciding

whether to grant a preliminary injunction. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009).

The district court's legal conclusions are reviewed *de novo*. *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002). Thus, this Court "review[s] the meaning of the RFRA *de novo*, including the definitions as to what constitutes substantial burden and what constitutes religious belief, and the ultimate determination as to whether the RFRA has been violated." *United States v. Myers*, 95 F.3d 1475, 1482 (10th Cir. 1996) (citation omitted); *see also United States v. Wilgus*, 638 F.3d 1274, 1284 (10th Cir. 2011) (in a RFRA case, the Court is "obliged to make an independent examination of the whole record in order to make sure that the judgment does not constitute too great an intrusion on religious expression") (quotation omitted). Finally, this Court may determine for itself whether the Greens and Hobby Lobby deserve a preliminary injunction. *See Westar Energy*, 552 F.3d at 1224 (explaining that "[i]f the district court fails to analyze the factors necessary to justify a preliminary injunction, this court may do so if the record is sufficiently developed").

## II.    PRELIMINARY INJUNCTION STANDARD

To obtain a preliminary injunction, a movant must show "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) [that] the threatened injury outweighs the harm that the preliminary

injunction may cause the opposing party; and (4) [that] the injunction, if issued, will not adversely affect the public interest." *Davis*, 302 F.3d at 1111 (quotation omitted). If movants "can establish that the latter three requirements tip strongly in [their] favor," a "modified" version of the traditional likelihood-of-success test applies, which requires "showing 'that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation.'"[9] *Id.* at 1111.

The district court declined to apply the "modified" standard because the Greens "seek[] to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme." JA 208a (quoting *Nova Health Sys. v. Edmonson*, 460 F.3d 1295, 1298 n.6 (10th Cir. 2006)). This was error. While the question is open in this Circuit,[10] in RFRA cases other circuits have applied a modified

---

[9]     By contrast, a "disfavored" injunction—such as one that would alter the status quo—demands a "strong showing" under all preliminary injunction factors. *RoDa Drilling*, 552 F.3d at 1208-09 n.3. Both the district court and the motions panel correctly concluded that this heightened standard does not apply here. JA 208a; *Hobby Lobby II*, 2012 WL 6930302, at *1.

[10]     It appears no merits panel of this Court has decided whether a non-disfavored injunction sought under RFRA triggers the modified or traditional standard. *See, e.g., O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975-76 (10th Cir. 2004) (en banc) (*O Centro I*) (applying heightened standard to disfavored injunction), *aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418 (2006) (*O Centro II*); *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001) (heightened standard applies "[b]ecause … requested relief would disturb the status quo"); *see also*

13

standard to injunctions that "seek[] to stay governmental action."[11] JA 208a. The Seventh Circuit has twice applied a similar standard to enjoin the Mandate under RFRA. *See Korte v. Sebelius*, No. 12-3841, 2012 WL 6757353, at *2 (7th Cir. Dec. 28, 2012) (concluding under "sliding scale" that business owners established "a reasonable likelihood of success on the merits"); *Grote v. Sebelius*, No. 13-1077, 2013 WL 362725 (7th Cir. Jan. 30, 2013) (same). The court therefore should have applied the "modified" injunction standard, which it acknowledged the Greens and Hobby Lobby would meet. JA 208a (agreeing that "the questions presented here are 'serious, substantial, difficult and doubtful'"); *see also Newland v. Sebelius*, 881 F. Supp. 2d 1287, 1294 (D. Colo. 2012) (Kane, J.) (enjoining Mandate under modified standard).

The Court need not resolve this issue, however, because the Greens and Hobby Lobby are entitled to a preliminary injunction under either the traditional or modified standard. *Cf. Awad*, 670 F.3d at 1126 (not resolving issue because free exercise movant met heightened standard).

---

*Awad v. Ziriax*, 670 F.3d 1111, 1126 (10th Cir. 2012) (holding free exercise injunction proper under either traditional or heightened standard).

[11]    *See, e.g., Cheema v. Thompson*, 67 F.3d 883, 885 (9th Cir. 1995) (applying "fair chance of success on the merits" standard in RFRA challenge to school district rules required by state law); *but see Jolly v. Coughlin*, 76 F.3d 468, 473-74 (2d Cir. 1996) (rejecting modified standard in RFRA case).

## SUMMARY OF ARGUMENT

The district court made fundamental legal errors in denying preliminary injunctive relief.

*RFRA*

The Mandate threatens to penalize the Greens' business unless they violate their faith by offering insurance for certain drugs. This is a textbook substantial burden under RFRA and Tenth Circuit precedent.

The district court avoided this conclusion by making three errors.

*First*, using another circuit's "direct and personal" standard, it deemed the burden on the Greens "indirect" because the Mandate impacts their business and not the Greens "personally." But this Circuit's standard rejects the false dichotomy between "direct" and "indirect" burdens. *Second*, the district court applied its erroneous standard to the wrong religious exercise. The Greens do not object to the Mandate because their *employees* may use certain drugs; they object because the Mandate forces *them* to provide and subsidize those drugs. The court had no authority to re-write the Greens' religious beliefs. *Third*, the district court speculated that Hobby Lobby's corporate form insulates the Greens from the Mandate. It was mistaken. Threatening to harm a family's business unless they violate their faith severely burdens their faith. That burden is not somehow diluted by the business' corporate form.

The district court also mistakenly ruled that Hobby Lobby, as a "general business corporation," cannot engage in religious exercise. But neither RFRA nor Supreme Court precedent suggests that a for-profit entity is barred from making a religious liberty claim. The district court also ignored the undisputed facts, which show that Hobby Lobby manifests its religious mission through obvious religious practices—such as closing on Sundays, evangelizing, providing chaplains for employees, and refraining from practices contrary to the Greens' faith. Consequently, the district court should have ruled that the Mandate substantially burdens Hobby Lobby's religious exercise as well.

In light of this substantial burden, the government must justify the Mandate under strict scrutiny. This Court should find, as have numerous other courts, that the government cannot do so. It should also conclude that the equities heavily support a preliminary injunction.

*Free Exercise*

An injunction is also required because the Mandate is neither "neutral" nor "generally applicable" under the Free Exercise Clause. The government has honeycombed the Mandate with numerous secular exemptions—embracing health plans covering over 100 million persons—while refusing to grant a narrow exemption for religious objectors like the Greens and Hobby Lobby. This naked preference for secular over religious accommodation is a textbook failure of

general applicability and neutrality. Moreover, the Mandate creates a three-tiered system that impermissibly discriminates among religious objectors, failing neutrality for that independent reason.

These violations of neutrality and general applicability subject the Mandate to strict scrutiny, which it cannot satisfy.

## ARGUMENT

### I. THE GREENS AND HOBBY LOBBY ARE LIKELY TO SUCCEED ON THEIR RFRA CLAIMS.[12]

Under RFRA, the federal government "may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b); *United States v. Hardman*, 297 F.3d 1116, 1126 (10th Cir. 2002) (en banc) (discussing RFRA).

A plaintiff makes a prima facie case under RFRA by showing the government substantially burdens its sincere religious exercise. *Kikumura*, 242 F.3d at 960. The burden then shifts to the government to show that the "compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *O*

---

[12]   This Court reviews *de novo* the district court's interpretation of RFRA. JA 220a, 228-29a; *Myers*, 95 F.3d at 1482.

*Centro II*, 546 U.S. at 420 (quoting 42 U.S.C. § 2000bb-1(b)). The government must carry these heavy burdens, even at the preliminary injunction stage. *Id.* at 429-30 (citing *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004)).

Here, the Greens and Hobby Lobby have demonstrated they are likely to succeed under RFRA. The Mandate imposes a substantial burden on the Greens, because it pressures them to cover abortifacient drugs in violation of their religious beliefs, on pain of multi-million dollar fines. And the Mandate cannot satisfy strict scrutiny, because the government has exempted plans that cover millions of Americans from offering any of the mandated services and can increase contraceptive access in many ways that do not coerce religious objectors. The district court erred by concluding that multi-million dollar fines assessed against the Greens' businesses are merely an "indirect" burden on their religious exercise, and that Hobby Lobby cannot engage in religious exercise.

> **A.  It is undisputed that the Greens sincerely exercise religion by excluding certain drugs and devices from their insurance plan.**

RFRA defines "religious exercise" to include "*any* exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" 42 U.S.C. § 2000cc-5(7)(A) (emphasis added). Consistent with this broad definition, the Greens exercise religion through their businesses in a variety of ways. They affirmatively engage in activities important to their faith—such as evangelizing in newspaper ads, providing employees with spiritual counseling, and using profits to

fund Christian ministries. They also refrain from activities forbidden by their faith—such as working on the Sabbath and facilitating the sale of alcohol. JA 23a. The Greens have maintained these commitments even when it costs them millions of dollars. JA 21-25a.

The Greens are also forbidden by their faith from including certain drugs or devices in Hobby Lobby's insurance plan. As they explained in their Verified Complaint—undisputed below—"[t]he Green family's religious beliefs prohibit them from deliberately providing insurance coverage for … abortion-causing drugs and devices." JA 26-27a. Doing so would cause them to be complicit in a grave moral evil forbidden by their faith. *See id.*

This understanding of religious exercise is consistent with a long line of Supreme Court precedent recognizing that religious exercise involves "not only belief and profession but the performance of (*or abstention from*) physical acts." *Employment Div., Dept. of Human Res. of Ore. v. Smith*, 494 U.S. 872, 877 (1990) (emphasis added). So, for example, the Supreme Court has vindicated a religious requirement (1) to abstain from working on the Sabbath, *Sherbert v. Verner*, 374 U.S. 398 (1963), (2) to abstain from sending children to public schools after a certain age, *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and (3) to abstain from manufacturing items that other people may later use in war, *Thomas v. Review Bd.*,

450 U.S. 707 (1981). Similarly, the Greens' religious beliefs require them to abstain from providing insurance coverage for abortion-inducing drugs.

### B. The Mandate substantially burdens the Greens' religious exercise.

The Mandate substantially burdens the Greens' religious exercise by requiring them to cover abortion-inducing drugs on pain of multi-million dollar fines. To date, fourteen cases have raised similar claims of substantial burden by for-profit business owners. In eleven of fourteen, courts have granted the plaintiffs preliminary relief.[13]

There is clear precedent in this Circuit governing whether a law imposes a "substantial burden" on religious exercise. A law does so when it:

(1) "requires participation in an activity prohibited by a sincerely held religious belief,"

---

[13] *See* Order, *Annex Med., Inc. v. Sebelius*, No. 13-1118 (8th Cir. Feb. 1, 2013) (granting injunction pending appeal); *Grote*, 2013 WL 362725 (same); *Korte*, 2012 WL 6757353 (same); Order, *O'Brien v. U.S. Dep't of Health & Human Servs.*, No. 12-3357 (8th Cir. Nov. 28, 2012) ("*O'Brien II*") (same); *see also* Order, *Triune Health Group, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 12-cv-6756 (N.D. Ill. Jan. 3, 2013) (granting preliminary injunction); *Am. Pulverizer Co. v. U.S. Dep't of Health & Human Servs.*, No. 12-cv-3459, 2012 WL 6951316 (W.D. Mo. Dec. 20, 2012) (same); *Tyndale House Publishers, Inc. v. Sebelius*, No. 12-cv-1635, 2012 WL 5817323 (D.D.C. Nov. 16, 2012) (same); *Legatus v. Sebelius*, No. 12-cv-12061, 2012 WL 5359630 (E.D. Mich. Oct. 31, 2012) (same); *Newland*, 881 F. Supp. 2d 1287 (D. Colo. 2012) (same); *see also* Order, *Sharpe Holdings, Inc. v. U.S. Dep't of Health and Human Servs.*, No. 2:12-cv-92 (E.D. Mo. Dec. 31, 2012) (granting temporary restraining order); *Monaghan v. Sebelius*, No. 12-cv-15488, 2012 WL 6738476 (E.D. Mich. Dec. 30, 2012) (same); *but see* Order, *Conestoga Wood Specialties Corp. v. Sebelius*, No. 13-1144 (3d Cir. Feb. 7, 2013) (denying relief); Order, *Autocam Corp. v. Sebelius*, No. 12-2673 (6th Cir. Dec. 28, 2012) (same).

(2)     "prevents participation in conduct motivated by a sincerely held religious belief," or

(3)     "places substantial pressure on an adherent … to engage in conduct contrary to a sincerely held religious belief[.]"

*Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1315 (10th Cir. 2010) (quotations omitted).[14] Under both the first and third prongs, the Mandate substantially burdens the Greens' religious exercise.

As to the first prong, the Mandate "requires participation" in a religiously forbidden activity by requiring the Greens to provide insurance coverage forbidden by their religious beliefs. *Abdulhaseeb*, 600 F.3d at 1315; *see also, e.g., Korte*, 2012 WL 6577353, at *3 (explaining that "[t]he religious-liberty violation at issue here inheres in the *coerced coverage* of … abortifacients") (emphasis in original). As to the third prong, the Mandate "places substantial pressure on [the Greens] … to engage in conduct contrary to a sincerely held religious belief," by imposing crippling fines unless the Greens provide coverage contrary to their beliefs. *Abdulhaseeb*, 600 F.3d at 1315. The price for exercising their faith will be steep. If

---

[14]     *Abdulhaseeb* is a RLUIPA case, but the district court correctly recognized that a substantial burden is the same under RLUIPA or RFRA. JA 222. This Circuit's substantial burden standard is similar to other circuits' standards. *See, e.g., Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (explaining that "[a] substantial burden exists when government action puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs'") (quoting *Thomas*, 450 U.S. at 718); *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (same); *Washington v. Klem*, 497 F.3d 272, 280 (3d Cir. 2007) (same). *But see infra* part I.B.1 (discussing the Seventh Circuit's "*CLUB*" decision).

the Greens drop insurance, they will cause massive disruptions to their employees and be fined $26 million per year. Alternatively, if they offer insurance without the mandated coverage, they will be fined $1.3 million per day or almost $500 million per year. 26 U.S.C. §§ 4980D, 4980H; 29 U.S.C. § 1132(a); JA 40-41a. On either ground recognized by this Circuit—"require[d] participation" or "substantial pressure"—the Greens have shown a substantial burden.

The district court reached a contrary conclusion based on three key errors. First, without ever mentioning the controlling substantial burden standard in *Abdulhaseeb*, the court adopted an outdated standard from the Seventh Circuit that has been rejected by several circuits. *See infra* part I.B.1. Second, the court attempted to re-interpret the Greens' religious beliefs in violation of RFRA. *See infra* part I.B.2. And third, the court wrongly held that regulating a for-profit company can never substantially burden the owners' religious exercise. *See infra* part I.B.3.

> 1. *The district court erred when it applied a substantial burden standard unknown in this Circuit.*

Without ever citing this Circuit's substantial burden test, the district court held that a burden on religious exercise is "substantial" only if it "operates *directly and primarily* on the individual's religious exercise." JA 223-24a (emphasis added). Based in this standard, it concluded that the burden on the Greens was insubstantial, because the Mandate applies only to the Greens' businesses, and

because the Greens are objecting only to an *employee's* decision to use the abortion-causing drugs obtained through Hobby Lobby's health plan. JA 224 (citing *O'Brien v. U.S. Dep't of Health and Human Servs.*, __ F. Supp. 2d __, 2012 WL 4481208, at *6 (E.D. Mo. Sept. 28, 2012)); *but see O'Brien II*, No. 12-3357 (8th Cir. Nov. 28, 2012) (enjoining Mandate pending appeal); Order, *Annex Med.*, No. 13-1118 (8th Cir. Feb. 1, 2013) (same). According to the court, the burden of the Mandate therefore lacked any "direct and personal connection" to the Greens and was instead "indirect and attenuated." JA 224a, 227a.

The district court based its "directly and primarily" test on the Seventh Circuit's decision in *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) (*CLUB*); JA 223a. But that test has no basis in the text of RFRA, contradicts Tenth Circuit precedent, and has been rejected by three other circuits.[15] Indeed, the Seventh Circuit itself has limited *CLUB*,[16] and it pointedly ignored it when granting an injunction in a similar Mandate challenge. *Korte*, 2012 WL 6757353, at *3; *Grote*, 2013 WL 362725, at *3; *but see id.* at *4. The district

---

[15]    *See Adkins v. Kaspar*, 393 F.3d 559, 568-70 (5th Cir. 2004) (rejecting *CLUB*); *Guru Nanak Sikh Soc'y v. Cnty. of Sutter*, 456 F.3d 978, 988 & n.12 (9th Cir. 2006) (same); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004) (same).

[16]    *See Saints Constantine and Helen Greek Orth. Church, Inc. v. City of New Berlin*, 396 F.3d 895, 899-900 (7th Cir. 2005) (distinguishing *CLUB*); *see also World Outreach Conf. Ctr. v. City of Chicago*, 591 F.3d 531, 537-38 (7th Cir. 2009) (analyzing substantial burden under *Constantine* standard).

court mistakenly thought this Circuit "cited [*CLUB*] with approval" for its problematic standard. JA 224a. It has not. This Court's opinion in *Grace United Methodist Church v. City of Cheyenne*—the sole support for the district court's view—cited *CLUB* only for the principle that a substantial burden under RLUIPA tracks the definition under RFRA. *See* 451 F.3d 643, 661 (10th Cir. 2006) (citing *CLUB*, 342 F.3d at 760-61).

In this Circuit, a law substantially burdens religious exercise by "requir[ing] participation" in objectionable activities, *or* by "substantial[ly] pressur[ing]" participation in those activities. *Abdulhaseeb*, 600 F.3d at 1315; *McKinley v. Maddox*, No. 11-6263, 2012 WL 3292389 (10th Cir. Aug. 14, 2012).[17] This Circuit has also rejected any distinction between "direct" and "indirect" burdens. *See Abdulhaseeb*, 600 F.3d at 1316 (explaining that "[s]ubstantial pressure" includes "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions'") (quoting *Lyng v. N.W. Indian Cemetery Protective Ass'n,* 485 U.S. 439, 450 (1988)).

---

[17]    *See also Hardman*, 297 F.3d at 1126-27 (noting that because the eagle feather is sacred to many Native Americans, "[a]ny scheme that that limits their access to eagle feathers therefore must be seen as having a substantial effect on the exercise of religious belief"); *Beerheide v. Suthers*, 286 F.3d 1179, 1184 (10th Cir. 2002) (holding that a prison policy requiring Jewish inmates to pay 25% of the cost of their kosher meals was unconstitutional even under deferential pre-RLUIPA standards).

The Supreme Court has likewise rejected the district court's proposed distinction between "direct" and "indirect" burdens. In *Sherbert* and *Thomas*, plaintiffs' religious exercise was penalized indirectly through loss of unemployment benefits. *See Sherbert*, 374 U.S. at 403 (burden was "only an indirect result" of unemployment laws). Yet, in both cases, the Supreme Court rejected the government's argument that the burden was "only the indirect consequence of public welfare legislation." *Thomas*, 450 U.S. at 717; *see id.* (noting that "a similar argument was made and rejected in *Sherbert*"). As *Thomas* explained, "[w]hile the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial." 450 U.S. at 718. This Circuit has expressly adopted that language from *Thomas. See Abdulhaseeb*, 600 F.3d at 1315 (quoting *Thomas*, 450 U.S. at 717-18). In sum, the district court's "directly and primarily" standard, borrowed from *CLUB*, is incompatible with both Circuit and Supreme Court precedent.

Finally, even under the district court's flawed test, the Mandate *does* burden the Greens' religious exercise in a "direct and personal" manner, JA 224a, because it coerces them to run their business in violation of their faith. As explained above, the Greens sincerely exercise religion through their businesses in numerous concrete ways. *See supra* part I.A. One of those practices is the religious requirement that they must exclude abortion-causing drugs from their insurance.

Forcing the Greens to cover such drugs is just as "direct and personal" an affront to their faith as a mandate to sell alcohol in their stores, JA 23a, to stock risqué greeting cards, *id.*, or to stop proclaiming in ads that Jesus is "Lord and Savior," JA 24a. Moreover, for not complying, the Mandate threatens their businesses with multi-million dollar fines. Thus, even if there were a distinction between "direct" and "indirect" burdens (and there is not), the Mandate's command is a direct and crippling burden on the Greens' religious exercise. *Cf. Yoder*, 406 U.S. at 208, 218 (*five* dollar fine on religious practice created "not only severe, but inescapable" pressure).

2.    *The district court erred by re-writing the Greens' religious beliefs.*

Compounding its choice of the wrong substantial burden standard, the district court also wrongly substituted its own definition of the Greens' religious exercise. The court proceeded as if the Greens' objections to the Mandate concerned not their *own* participation in an objectionable practice, but instead merely their *employees'* "independent" participation in that practice. JA 140-41a (concluding that the "particular 'burden of which plaintiffs complain'" is contributing "funds" that "might, after a series of independent decisions by health care providers and patients covered by [Hobby Lobby's] plan, subsidize <u>someone else's</u> participation in an activity that is condemned by plaintiff's religion") (quoting *O'Brien*, 2012 WL 4481208, at *6) (emphasis in original). But this analysis simply misunderstood

the Greens' actual religious claim, which concerns their obligation to avoid their *own* participation in a specific practice: covering abortion-drugs in their health plan. *See supra* part I.A (discussing Greens' religious beliefs); JA 26-27a.

The Greens have never asserted a religious exercise claim regarding the actions of their employees or their doctors. To the contrary, the Greens claim—without contradiction, *see* JA 14a—that their faith demands they refrain from "participating in, providing access to, paying for, training others to engage in, or otherwise supporting abortion-causing drugs and devices," whereas the Mandate forces them to do so. Put another way, the Greens never filed a lawsuit arguing that their employees' decisions to use such drugs violated (or even implicated) the Greens' beliefs; they sued only when the government forced the Greens and their businesses to participate in such practices in ways prohibited by their faith. The precise "religious-liberty violation at issue here," as the Seventh Circuit has explained, "inheres in the *coerced coverage* of … abortifacients …, *not*—or perhaps more precisely, *not only*—in the later purchase or use of [abortifacients]." *Korte*, 2012 WL 6577353, at *3; *see also Grote*, 2013 WL 362725, at *3.

The moral reasoning behind the Greens' religious exercise is both familiar and widely shared across religious faiths. Whether called "facilitation," "material assistance," or "material cooperation," the principle that someone may be culpably

involved in another's actions is common to secular and religious thinking.[18] Such non-participation occurs, for example, when: (1) a hotel chain eliminates pornography from hotel televisions;[19] (2) a Jewish deli offers only kosher foods;[20] (3) an ethical vegetarian excludes meat from her vegan market;[21] and (4) a prison guard or a physician refuses any participation in capital punishment.[22] All of these

---

[18]    *See, e.g.,* John Calvin, Commentary on Galatians and Ephesians (Christian Classics Ethereal Library 1999), *available at* http://www.ccel.org/ccel/calvin/comment3/comm_vol41/htm/iv.vi.iii.htm (quoting Ephesians 5:11 and stating "[i]t is not enough that we do not, of our own accord, undertake anything wicked. We must beware of joining or assisting those who do wrong").

[19]    *See, e.g.,* Barbara De Lollis, *Marriott takes porn off the menu at new hotels*, USA Today, Jan. 11, 2011, *available at* http://travel.usatoday.com/ hotels/post/2011/01/marriott-hotels-to-remove-porn-new-hotels/139423/1 (discussing Marriott's new policy of placing "adult content … off the menu for virtually all of our newly built hotels" in order "to keep adult content out of the reach of children and unavailable to any adult who chooses not to view it").

[20]    *See generally* Rabbi Dovid Cohen, Chicago Rabbinical Council, Doing Business Involving Non-Kosher Food (2008) (stating that "[a] Jewish-owned supermarket may not sell even the few non-kosher items necessary to round out their selection and attraction for non-Jewish customers"), *available at* http://www.crcweb.org/kosher_articles/business_involving_non_kosher.php.

[21]    *See, e.g.,* NOOCH Vegan Market, About, http://noochveganmarket. tumblr.com/about (last visited Feb. 11, 2013) (owners of vegan store "believe that animals have the right to be free from human use and see [store] as an extension of that ideology").

[22]    18 U.S.C. § 3597(b) (protecting objecting employees from being required "to be in attendance at or to participate in any … execution," where "participation" includes "personal preparation of the condemned individual and the apparatus used for execution and supervision of the activities of other personnel in carrying out such activities"); American Medical Association, Ethics Opinion 2.06 Capital Punishment (prohibiting physician's direct involvement as well as any action that

religious and moral practices involve shielding oneself from an unacceptable degree of participation in objectionable activities. If undertaken for religious reasons, such non-participation constitutes "religious exercise" under RFRA.

The district court initially claimed to accept the Greens' beliefs at face value, *see* JA 206a, but its substantial burden analysis measures the impact of the Mandate on beliefs of the court's own invention. The district court had no power to redefine the Greens' beliefs about their *own* participation in abortion into beliefs about "someone else's" participation in it. It is settled that courts may not re-draw theological lines. *See, e.g., Smith*, 494 U.S. at 887 ("[r]epeatedly … we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim"); *United States v. Lee*, 455 U.S. 252, 256-57 (1982) ("[i]t is not within 'the judicial function and judicial competence' … to determine whether appellee or the Government has the proper interpretation of the Amish faith"); *Thomas*, 450 U.S. at 715-16 (because Jehovah's Witness "drew a line" against participating in tank manufacturing, "it is not for us to say that the line he drew was an unreasonable one").

The Supreme Court's decision in *Thomas* is particularly instructive. There, a Jehovah's Witness lost his job and was denied unemployment benefits because his

---

would "assist, supervise, or contribute to the ability of another individual to directly cause the death").

religious beliefs prohibited him "from participating in the production of war materials," such as tank turrets. *Thomas*, 450 U.S. at 709. He was willing to work in a department producing raw steel, because such work was "sufficiently insulated from producing weapons of war." *Id.* at 715. But he could not participate in fabricating tank turrets, because it would make him a "direct party" to war. *Id.* at 715. The lower court rejected his claim because he "was not able to 'articulate' his belief precisely," and because his beliefs seemed "inconsistent." *Id.* at 707-08, 715.

The Supreme Court reversed, concluding that the lower court was wrong "to dissect [his] religious beliefs." *Id.* Rather, if he believed that "work in the roll foundry [was] sufficiently insulated from producing weapons of war," the Court had to take him at his word. *Id.* As the Court put it, "Thomas drew a line, and it is not for us to say that the line he drew was an unreasonable one." *Id.*

Similar lines are drawn by the Greens' faith. They do not object to paying salaries to employees who may then buy abortifacient drugs. But offering those specific drugs in their health plan crosses a moral line. Doing so, the Greens believe, unacceptably entangles them and their business in abortion. JA 14a. *This* is the "exercise of religion" to which the district court should have applied this Circuit's substantial burden test, but it did not do so. Instead, the court acted as an "arbiter[] of scriptural interpretation," *Thomas*, 450 U.S. at 716, and adopted its own interpretation of the Greens' beliefs.

Other courts considering challenges to the Mandate have overwhelmingly rejected this kind of theological line-drawing. In *Korte*, the Seventh Circuit emphasized that "[t]he religious-liberty violation at issue here inheres in the *coerced coverage* of contraception, abortifacients, sterilization, and related services, *not*—or perhaps more precisely, *not only*—in the later purchase or use of contraception or related services." *Korte*, 2012 WL 6757353, at *3. Addressing another business' claim, the Seventh Circuit reiterated that "the government's minimalist characterization of the burden continues to obscure the substance of the religious-liberty violation asserted." *Grote*, 2013 WL 362725 at *3l; *see also Tyndale*, 2012 WL 5817323, at *15 ("Because it is the coverage, not just the use, of the contraceptives at issue to which the plaintiffs object, it is irrelevant that the use of the contraceptives depends on the independent decisions of third parties."); *see also Legatus*, 2012 WL 5359630, at *6 (deferring to plaintiffs' assertion that Mandate "substantially burdens the observance of the tenets of Catholicism"); *Monaghan*, 2012 WL 6738476, at *4 (same); *Am. Pulverizer*, 2012 WL 6951316, at *4 (rejecting argument that "any causation between the [plaintiffs] and the use of the provided contraceptive services would be broken by the individual's own decision to use the contraceptive services" because "[w]hile the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial") (citation omitted). Indeed, four of the seven district court decisions which have

erroneously redefined business plaintiffs' beliefs have been enjoined on appeal. *See Korte*, 2012 WL 6757353, at *3; *Grote*, 2013 WL 362725 at *3; *O'Brien II*, No. 12-3357 (8th Cir. Nov. 28, 2012); Order, *Annex Medical*, No. 13-1118 (8th Cir. Feb. 1, 2013); *but see* Order, *Conestoga*, No. 13-1144 (3d Cir. Feb. 7, 2013) (denying injunctive relief); Order, *Autocam*, No. 12-2673 (6th Cir. Dec. 28, 2012) (same).

        3.    *The corporate form of the Greens' business does not render the burden insubstantial.*

The district court also erred by finding the burden insubstantial because the mandate "applies only to Hobby Lobby and Mardel, not to its officers or owners." JA 224a. Effectively, the court concluded that a government threat to destroy a believer's business unless he abandons his faith only "indirectly" burdens him, and is therefore not a substantial burden under RFRA. That analysis is wrong for two reasons: (1) threatening to penalize a business obviously pressures the business' owner, and (2) a corporation acts only when the individuals who own and operate the corporation direct it to act.

Whereas the district court asked whether Hobby Lobby's corporate form renders the burden on the Greens insufficiently "direct and personal," JA 221-27a, RFRA asks only whether the burden on religious exercise is "substantial." As this Court has held, a burden is substantial where it "places substantial pressure on an adherent … to engage in conduct contrary to a sincerely held religious belief."

*Abdulhaseeb*, 600 F.3d at 1315. This test—which the district court did not acknowledge—does not ask how the Greens choose to structure their business, but whether the government pressures the Greens to give up their religious practice.

The answer is obvious. Threatening to ruin a family business unless the family violates its faith places unmistakable pressure on the family *itself*. If the government tells a business owner, "We will close your business on Monday if you attend church this weekend," the owner feels pressure even if the sanction falls on his business. *Cf. Yoder*, 406 U.S. at 218 (pressure from a five dollar fine was "severe" and "inescapable"); *Sherbert*, 374 U.S. at 404. Whether the threatened business is structured as a traditional corporation, an "S corporation" like Hobby Lobby, a partnership, or a sole proprietorship, the pressure on the owners is inescapable.[23]

The district court also overlooked that Hobby Lobby acts only when the Greens direct it to act. *See* JA 205a (the Green family "owns and operates Hobby Lobby Stores, Inc. and Mardel, Inc."). Thus, the court's observation that "[t]he mandate in question applies only to Hobby Lobby and Mardel," JA 224a, is irrelevant. Hobby

---

[23] The government itself implicitly recognizes this concept when it treats income generated by certain kinds of limited-liability companies—including S Corporations like Hobby Lobby—as individual income *to its owners*. *See United States v. Rice,* 52 F.3d 843, 844 (10th Cir. 1995) (noting that "[i]ncome and losses are chronicled on the S Corporation's shareholders' individual tax returns").

Lobby will comply with the Mandate only if the Greens say so, and *that* will occur only if the Greens yield to the pressure on their faith.

No precedent supports the idea that the corporate form dilutes any burden on the owner's religious exercise. To the contrary, Courts have repeatedly recognized that individuals may assert religious claims in the context of operating businesses. The Ninth Circuit has twice confirmed that "a corporation has standing to assert the free exercise right of its owners." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1120-21 (9th Cir. 2009) (relying on *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 619-20 (9th Cir. 1988)). While not deciding whether corporations *themselves* exercise religion, JA 220a, those decisions recognize that businesses can assert their owners' rights. Here, the matter is even clearer because the Greens *themselves* sue as owners, trustees, and officers.

Likewise, the Supreme Court has twice allowed commercial proprietors to assert religious claims against business regulation. *See Lee*, 455 U.S. at 256-57 (recognizing an Amish employer could object to social security taxes); *Braunfeld v. Brown*, 366 U.S. 599, 605 (1961) (allowing Jewish merchants to challenge Sunday closing law because it "ma[d]e the practice of their religious beliefs more expensive"). The district court incorrectly distinguished *Lee* and *Braunfeld* because "neither case appears to have involved a corporation and, in any event, it is clear that the religious beliefs that were allegedly being interfered with were those of the

owners." JA 219-20a. But neither case suggested the businesses' *form* determined whether the plaintiffs properly asserted a substantial burden. *See, e.g., Braunfeld*, 366 U.S. at 601 (observing only that plaintiffs were "merchants in Philadelphia who engage[d] in the retail sale of clothing and home furnishings"). And the fact that those decisions allowed claims by business *owners* is precisely the point—the Greens bring the same kind of claims.[24]

Finally, in fourteen other cases by business owners challenging the Mandate, eleven courts have found the corporate form immaterial to business owners' ability to assert religious claims.[25] As those courts have recognized, threatening to impose massive fines on a person's business imposes substantial pressure on that person to change his or her behavior.

---

[24]    Hobby Lobby's use of a corporate form is immaterial. Corporate forms are state-law constructs designed primarily "to create an incentive for investment by limiting exposure to personal liability." *NLRB v. Greater Kansas City Roofing*, 2 F.3d 1047, 1051 (10th Cir. 1993). The district court offered no precedent for the notion that the choice among available state-law corporate forms dictates the availability of federal civil rights protections for owners.

[25]    *See supra* n. 13; *e.g., Korte*, 2012 WL 6757353, at *3 ("That the Kortes operate their business in the corporate form is not dispositive of their claim."); *Grote*, 2013 WL 362725 at *3 (same); *Tyndale*, 2012 WL 5817323, at *7 ("[T]he case law is replete with examples of such organizations asserting cognizable free exercise and RFRA challenges."); *Monaghan*, 2012 WL 6738476, at *4 ("[T]he Court is in no position to declare that acting through his company to provide certain health care coverage to his employees does *not* violate Monaghan's religious beliefs. They are, after all, *his* religious beliefs."); *Sharpe*, Slip Op. at 6 ("[T]he court concludes that plaintiffs have shown that the . . . mandate, and its substantial financial penalties, on their *health plan* would substantially burden *their* religious beliefs.") (emphases added).

### C. Hobby Lobby and Mardel are "persons" protected by RFRA.

An injunction is required for another reason: Hobby Lobby and Mardel are also likely to show that the Mandate violates their RFRA rights. The district court's contrary holding—that "general business corporations" are not "persons" capable of religious exercise under RFRA (or the First Amendment), JA 219a—contravenes both binding precedent and the undisputed record.

First, the Supreme Court rejects the district court's categorical approach to limiting rights. In *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 776 (1978), the Court explained that "[t]he proper question … is not whether corporations 'have' First Amendment rights and, if so, whether they are coextensive with those of natural persons. Instead the question must be whether [the challenged law] abridges expression that the First Amendment was meant to protect." *See also Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 899-900 (2010) (explaining that "political speech does not lose First Amendment protection 'simply because its source is a corporation'") (quoting *Bellotti*, 435 U.S. at 784). Consequently, just as it is wrong to ask whether "corporations have speech rights," it is also wrong to ask whether "corporations exercise religion." The right question, *Bellotti* teaches, is whether the law abridges religious activity that RFRA and the First Amendment protect. Here, the answer is plainly yes.

Second, the corporate form does not preclude religious exercise. This Circuit and the Supreme Court have, without hesitation, vindicated religious exercise claims on behalf of corporately-organized entities. In *O Centro*, a church suing as "a New Mexico corporation on its own behalf" prevailed under RFRA claim before the *en banc* Tenth Circuit and a unanimous Supreme Court. *O Centro I*, 389 F.3d at 973, *aff'd by O Centro II*, 546 U.S. 418. Similarly, in *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 525 (1993), a "not-for-profit corporation organized under Florida law" prevailed on a free exercise claim. And in its recent *Hosanna-Tabor* decision, the Supreme Court unanimously vindicated an "ecclesiastical corporation['s]" free exercise rights. *EEOC v. Hosanna-Tabor Evangelical Lutheran Church and Sch.*, 597 F.3d 769, 772 (6th Cir. 2010), *rev'd by Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 132 S. Ct. 694 (2012). If the corporate form *itself* barred religious exercise, these decisions are all incorrect.

Third, RFRA protects "persons" without distinguishing between natural or artificial persons, or between non-profit and for-profit entities. *See* 42 U.S.C. § 2000bb-1(b) (protecting "a person's" religious exercise). RFRA's text offers no support for excluding "general business corporations." Corporations, moreover, have long been understood to be "persons" under the Fourteenth Amendment and section 1983. *See Santa Clara Cnty. v. S. Pac. R.R. Co.*, 118 U.S. 394 (1886)

(Equal Protection Clause); *Minneapolis & St. Louis Ry. Co. v. Beckwith*, 129 U.S. 26, 28 (1889) (Due Process Clause); *Monell v. Dep't of Social Serv's*, 436 U.S. 658, 687-88 (1978) (section 1983). And the federal Dictionary Act confirms that, by broadly protecting "persons," Congress presumptively intended to "include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1.

Ultimately, the district court's analysis turned on its own supposition that

> [g]eneral business corporations do not, separate and apart from the actions or belief systems of their individual owners or employees, exercise religion. They do not pray, worship, observe sacraments or take other religiously-motivated actions separate and apart from the intention and direction of their individual actors.

JA 219a. But this proves nothing other than that Hobby Lobby, like *any* corporation, acts only through "the actions or belief systems of [its] individual owners or employees." *Id*. Churches do the same, as does the New York Times, without forfeiting their religion or speech rights. *See Lukumi*, 508 U.S. at 526; *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 265-66 (1964). Here, there is no question that Hobby Lobby—through the "actions [and] belief systems" of the Greens—"take[s] … religiously-motivated actions," such as those at issue here. JA 220a. The district court's contrary conclusion depended on faulty intuition, not law.[26]

---

[26] Hobby Lobby's religious exercise is perfectly compatible with the Oklahoma General Corporation Act, which is "applicable to every corporation, whether profit or not for profit," and allows corporations to "promote any lawful

38

That intuition also contradicts the facts. Hobby Lobby engages in numerous acts "motivated by a sincerely held belief." *Abdulhaseeb*, 600 F.3d at 1312. For example, buying evangelistic advertisements and closing on Sundays are obviously "religious exercises." *See Smith*, 494 U.S. at 877 (religious exercise "often involves … proselytizing"). The same is true for Mardel's sole business activity, selling religious materials. JA 13a. Similarly, Hobby Lobby's exclusion of emergency contraceptives from its plan is a religious exercise. JA 206a.

Finally, the Mandate "substantially burdens" Hobby Lobby's religious exercise, because it "requires [Hobby Lobby's] participation" in religiously-forbidden activities, and "substantial[ly] pressure[s]" Hobby Lobby to engage in them. *Abdulhaseeb*, 600 F.3d at 1314-15.

### D. The government is unlikely to justify the Mandate under strict scrutiny.

Even at the preliminary injunction stage, RFRA requires the government to prove that placing the Mandate's burden on the Greens and Hobby Lobby is "the least restrictive means of advancing a compelling interest." *O Centro II*, 546 U.S. at 423 (citing 42 U.S.C. § 2000bb-1(b)); *id.* at 429. This is "the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997), and the government cannot meet it.

---

business or purposes," except as forbidden by law. 18 Okl. St. Ann. §§ 1002, 1005; *see* JA 162a (Hobby Lobby Articles of Incorporation reciting company formed "to engage in any lawful act or activity").

As other courts have found, "the government has not, at this juncture, made an effort to satisfy strict scrutiny." *Grote*, 2013 WL 362725, at *3. It has not presented "*any* proof that mandatory insurance coverage for the specific contraceptives to which [*the Greens*] object—Plan B, ella, and intrauterine devices—furthers the government's compelling interests," *Tyndale House*, 2012 WL 5817323, at *16, and it has authorized "massive exemption[s]" that "completely undermine[] any compelling interest in applying the preventive care coverage mandate" to the Greens and Hobby Lobby. *Newland*, 881 F.Supp.2d at 1298 (citing 42 U.S.C. § 18011; 26 U.S.C. § 4980H(c)(2)). Moreover, it has not even "advanced an argument that the contraception mandate is the least restrictive means of furthering" its "general interest" in ensuring access to contraceptives. *Korte*, 2012 WL 6757353, at *4; *accord Grote*, 2013 WL 362725, at *3 (holding the government "has not demonstrated that requiring religious objectors to provide cost-free contraception coverage is the least restrictive means of increasing access to contraception.").

1.   *The government has not shown a compelling interest in the narrow class of emergency contraceptives at issue.*

To demonstrate a compelling interest, the government must show the mandate furthers interests "of the highest order." *Lukumi*, 508 U.S. at 546; *Hardman*, 297 F.3d at 1127. This determination "is not to be made in the abstract" but rather "in the circumstances of this case." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 584

(2000); *see also Lukumi*, 508 U.S. at 546 (rejecting public health interest as compelling "in the context of" the relevant ordinances). "Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation" of religious exercise. *Thomas v. Collins*, 323 U.S. 516, 530 (1945). Further, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 624, 664 (1994). Thus, RFRA requires courts to "look[] beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *O Centro II*, 546 U.S. at 431.

The Mandate seeks to increase access to contraceptives, a measure the government believes will promote women's health and equality. 77 Fed. Reg. 8725, 8727-28 (Feb. 15, 2012); *see also Korte*, 2012 WL 6757353, at *4 (discussing these "generalized" interests). But the compelling interest test asks the government to go beyond "broadly formulated interests" like these and instead specify "the asserted harm of granting specific exemptions to particular religious claimants." *O Centro II*, 546 U.S. at 431.

The Greens cover women's preventive services generally, including most FDA-approved contraceptives. They seek an exemption only for drugs and devices that

may inhibit implantation of a fertilized egg—*i.e.*, an exceedingly small subset of the mandated preventive services. JA 27a. The government has never even addressed whether this minuscule exemption would endanger its interests at all,[27] and thus fails to address the crux of the compelling interest test. "Under the more focused inquiry required by RFRA and the compelling interest test, the [g]overnment's mere invocation of the general characteristics" of preventive services or contraception "cannot carry the day." *O Centro II*, 546 U.S. at 432.

Furthermore, an interest cannot be "compelling" where the government "fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort." *Lukumi*, 508 U.S. at 522; *United States v. Friday*, 525 F.3d 938, 958 (10th Cir. 2008). According to HHS, "grandfathered" plans covering millions Americans need not cover those services, and it estimates that, in 2013, nearly half of all employer-based plans will remain grandfathered, leaving over 87 million Americans under plans not subject to the Mandate. *See* Grandfathering Factsheet. Additionally, "small employers" need not provide insurance at all, leaving 5.8 million businesses, employing over 34 million people,

---

[27] For instance, the government relied on an Institute of Medicine ("IOM") study and Congressional Record citations addressing only general benefits of preventive care or family planning, not emergency contraception in particular. JA 142-43a (citing IOM Rep. at 20 (general benefits of preventive care); *id*. at 103-04 (general costs and dangers of unintended pregnancies); 155 Cong. Rec. S12106-02, S12114 (daily ed. Dec. 2, 2009) (preventive care); 155 Cong. Rec. S12265-02, S12271, S12275 (family planning).

with a way to avoid the Mandate.[28] *See Newland*, 881 F.Supp.2d at 1297-98 (noting exceptions).

Beyond that, churches and religious orders are also exempt, 77 Fed. Reg. at 8726, as are other objecting religious groups. *See, e.g.,* 26 U.S.C. § 5000A (d)(2)(A), (B), (ii) (exempting "health care sharing ministr[ies]"). Moreover, the government recently proposed accommodations for many religious non-profits. 78 Fed. Reg. 8456. This wide-ranging scheme of exemptions, as Judge Kane correctly found, "completely undermines any compelling interest in applying the preventive care coverage mandate to Plaintiffs." *Newland*, 881 F.Supp.2d at 1298.

The Supreme Court's *O Centro* decision compels this conclusion. *O Centro II*, 546 U.S. at 434-37. There, a religious organization sued under RFRA for the right to use a hallucinogenic drug (*hoasca*) in violation of federal drug laws. *Id*. at 423. The government claimed a compelling interest in public health and suppressing dangerous drugs. But the Supreme Court unanimously rejected that argument, because federal drug laws already included an exemption for a different hallucinogen (peyote) used by a different religious group (Native Americans). *Id*. at 432-35. The Court thus held that "the Government failed to demonstrate, at the

---

[28]    White House Paper at 2.

preliminary injunction stage, a compelling interest in barring the [church's] sacramental use of *hoasca*." *Id.* at 439.

Under *O Centro*, interests in contraceptive access and health cannot be "compelling" where the government has chosen *not* to mandate contraceptive coverage for over 87 million employees, representing nearly 50% of all persons receiving employer-based health insurance. In *O Centro*, the government failed strict scrutiny when there was only *one* exemption to the drug laws, applicable to *one* religious group, for a *different* drug; here, there are *numerous* exemptions, applicable to *numerous* secular and religious organizations, for the *same* drugs. Thus, RFRA demands an exemption. *See, e.g., Newland*, 881 F.Supp.2d at 1298 (because "[t]he government has exempted over 190 million health plan participants and beneficiaries from the … mandate[,] this massive exemption completely undermines any compelling interest in applying the … mandate to Plaintiffs").

Additionally, the government's asserted interests cannot be compelling because the Greens' conduct poses no demonstrated threat to them. Strict scrutiny demands "hard evidence" of an "actual problem." *Hardman*, 297 F.3d at 1132; *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (2011). But the government has offered *no* proof that the Greens' exclusion of a tiny fraction of all FDA-approved contraceptives threatens employee health at all. *See United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 821-22 (2000) (noting that, "[w]ithout some sort

of field survey, it is impossible to know how widespread the problem in fact is").

Nor can the government credibly assert a crisis of access to contraceptives, because they have confirmed publicly that contraceptives are already widely available. In a January 20, 2012 press release, Secretary Sebelius explained that:

- "[B]irth control … is the most commonly taken drug in America by young and middle-aged women";

- "[C]ontraceptive services are available at sites such as community health centers, public clinics, and hospitals with income-based support";

- "[L]aws in a majority of states … already require contraception coverage in health plans[.]"[29]

The government therefore cannot credibly claim an interest "of the highest order" in marginally increasing access to a tiny fraction of contraceptives—much less in doing so by conscripting the Greens against their conscience. *See Brown*, 131 S. Ct. at 2741 n.9 (noting that "the government does not have a compelling interest in each marginal percentage point by which its goals are advanced").

      2.    *The government has numerous less restrictive means of furthering its interest.*

Even assuming a compelling interest, the mandate still fails strict scrutiny because there are ready means of enhancing contraception coverage that would not violate the Greens' and Hobby Lobby's rights. *See Hardman*, 297 F.3d at 1130

---

[29]    Press Release, Statement by HHS Secretary Kathleen Sebelius (Jan. 20, 2012), http://www.hhs.gov/news/press/2012pres/01/20120120a.html.

(explaining that, under strict scrutiny, government must "demonstrate that *no alternative forms of regulation would combat such abuses without infringing First Amendment rights*") (quoting *Sherbert*, 374 U.S. at 407) (emphasis in original). The government *must* employ such alternatives. *See Playboy Entm't Group*, 529 U.S. at 813 (if a less restrictive alternative would serve the government's purpose, "the legislature must use that alternative"). Further, the government must adduce evidence that its chosen means is the least restrictive option—"[m]ere speculation is not enough to carry this burden." *Hardman*, 297 F.3d at 1130.

Here, the government not even "advanced an argument that the contraception mandate is the least restrictive means of furthering" its "general interest" in ensuring contraceptive access. *Korte*, 2012 WL 6757353, at *4 (emphasis added); *accord Grote*, 2013 WL 362725, at *3 (government "has not demonstrated that requiring religious objectors to provide cost-free contraception coverage is the least restrictive means of increasing access to contraception"). Nor has it advanced any argument or evidence to support the relevant interest here concerning full-time employees and emergency contraceptives. The government *itself* has already proposed one alternative: paying insurers to issue contraceptive-only policies to employees of religious objectors.[30] Although that proposal is itself problematic, the

---

[30]    78 Fed. Reg. at 8456 (outlining proposed accommodation for religious non-profits).

government's willingness to propose an alternative arrangement for thousands of organizations eviscerates any argument that the Mandate is the "least restrictive means" of advancing its agenda here.

In addition, the government could:

- Provide a tax credit to employees who purchase emergency contraceptives with their own funds.

- Directly provide the drugs at issue, or directly provide insurance coverage for them through the state and federal health exchanges.

- Empower willing actors—for instance, physicians, pharmaceutical companies, or various interest groups—to deliver the drugs and sponsor education about them.

- Use their own resources to inform the public that these drugs are available in a wide array of publicly-funded venues.

This array of alternatives is real. Plan B is available over the counter to anyone over 17, from a leading online pharmacy for $50, and even in many college vending machines.[31] Ella can be purchased online for $40, with no need for a

---

[31] Teva Women's Health, Find Plan B One-Step at Your Local Pharmacy, http://planbonestep.com/pharmacylocator.aspx (last visited Feb. 11, 2013) (Plan B "available over the counter for consumers age 17 and older without a prescription"); Drugstore.com, Plan B One Step Emergency Contraceptive, http://www.drugstore.com/plan-b-one-step-emergency-contraceptive-must-be-17-or-over-to-purchase-without-a-prescription/qxp161395 (last visited Feb. 11, 2013) (advertising Plan B for $47.99 with free shipping); James Eng, *FDA OK with college's Plan B contraceptive vending machine*, MSN News, Jan. 29, 2013 (reporting that "Plan B is available widely in colleges and universities throughout… the nation," and that a Pennsylvania college that dispenses Plan B from a vending machine for $25 is "far from the first to do this").

physician's visit.[32] Moreover, HHS planned to spend over $300 million in 2012 to provide contraceptives directly through Title X funding.[33] And the federal government, in partnership with state governments, has constructed an extensive funding network designed to increase contraceptive access, education, and use, including:

- $2.37 billion for family planning in FY 2010.

- $228 million in FY 2010 for Title X program.

- $294 million in state spending for family planning in FY 2010. [34]

The government can employ such pre-existing sources to increase contraceptive access. *See also, e.g., Newland*, 881 F.Supp.2d at 1299 (noting existence of "analogous programs" and concluding that government has "failed to adduce facts establishing that government provision of contraceptive services will necessarily

---

[32]     KwikMed, ella Prescribed Online Legally, http://ella-kwikmed.com/ (last visited Feb. 11, 2013) (physicians licensed to prescribe online offering free medical consultation and free next day shipping for ella); Watson Pharmacy, Understanding How Your Patients Can Get ella, http://www.ella-rx.com/hcp/howpatientscangetella.asp (last visited Feb. 11, 2013) (noting "ella is also available at Planned Parenthood clinics").

[33]     See HHS Grant Announcement, 2012 Family Planning Services FOA, available at https://www.grantsolutions.gov/gs/preaward/previewPublic Announcement.do?id=12978   (last visited Feb. 11, 2013) (announcing that "[t]he President's Budget for … (FY) 2012 requests approximately $327 million for the Title X Family Planning Program").

[34]     Guttmacher Inst., Facts on Publicly Funded Contraceptive Services in the United States (May 2012), http://www.guttmacher.org/pubs/fb_contraceptive_ serv.html (citations omitted).

entail logistical and administrative obstacles defeating the ultimate purpose of providing no-cost preventive health care coverage to women").[35]

\*\*\*

In sum, the government cannot carry its heavy burdens under strict scrutiny and therefore the Greens and Hobby Lobby are likely to prevail on their claim that the Mandate violates RFRA.

## II. THE GREENS AND HOBBY LOBBY ARE LIKELY TO SUCCEED ON THEIR FREE EXERCISE CLAIM.

Laws which are not neutral or generally applicable face strict scrutiny under the Free Exercise Clause. *Lukumi*, 508 U.S. at 531-32.[36]

### A. The Mandate is not generally applicable.

A regulation fails general applicability when it "creates a categorical exemption for individuals with a secular objection but not for individuals with a religious objection." *Fraternal Order of Police v. City of Newark*, 170 F.3d 359, 365 (3rd Cir. 1999) (Alito, J.) ("*FOP*"). The ordinances in *Lukumi*, for example, ostensibly

---

[35] Nothing shows the government even considered these alternatives. *See Grutter v. Bollinger*, 539 U.S. 306, 339 (2003) (narrow tailoring requires "serious, good faith consideration of workable…alternatives").

[36] The Greens and Hobby Lobby would be entitled to injunctive relief under the Free Exercise Clause even if the Mandate were not a substantial burden under RFRA. *See, e.g., Hartmann v. Stone,* 68 F.3d 973, 979 & n. 4 (6th Cir. 1995) (where "the regulation at issue is not neutral and generally applicable," plaintiffs "need not demonstrate a substantial burden"). This Court reviews *de novo* legal errors underlying denial of a preliminary injunction. *Westar*, 552 F.3d at 1224; JA 216-17a.

protected public health and prevented animal cruelty, but "fail[ed] to prohibit nonreligious conduct that endanger[ed] these interests." 508 U.S. at 543. Because they exempted many types of animal killing—such as hunting, fishing, and euthanasia—the ordinances were not generally applicable. *Id.* at 543-44.

To be sure, not every exemption dooms a regulation. The problem arises when government allows secular exemptions that undermine a regulation's interests but disallows religious exemptions, thus making a "value judgment in favor of secular motivations, but not religious motivations." *FOP,* 170 F.3d at 366. In *FOP*, a regulation prohibiting police officers from growing beards allowed one exemption for undercover officers and another for medical reasons. *Id.* Two Muslim officers sued because the regulation forbade beards for religious reasons. The Third Circuit found that, whereas the undercover-officer exemption "d[id] not undermine the Department's interest in uniformity [of appearance]," the medical exemption did. *Id.* The court therefore found the policy failed general applicability.

Here, the Mandate goes far beyond the exemption scheme in *FOP*. The Mandate allows massive categorical exemptions for secular conduct that undermine the Mandate's purposes. Most notably, over 87 million Americans are covered under "grandfathered" plans that are indefinitely excused, not only from complying with the Mandate, but from covering *any* of the mandated preventive

services.[37] Additionally, 34 million more Americans are employed by small businesses which may avoid the Mandate. 26 U.S.C. § 4980H(c)(2). While these secular exemptions severely undermine the Mandate's interest in increasing insurance coverage for the whole range of women's preventive services, Hobby Lobby gets no exemption even from a narrow slice of the Mandate for religious reasons. This is exactly the kind of "value judgment in favor of secular motivations, but not religious motivations" that fails general applicability. *FOP*, 170 F.3d at 366.

The district court rejected this argument because "the mandate does not 'pursue[] . . . governmental interests *only* against conduct motivated by religious belief.'" JA 216a (quoting *Lukumi*) (emphasis added). This reasoning misreads *Lukumi* and contravenes other circuits' decisions.

*Lukumi* was an easy case because the ordinances "f[e]ll *well* below the minimum standard necessary to protect First Amendment rights." 508 U.S. at 543 (emphasis supplied). But courts have repeatedly found laws not generally applicable even when those laws still applied to a wide variety of secular conduct. In *FOP*, for example, the no-beard ban foreclosed numerous secular reasons for wearing a beard—like fashion, personal preference, or convenience. 170 F.3d at

---

[37]     *See* 42 U.S.C. § 18011; 45 C.F.R. § 147.140; Grandfathering Factsheet; White House Paper at 2.

365. In *Blackhawk v. Pennsylvania*, the Third Circuit found a wildlife permitting fee not generally applicable, despite the fact that it applied to numerous secular reasons for keeping wild animals—like curiosity, hobby, or love of wild animals. 381 F.3d 202, 211 (3d Cir. 2004) (Alito, J.). And in *Midrash*, the Eleventh Circuit struck down a zoning scheme as not generally applicable, even though it applied to numerous secular uses—like "educational institutions," "museums," or "public utilities." 366 F.3d at 1234-35.

The lower court also erred by requiring evidence of animus. *See* JA 214-15a. "[T]he Free Exercise Clause has been applied numerous times when government officials interfered with religious exercise not out of hostility or prejudice, but for secular reasons, such as saving money . . . ." *Shrum v. City of Coweta, Okla.*, 449 F.3d 1132, 1144-45 (10th Cir. 2006) (collecting cases). When the government categorically exempts some secular conduct, but not religious conduct, even its good faith actions trigger strict scrutiny.[38]

---

[38] In this Circuit the animus issue has arisen only regarding a system of individualized assessments. *See Axson-Flynn v. Johnson*, 356 F.3d 1277, 1298 (10th Cir. 2004) (discussing this particular exception); *Grace United Methodist Church*, 451 F.3d at 651 (same). Because Hobby Lobby here makes a different general applicability argument, those decisions do not control.

## B. The Mandate is not neutral.

Additionally, the Mandate fails neutrality by impermissibly discriminating among religious objectors and by penalizing the Greens for their religious conduct, while permitting the same behavior for secular reasons.

First, the Mandate is not neutral because it does not treat religious objectors equally. The Mandate establishes three tiers of religious objectors: favored "religious employers" (who are exempt), less-favored non-profit religious objectors (who have a "safe harbor" and have been promised a future "accommodation"), and disfavored religious objectors like the Greens, who get nothing. *See* 78 Fed. Reg. at 8462; *Lukumi*, 508 U.S. at 533 ("[T]he minimum requirement of neutrality is that a law not discriminate on its face.").

The government cannot rank in different tiers the rights of people with identical religious objections. *See Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1257 (10th Cir. 2008) (explaining, "when the state passes laws that facially regulate religious issues, it must treat individual religions and religious institutions without discrimination or preference") (quotations omitted); *see also Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 167 (3d Cir. 2002) (law non-neutral where the government "granted exemptions from the ordinance's unyielding language for various secular and religious" groups, but rejected exemption for plaintiffs).

Second, the Mandate fails neutrality by honoring certain secular reasons for failure to comply, while rejecting the Greens' religious reasons. *See supra* part II.A (cataloguing secular reasons that many employers may avoid Mandate). The net effect is that policies covering tens of millions of Americans are exempt for secular reasons, while, unprotected, the Greens must face crippling fines for their religious inability to comply with the Mandate. *See Lukumi*, 508 U.S. at 535 (noting "the effect of a law in its real operation is strong evidence of its object"); *Hartmann*, 68 F.3d at 978 (observing "the Supreme Court has made it clear that 'neutral' also means that there must be neutrality *between* religion and non-religion").

\* \* \*

Because the Mandate cannot qualify as a neutral or generally applicable law, the government must satisfy strict scrutiny. They cannot do so. *See supra* part I.D.

## III. THE GREENS AND HOBBY LOBBY WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION.

When the district court fails to analyze all the factors justifying a preliminary injunction and the record is adequate, this Court may conduct its own analysis. *See Westar*, 552 F.3d at 1224; JA 229a.

The Mandate puts the Greens and Hobby Lobby in an impossible position. When the Mandate takes effect against them on July 1, 2013, they must either violate their religious convictions concerning the sanctity of life, or face potential penalties of over one million dollars per day. Few laws in American history have

imposed such a severe penalty on any conduct, let alone on religious exercise. This plainly constitutes irreparable harm. *See, e.g., Kikumura* , 242 F.3d at 963 (noting "courts have held that a plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA"); *Korte,* 2012 WL 6757353, at *4 ("RFRA protects the same religious liberty protected by the First Amendment, and it does so under a more rigorous standard of judicial scrutiny; the loss of First Amendment rights 'for even minimal periods of time, unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)).

## IV. THE BALANCE OF EQUITIES TIPS DECIDEDLY IN THE GREENS' AND HOBBY LOBBY'S FAVOR.

Absent an injunction, the Greens and Hobby Lobby face compulsion to violate their faith. The district court acknowledged that "[n]o one questions that the Greens' beliefs are sincerely held." *See* JA 221a. Nor has anyone questioned the reality and severity of the fines the Greens and Hobby Lobby face for exercising those beliefs. In contrast, granting the injunction "temporarily interferes with the government's goal of increasing cost-free access to contraception … [which], while not insignificant, is outweighed by the harm to the substantial religious-liberty interests on the other side." *Korte,* 2012 WL 6757353 at *5. Unlike the *Korte* plaintiffs, the injunction here concerns only a tiny subset of contraceptives, tipping the equities further in favor of an injunction.

The district court itself acknowledged that an injunction would only temporarily "preserve the status quo," JA 208a, while the court navigates questions it recognized as "serious, substantial, difficult and doubtful." *Id.* Preserving the status quo in such circumstances is "the primary goal of a preliminary injunction." *RoDa Drilling*, 552 F.3d at 1208; *see also O Centro I*, 389 F.3d at 1018 (McConnell, J., concurring) (preservation of the "status quo will often be determinative" where a "newly enacted" statute "will restrict rights citizens previously had exercised and enjoyed").

The government has already exempted churches and their auxiliaries from the Mandate. It has delayed enforcement against many other religious organizations until August 2013, and given millions of employers an open-ended exemption in the form of grandfathering and small-business exceptions. Granting a preliminary injunction to the Greens and Hobby Lobby would therefore not injure the government in any significant way.

## V.     AN INJUNCTION IS IN THE PUBLIC INTEREST.

Finally, a preliminary injunction will serve the public interest by protecting religious exercise. "[I]t is always in the public interest to prevent the violation of a party's Constitutional rights." *Monaghan,* 2012 WL 6738476, at *7 (quotation omitted); *see also Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005) ("Vindicating First Amendment freedoms is clearly in the public

interest."). The district court's suggestion that the public interest in enforcement of a "statutory or regulatory scheme" (here, the ACA) weighs against an injunction, *see* JA 208a, is mistaken. In this matter, there are two statutory schemes in conflict. The public interest in enforcing long-standing religious rights outweighs the interest in immediate enforcement of a new law that creates a "substantial expansion of employer obligations" and raises "concerns and issues not previously confronted." JA 228a; *see also Newland*, 881 F.Supp.2d at 1295 (finding "'there is a strong public interest in the free exercise of religion even where that interest may conflict with [another statutory scheme]'") (quoting *O Centro I*, 389 F.3d at 1010). This is particularly true where the government has many obvious ways to serve its alleged interest in the interim. Furthermore, any government interest in uniform application of the Mandate is "undermined by the creation of exemptions for certain religious organizations and employers with grandfathered health insurance plans and a temporary enforcement safe harbor for non-profit organizations." *Newland*, 881 F.Supp.2d at 1295.

## CONCLUSION

The Court should reverse the district court's decision and remand with instructions to enter a preliminary injunction on behalf of the Greens and Hobby Lobby.

Respectfully submitted,

s/ S. Kyle Duncan
S. Kyle Duncan
Luke W. Goodrich
Mark L. Rienzi
Eric S. Baxter
Lori H. Windham
Adèle Auxier Keim
THE BECKET FUND FOR RELIGIOUS LIBERTY
3000 K Street, N.W., Suite 220
Washington, D.C. 20007
(202) 349-7209
kduncan@becketfund.org
*Attorneys for Appellants*

Dated:  February 11, 2013

# ORAL ARGUMENT STATEMENT

Appellants submit that oral argument is necessary because this appeal presents

issues of exceptional importance currently pending before several other circuits.

 s/ *S. Kyle Duncan*
S. Kyle Duncan
*Attorney for Appellants*

# CERTIFICATE OF SERVICE

I certify that on February 11, 2013, I caused the foregoing *Brief of Appellants* to be served electronically via the Court's electronic filing system on the following parties who are registered in the system:

Michelle Renee Bennett
michelle.bennett@usdoj.gov

Alisa B. Klein
alisa.klein@usdoj.gov

Mark B. Stern
mark.stern@usdoj.gov

*Attorneys for Appellees*

All other case participants will be served via the Court's electronic filing system as well.

s/ Adèle Auxier Keim
Adèle Auxier Keim
THE BECKET FUND FOR RELIGIOUS LIBERTY
3000 K Street, N.W., Suite 220
Washington, D.C. 20007
(202) 349-7213
akeim@becketfund.org
*Attorney for Appellants*

Dated: February 11, 2013

# CERTIFICATES OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains **13,823** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using **Microsoft Office Word 2007** in **Times New Roman 14-point font**.

3. Pursuant to this Court's guidelines on the use of the CM/ECF system, I hereby certify that:

a. all required privacy redactions have been made;

b. the hard copies that have been submitted to the Clerk's Office are *exact* copies of the ECF filing; and

c. the ECF submission was scanned for viruses with the most recent version of Symantec Endpoint Protection (last updated February 11, 2013) and, according to the program, is free of viruses.

s/ Adèle Auxier Keim

Adèle Auxier Keim

THE BECKET FUND FOR RELIGIOUS LIBERTY

3000 K Street, N.W., Suite 220

Washington, D.C. 20007

(202) 349-7213

akeim@becketfund.org

*Attorney for Appellants*

Dated: February 11, 2013