No. 12-6294

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

HOBBY LOBBY STORES, INC., MARDEL, INC., DAVID GREEN,
BARBARA GREEN, MART GREEN, STEVE GREEN, AND DARSEE LETT,
*Plaintiffs- Appellants,*

v.

KATHLEEN SEBELIUS, Secretary of the United States Department of Health and
Human Services; HILDA L. SOLIS, Secretary of the United States Department of
Labor; UNITED STATES DEPARTMENT OF LABOR; TIMOTHY F.
GEITHNER, Secretary of the United States Department of the Treasury; and
UNITED STATES DEPARTMENT OF THE TREASURY,
*Defendants-Appellees.*

**On Appeal from the United States District Court
for the Western District of Oklahoma, No. 5:12-cv-01000
Judge Joe Heaton, Presiding**

## BRIEF FOR LIBERTY, LIFE, AND LAW FOUNDATION
## AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS
## AND URGING REVERSAL

DEBORAH J. DEWART
Liberty, Life, and Law Foundation
620 E. Sabiston Drive
Swansboro, NC   28584-9674
Telephone: (910) 326-4554
Facsimile:   (877) 326-4585
debcpalaw@earthlink.net

February 15, 2013

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae*, Liberty, Life, and Law Foundation, is a nonprofit corporation that has no parent corporation and is not a publicly held corporation.

DATED:     February 15, 2013          /s/Deborah J. Dewart_____
                                      Deborah J. Dewart
                                      Counsel for *Amici Curiae*
                                      *Liberty, Life, and Law Foundation*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ...................................................................................... ii

TABLE OF AUTHORITIES ................................................................................ v

IDENTITY AND INTEREST OF *AMICUS CURIAE* ............................................ 1

AUTHORITY TO FILE *AMICUS* BRIEF ............................................................. 1

AUTHORSHIP AND FUNDING OF *AMICUS* BRIEF ......................................... 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................. 1

ARGUMENT ...................................................................................................... 2

I.    RESPECT FOR INDIVIDUAL CONSCIENCE IS DEEPLY
      ROOTED IN AMERICAN HISTORY ......................................................... 2

      A.    Courts Have Long Respected The Conscience Rights Of Both
            Patients And Health Care Professionals ................................................ 4

      B.    Like Many Successful Free Exercise Cases, This Case Involves
            *Conscientious Objectors*—Not Civil Disobedience .......................... 5

II.   AN EMPLOYER'S REFUSAL TO FINANCE CONTRACEPTION
      AND/OR ABORTION IS NOT THE INVIDIOUS, IRRATIONAL,
      ARBITRARY DISCRIMINATION PROHIBITED BY THE
      CONSTITUTION .......................................................................................... 7

      A.    Anti-Discrimination Provisions Have Expanded To Cover More
            Places And Protect More Groups—Complicating The Legal
            Analysis And Triggering Collisions With The First Amendment ....... 8

      B.    Many Decisions Necessitate Selection Criteria ................................. 12

C.    Where "Discrimination" Is Integrally Related To The Exercise Of A Core Constitutional Right, It Is Not Arbitrary, Irrational, Or Unreasonable ................................................................................. 12

D.    A Narrowly Crafted Exemption Would Not Constitute The Arbitrary, Unreasonable Discrimination The Constitution Rightly Prohibits ................................................................................. 14

E.    Contraception Is A Gender-Neutral Term ........................................... 14

III.    THE RIGHT TO ACCESS CONTRACEPTION DOES NOT JUSTIFY COERCED FUNDING BY UNWILLING PRIVATE EMPLOYERS .................................................................................... 15

A.    Abortion Is A Highly Controversial, Divisive Issue ........................... 17

B.    Religious Freedom Is Our *First* Liberty—It Should Not Be Dismantled To Coerce Private Funding Of Abortion Rights ............. 18

C.    No Person Has A Constitutional Right To *Free* Access To Contraception.  Accommodation Of A Private Employer's Conscience Poses No Threat To Any Employee's Legal Rights ....... 19

D.    Other Cases Limiting Religious Freedom In The Commercial Sphere Left The Objector With A Viable Choice.  The HHS Mandate Does Not. ............................................................................. 22

IV.    BELIEVERS DO NOT FORFEIT THEIR CONSTITUTIONAL RIGHTS WHEN THEY ENTER THE COMMERCIAL SPHERE. ........... 24

A.    Free Exercise Cases Commonly Arise In The Context Of Commercial Activity ......................................................................... 25

B.    The Government Discriminates *Against* Employers Who Hold Conscientious Objections To Contraception ...................................... 26

V.    IRONICALLY, THE MANDATE WEAKENS CONSTITUTIONAL PROTECTION FOR EVERYONE—INCLUDING THOSE WHO ADVOCATE IMPOSING IT ON UNWILLING PRIVATE EMPLOYERS ................................................................................... 27

CONCLUSION ................................................................................... 30

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a) .................... 31

CERTIFICATE OF SERVICE ............................................................... 32

CERTIFICATE OF DIGITAL SUBMISSION ...................................... 33

# TABLE OF AUTHORITIES

## CASES

*Ariz. Christian Sch. Tuition Org. v. Winn*,
  131 S. Ct. 1436 (2011) ........................................................ 4

*Attorney Gen. v. Desilets*,
  418 Mass. 316, 636 N.E.2d 233 (1994) ................................ 25, 26

*Baird v. State Bar of Arizona*,
  401 U.S. 1 (1971) ............................................................... 27

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*,
  481 U.S. 537 (1987) ........................................................... 22

*Bob Jones Univ. v. United States*,
  461 U.S. 574 (1983) ....................................................... 18, 23

*Bowen v. Kendrick*,
  487 U.S. 589 (1988) ........................................................... 20

*Boy Scouts of Am. v. Dale*,
  530 U.S. 640 (2000) .................................................. 8, 9, 22, 29

*Braunfeld v. Brown*,
  366 U.S. 599 (1961) ....................................................... 25, 26

*Catholic Charities of Sacramento, Inc. v. Superior Court*,
  32 Cal.4th 525 (2004) ........................................ 21, 22, 24, 25, 26

*Catholic Charities of Diocese of Albany v. Seri*,
  7 N.Y.3d 510 (N.Y. 2006) ........................................... 21, 23, 24

*Citizens United v. Fed. Election Comm'n*,
  558 U.S. 310 (2010) ........................................................... 25

*Doe v. Bolton*,
  410 U.S. 179 (1973) ........................................................... 16

*Dole v. Shenandoah Baptist Church*,
  899 F.2d 1389 (4th Cir. 1990) ............................................................ 23

*EEOC v. Fremont Christian Sch.*,
  781 F.2d 1362 (9th Cir. 1986) ...................................................... 23, 24

*EEOC v. Townley Eng'g & Mfg. Co.*,
  859 F.2d 610 (9th Cir. 1988) ............................................................ 25

*Emp't Div., Ore. Dep't of Human Res. v. Smith*,
  494 U.S. 872 (1990) ...................................................................... 6, 7

*Erzinger v. Regents of Univ. of Cal.*,
  137 Cal. App. 3d 389 (Cal. Ct. App. 1982) .................................... 23

*Everson v. Bd. of Educ. of Ewing*,
  330 U.S. 1 (1947) ............................................................................ 27

*First Nat'l Bank v. Bellotti*,
  435 U.S. 765 (1978) ........................................................................ 25

*Flast v. Cohen*,
  392 U.S. 83 (1968) ............................................................................ 4

*Gay Alliance of Students v. Matthews*,
  544 F.2d 162 (4th Cir. 1976) ............................................................ 29

*Gay Rights Coalition of Georgetown Univ. Law Ctr. v. Georgetown Univ.*,
  536 A.2d 1 (D.C. 1987) .................................................................... 11

*Girouard v. United States*,
  328 U.S. 61 (1946) ...................................................................... 6, 19

*Goehring v. Brophy*,
  94 F.3d 1294 (9th Cir. 1996) ............................................................ 23

*Harris v. McRae*,
  448 U.S. 297 (1980) ........................................................................ 20

*Healy v. James*,
    408 U.S. 169 (1972)..................................................................... 29

*Heart of Atlanta Motel v. United States*,
    379 U.S. 241 (1964)..................................................................... 10

*Hobbie v. Unemployment Appeals Comm'n of Florida*,
    480 U.S. 136 (1987)..................................................................... 13

*Hsu v. Roslyn Union Free Sch. Dist. No. 3*,
    85 F.3d 839 (2d Cir. 1996) ........................................................... 12

*Hurley v. Irish-American Gay, Lesbian, & Bisexual Grp. of Boston*,
    515 U.S. 557 (1995)........................................................... 8, 9, 15, 22

*In re Cox*,
    3 Cal.3d 205 (1970) ...................................................................... 9

*In re Union Pac. R.R. Emp't Practices Litig.*,
    479 F.3d 936 (8th Cir. 2007) ....................................................... 15

*Isbister v. Boys Club of Santa Cruz*,
    40 Cal.3d 72 (1985) ..................................................................... 10

*Jacobson v. Massachusetts*,
    197 U.S. 11 (1905)....................................................................... 21

*Keyishian v. Bd. of Regents*,
    385 U.S. 589 (1967)..................................................................... 27

*Krauel v. Iowa Methodist Med. Ctr.*,
    95 F.3d 674 (8th Cir. 1996) ......................................................... 15

*Lawrence v. Texas*,
    539 U.S. 558 (2003)..................................................................... 11

*Lee v. Weisman*,
    505 U.S. 577 (1992)..................................................................... 27

*Legatus v. Sebelius*,
  No. 2:12-cv-12061-RHC, 2012 U.S. Dist. LEXIS 156144
  (E.D. Mich. Oct. 31, 2012) .................................................................................. 25

*Lynch v. Donnelly*,
  465 U.S. 668 (1984) ........................................................................................ 21

*Marina Point, Ltd. v. Wolfson*,
  30 Cal.3d 721 (1982) ........................................................................................ 9

*McCreary County, KY v. ACLU*,
  545 U.S. 844 (2005) ........................................................................................ 27

*Mead v. Holder*,
  766 F. Supp. 2d 16 (D.D.C. 2011), *aff'd*, *Seven-Sky v. Holder*,
  661 F.3d 1 (D.C. Cir. 2011) ............................................................................ 23

*New York State Club Ass'n, Inc. v. City of New York*,
  487 U.S. 1 (1988) ............................................................................................ 14

*Orloff v. Los Angeles Turf Club*,
  36 Cal.2d 734 (1951) ........................................................................................ 9

*Planned Parenthood of Se. Pa. v. Casey*,
  505 U.S. 833 (1992) ........................................................................................ 20

*Prince v. Massachusetts*,
  321 U.S. 158 (1944) .................................................................................... 6, 21

*Rasmussen v. Glass*,
  498 N.W.2d 508 (Minn. Ct. App. 1993) ...................................... 3, 13, 25, 26

*Reynolds v. United States*,
  98 U.S. 145 (1878) .......................................................................................... 21

*Roberts v. United States Jaycees*,
  468 U.S. 609 (1984) .................................................................................. 22, 25, 26

*Roe v. Wade*,
  410 U.S. 113 (1973) ........................................................................................ 16

*Rust v. Sullivan*,
　　500 U.S. 173 (1991)......................................................................... 20

*Sherbert v. Verner*,
　　374 U.S. 398 (1963).............................................. 6, 21, 25, 26

*State ex rel. McClure v. Sports & Health Club, Inc.*,
　　370 N.W.2d 844 (Minn. 1985) ....................................... 25, 26

*Stormans, Inc. v. Selecky*,
　　586 F.3d 1109 (9th Cir. 2009) ........................................... 25

*Stoumen v. Reilly*,
　　37 Cal.2d 713 (1951) ............................................................. 9

*Swanner v. Anchorage Equal Rights Comm'n*,
　　874 P.2d 274 (Alaska 1994) ........................................ 25, 26

*Thomas v. Review Bd. of Ind. Emp't*,
　　450 U.S. 707 (1981)................................................................ 13

*Tony and Susan Alamo Found. v. Sec'y of Labor*,
　　471 U.S. 290 (1985)........................................................ 25, 26

*Tyndale House Publishers, Inc. v. Sebelius*,
　　No. 1:12-cv-01635-RBW, 2012 U.S. Dist. LEXIS 163965
　　(D.D.C. November 16, 2012) ......................................... 8, 24

*United States v. Ballard*,
　　322 U.S. 78 (1944)................................................................. 28

*United States v. Lee*,
　　455 U.S. 252 (1982)........................................................ 25, 26

*United States v. Seeger*,
　　380 U.S. 163 (1965)................................................................ 3

*Walker v. Superior Court*,
　　47 Cal.3d 112 (1988) ............................................................. 21

*Webster v. Reprod. Health Servs.,*
  492 U.S. 490 (1989)................................................................ 20

*West Virginia State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943)............................................................ 15, 20

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972)............................................................ 6, 21

*Wooley v. Maynard*,
  430 U.S. 705 (1977)................................................................ 15

*Zorach v. Clauson,*
  343 U.S. 306 (1952)............................................................ 21, 27

**STATUTES**

42 U.S.C. § 300a-7(c) (the "Church Amendment")................................... 5

42 U.S.C. § 2000e(k) (the "Pregnancy Discrimination Act of 1978") .................. 14

Cal. Civ. Code § 51 (the "Unruh Act") .................................................. 9

Ga. Crim. Code § 26-1202(e) ............................................................ 16

**OTHER AUTHORITIES**

http://www.becketfund.org/hhsinformationcentral/.....................................3

119 Cong. Rec. 9595 (1973)...............................................................5

Sen. Rep.  No. 103-111, 1st Sess., p. 4 (1993), reprinted in 1993 U.S. Code
  Cong. & Admin. News ....................................................... 18

David E. Bernstein, *Defending the First Amendment From
  Antidiscrimination*, 82 N.C. L. Rev. 223 (2003) .............................. 7, 11, 28, 29

J. David Bleich, *The Physician as a Conscientious Objector*, 30 Fordham
  Urb. L. J. 245 (2002)............................................................ 5

x

Gerard V. Bradley, *Beguiled: Free Exercise Exemptions And The Siren Song of Liberalism*, 20 Hofstra L. Rev. 245 (1991) .................................................... 13

Feldman, *Intellectual Origins of the Establishment Clause*, 77 N. Y. U. L. Rev. 346 (2002) ................................................................................................ 4

Harlan Loeb and David Rosenberg, *Fundamental Rights in Conflict: The Price of a Maturing Democracy*, 77 N.D. L. Rev. 27 (2001) ....................... 7, 11

Michael W. McConnell, *"God is Dead and We have Killed Him!" Freedom of Religion in the Post-Modern Age*, 1993 BYU L. Rev. 163 .............. 10, 16, 24

Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990) ......................................... 4

Courtney Miller, Note: *Reflections on Protecting Conscience for Health Care Providers: A Call for More Inclusive Statutory Protection in Light of Constitutional Considerations*, 15 S. Cal. Rev. L. & Social Justice 327 (2006) ........................................................................................................ 5, 17

Nora O'Callaghan, *Lessons From Pharaoh and the Hebrew Midwives: Conscientious Objection to State Mandates as a Free Exercise Right*, 39 Creighton L. Rev. 561 (2006) ............................................................. 5, 6, 16, 24

Harlan Fiske Stone, *The Conscientious Objector*, 21 Col. Un iv. Q. 253 (1919) ................................................................................. 3

Jack S. Vaitayanonta, Note: *In State Legislatures We Trust? The "Compelling Interest" Presumption and Religious Free Exercise Challenges to State Civil Rights Laws*, 101 Colum. L. Rev. 886 (2001) ..... 7, 11

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Liberty, Life, and Law Foundation ("LLLF") is a North Carolina nonprofit corporation established to defend religious liberty, sanctity of human life, liberty of conscience, family values, and other moral principles.  LLLF is gravely concerned about the growing hostility to religious expression in America and related threats to liberty.  The HHS Mandate at issue tramples the conscience of a multitude of Americans by requiring them to finance drugs and services contrary to their most cherished religious beliefs.

## AUTHORITY TO FILE *AMICUS* BRIEF

*Amicus curiae* has obtained written consent from all parties to file this brief. Fed. R. App. P. 29(a).

## AUTHORSHIP AND FUNDING OF AMICUS BRIEF

Counsel for *amicus* authored this brief in whole.  No party of party's counsel authored this brief in any respect, and no person or entity, other than amicus, its members, or its counsel, made a monetary contribution to the preparation or submission of this brief.   Fed. R. App. P. 29(c)(5).

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The First Amendment has never been confined within the walls of a church, as if it were a wild animal needing to be caged.  On the contrary, the Constitution broadly guarantees religious liberty to individuals, like the Green family owners of

1

Hobby Lobby, Inc. and Mardel, Inc., who participate in public life and conduct business according to their deeply held moral, ethical, and religious convictions.

But now, the Patient Protection and Affordable Care Act of 2010 requires Plaintiffs to provide health insurance to company employees, including coverage for contraception, sterilization, and related educational/counseling services, in violation of the owners' religious faith (the "Mandate" or "HHS Mandate"). This Mandate is a frontal assault on liberties Americans have treasured for over 200 years—liberties no person can be required to sacrifice as a condition for owning a business.

Some argue that failure to comply with the Mandate constitutes discrimination against women. That rabbit trail diverts attention from the heart of this case: liberty of conscience. It is hardly "discrimination" to decline to advance a politically charged agenda, particularly since no person has a right to *free* contraceptive services funded by an unwilling private employer.

## ARGUMENT

## I. RESPECT FOR INDIVIDUAL CONSCIENCE IS DEEPLY ROOTED IN AMERICAN HISTORY.

The American legal system has traditionally respected conscience, as illustrated by the statutory and judicially crafted exemptions granting relief from the moral dilemma created by mandatory military service. One case,

2

acknowledging man's "duty to a moral power higher than the State," quotes Harlan

Fiske Stone (later Chief Justice):

> "...both morals and sound policy require that the state should not violate the conscience of the individual. All our history gives confirmation to the view that liberty of conscience has a moral and social value which makes it worthy of preservation at the hands of the state. So deep in its significance and vital, indeed, is it to the integrity of man's moral and spiritual nature that nothing short of the self-preservation of the state should warrant its violation; and it may well be questioned whether the state which preserves its life by a settled policy of violation of the conscience of the individual will not in fact ultimately lose it by the process." Stone, *The Conscientious Objector*, 21 Col. Univ. Q. 253, 269 (1919).

*United States v. Seeger*, 380 U.S. 163, 170 (1965). It is hazardous for any

government to systematically crush the conscience of its citizens. But that is

exactly what the Mandate does, breeding a nation of business owners who lack

*conscience*—citizens who must set aside conscience, values, *and religion* just to

remain in business. The sheer number of pending lawsuits testifies to the gravity

of the matter.[1]

Many state constitutions link free exercise to "liberty of conscience." One

Minnesota court ruled in favor of a religious deli owner who refused to deliver

food to an abortion clinic, observing that: "Deeply rooted in the constitutional law

of Minnesota is the fundamental right of every citizen to enjoy 'freedom of

conscience.'" *Rasmussen v. Glass*, 498 N.W.2d 508, 515 (Minn. Ct. App. 1993).

---

[1] There are forty (46) pending cases, per "HHS Mandate Information Central." See http://www.becketfund.org/hhsinformationcentral/ (last visited 02/11/13).

Although "freedom of conscience" is even broader than "free exercise of religion," the First Amendment explicitly protects religion.  Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1491 (1990).

Liberty of conscience underlies the Establishment Clause and the unique taxpayer standing rules developed in *Flast v. Cohen*, 392 U.S. 83 (1968):

> [T]he Framers' generation worried that conscience would be violated if citizens were required to pay taxes to support religious institutions with whose beliefs they disagreed.

*Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1446-1447 (2011), quoting Feldman, *Intellectual Origins of the Establishment Clause*, 77 N. Y. U. L. Rev. 346, 351 (2002).  An equivalent principle is true here: The Mandate requires business owners to violate conscience and religious faith by financing activities they believe to be immoral.  This is as much a frontal assault on conscience as the Establishment Clause evil of compelling citizens to support religious beliefs they do not hold.

### A.     Courts Have Long Respected The Conscience Rights Of Both Patients And Health Care Professionals.

There is a long history of respect for the conscience and moral autonomy of both patients and health care professionals.  Women may have a legal right to contraception and abortion, but "to demand of a physician that she act in a manner she deems to be morally unpalatable not only compromises the physician's ethical

integrity, but is also likely to have a corrosive effect upon the dedication and zeal with which she ministers to patients."   J. David Bleich, *The Physician as a Conscientious Objector*, 30 Fordham Urb. L. J. 245 (2002).  The conscience and integrity of a private employer is entitled to respect.  Instead, the Mandate has a corrosive impact on American society by compelling people of faith to facilitate services they consider immoral.

After abortion became legal, Congress acted swiftly to preserve the conscience rights of professionals who object to participating in abortions.  When Senator Church introduced the "Church Amendment" (42 U.S.C. § 300a-7(c)) for that purpose, he explained that:   "Nothing is more fundamental to our national birthright than freedom of religion."   119 Cong. Rec. 9595 (1973).   Nora O'Callaghan, *Lessons From Pharaoh and the Hebrew Midwives: Conscientious Objection to State Mandates as a Free Exercise Right*, 39 Creighton L. Rev. 561, 627-628 (2006).  Almost every state has also enacted conscience clause legislation. Courtney Miller, Note:   *Reflections on Protecting Conscience for Health Care Providers: A Call for More Inclusive Statutory Protection in Light of Constitutional Considerations*, 15 S. Cal. Rev. L. & Social Justice 327, 331 (2006).

**B.    Like Many Successful Free Exercise Cases, This Case Involves *Conscientious Objectors*—Not Civil Disobedience.**

Prior to *Emp't Div., Ore. Dep't of Human Res. v. Smith*, 494 U.S. 872 (1990), many winning cases involve conscientious objectors—believers seeking freedom

from state compulsion to commit an act against conscience. *Girouard v. United States,* 328 U.S. 61 (1946); *Sherbert v. Verner*, 374 U.S. 398 (1963) (Sabbath work); *Barnett,* 319 U.S. 624 (flag salute); *Wisconsin v. Yoder*, 406 U.S. 205 (1972) (education). Many losing cases involve "civil disobedience" claimants seeking to engage in illegal conduct, e.g., *Prince v. Massachusetts*, 321 U.S. 158 (1944) (child labor). *Lessons From Pharaoh*, 39 Creighton L. Rev. at 564. *Smith* repeatedly emphasized the *criminal* conduct at issue. *Smith,* 494 U.S. at 874, 878, 887, 891-892, 897-899, 901-906, 909, 911-912, 916, 921.

Conscientious objector claims are "very close to the core of religious liberty." *Lessons From Pharaoh*, 39 Creighton L. Rev. at 565, 611, 615-616. Religious entrepreneurs should never have to choose between allegiance to the state and faithfulness to God when their beliefs can be accommodated without sacrificing public peace or safety. If morally shocking behavior (flag burning, computer-generated child pornography, cross burnings) is protected expression, then surely Christian business owners should not be compelled to violate conscience. *Id.*

This Court's decision has broad ramifications for others burdened by legal directives to act against conscience. It is difficult to pinpoint the myriad of situations where legal mandates may invade conscience. In light of the high value that courts, legislatures, and state constitutions have historically assigned to

conscience and religious liberty, it is incumbent upon this Court to protect private

employers who decline to finance morally objectionable medical services.

## II.  AN EMPLOYER'S REFUSAL TO FINANCE CONTRACEPTION IS NOT THE INVIDIOUS, IRRATIONAL, ARBITRARY DISCRIMINATION PROHIBITED BY THE CONSTITUTION.

Some supporters of the Mandate reframe the issue in terms of discrimination

against women or gender equality.[2]  But expansive modern anti-discrimination

principles increasingly collide with religious liberty.  Commentators have observed

the legal quagmire in the context of statutory protections:

> This conflict between the statutory rights of individuals against private acts
> of discrimination and the near universally-recognized right of free exercise
> of religion places a complex legal question involving competing societal
> values squarely before the courts.

Jack S. Vaitayanonta, Note:  *In State Legislatures We Trust?  The "Compelling*

*Interest" Presumption and Religious Free Exercise Challenges to State Civil*

*Rights Laws*, 101 Colum. L. Rev. 886, 887 (2001).  *See also* Harlan Loeb and

David Rosenberg, *Fundamental Rights in Conflict: The Price of a Maturing*

*Democracy*, 77 N.D. L. Rev. 27, 29 (2001); David E. Bernstein, *Defending the*

*First Amendment From Antidiscrimination*, 82 N.C. L. Rev. 223 (2003) (urging

resolution in favor of First Amendment liberties).

---

[2] The American Civil Liberties Union has made such arguments in amicus briefs in
several of the HHS Mandate cases.

As in the recent *Tyndale* case, "[t]he plaintiffs here challenge only a portion of the 'comprehensive package' meant to further the government's compelling interests." *Tyndale House Publishers, Inc. v. Sebelius*, No. 1:12-cv-01635-RBW, 2012 U.S. Dist. LEXIS 163965, *56 n. 17 (D.D.C. November 16, 2012).  Most services unique to women are not morally objectionable, e.g., childbirth, prenatal care, mammograms, pap smears, and treatments for breast or cervical cancer. Plaintiffs have carefully carved out only those services they cannot in good conscience facilitate or finance.  Seen against the backdrop of common law principles and the First Amendment, their conduct is not unlawful discrimination against female employees.

> ### A.     Anti-Discrimination Provisions Have Expanded To Cover More Places And Protect More Groups—Complicating The Legal Analysis And Triggering Collisions With The First Amendment.

Antidiscrimination policies have ancient roots.  The Massachusetts law at issue in *Hurley* grew out of the common law principle that innkeepers and others in public service could not refuse service to a customer without good reason.  *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 571 (1995).  But the Massachusetts legislature broadened the scope, adding more protected categories and more places subject to the law.  *Id.* at 571-572.  The same trend was apparent in *Dale*.  The traditional "places" moved beyond inns and trains to commercial entities and even membership associations—increasing the potential

for collisions with First Amendment association rights. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 656 (2000). Protection also expanded, adding criteria such as prior criminal record, prior psychiatric treatment, military status, personal appearance, source of income, place of residence, and political ideology. *Id.* at 656 n. 2.

Similarly, California's Unruh Act (Cal. Civ. Code § 51) originally encompassed "inns, restaurants, hotels, eating-houses, barber-shops, bath-houses, theaters, skating-rinks, and all other places of public accommodation or amusement." Stats. 1897, ch. 108, p. 137, § 1, cited in *In re Cox*, 3 Cal.3d 205, 213 (1970). The Act expanded over the years to cover more places and people: *Orloff v. Los Angeles Turf Club*, 36 Cal.2d 734 (1951) (race track could not expel man of immoral character); *Stoumen v. Reilly*, 37 Cal.2d 713 (1951) (homosexuals may obtain food and drink at a public restaurant). What the Act clearly forbids is the "irrational, arbitrary, or unreasonable discrimination" prohibited by the Equal Protection Clause. *In re Cox*, 3 Cal.3d at 216. Discrimination is "arbitrary" where an entire class of persons is excluded without justification. *Marina Point, Ltd. v. Wolfson*, 30 Cal.3d 721 (1982). But it is hardly "arbitrary" to avoid promoting an agenda. *Hurley*, 515 U.S. 557 (parade organizers did not exclude individual homosexuals, but could not be compelled to grant access to a gay organization). When Unruh Act amendments were considered in 1974, the Legislative Counsel cautioned that "a construction of the act that would prohibit discrimination on any

9

of the grounds enumerated therein *whether or not such action was arbitrary* would lead to *absurd results*." *Isbister v. Boys Club of Santa Cruz*, 40 Cal.3d 72, 87 (1985) (emphasis added).

The Supreme Court has rightly upheld civil rights legislation intended to eradicate America's long history of racial discrimination. *Heart of Atlanta Motel v. United States*, 379 U.S. 241 (1964). But as protection expands to more places and people, so does the potential to employ anti-discrimination principles to suppress traditional viewpoints and impose social change on unwilling participants. Religious liberty is particularly susceptible to infringement:

> With respect to the great post-modern concerns of sexuality, race, and gender, the advocates of social change are anything but indifferent toward the teachings of traditional religion—and since they are not indifferent they are not tolerant.

Michael W. McConnell, *"God is Dead and We have Killed Him!" Freedom of Religion in the Post-Modern Age*, 1993 BYU L. Rev. 163, 187 (1993). Political power can be used to squeeze religious views out of public debate about controversial social issues. *Id*. at 188.

The clash between anti-discrimination principles and the First Amendment is particularly volatile when a morally controversial practice is protected and religious groups are swept within the ambit of the law. Government has no right to legislate a particular view of sexual morality and compel religious institutions and individuals to facilitate it. Religious voices have shaped views of sexual

morality for centuries.  These views about right and wrong "are not trivial concerns but profound and deep convictions accepted as ethical and moral principles." *Lawrence v. Texas*, 539 U.S. 558, 571 (2003).

The clash between non-discrimination rights and religious liberty "places a complex legal question involving competing societal values squarely before the courts."  *In State Legislatures We Trust?*, 101 Colum. L. Rev. at 887.  When the D.C. Circuit addressed the question "of imposing official orthodoxy on controversial issues of religious, moral, ethical and philosophical importance, upon an entity whose role is to inquire into such matters" it concluded that "[t]he First Amendment not only ensures that questions on difficult social topics will be asked, it also *forbids government from dictating the answers*."  *Gay Rights Coalition of Georgetown Univ. Law Ctr. v. Georgetown Univ.,* 536 A.2d 1, 24 (D.C. 1987) (emphasis added).   Non-discrimination rights, whether created by statute or derived from equal protection principles, may conflict with core rights to religious liberty.  *Fundamental Rights in Conflict*, 77 N.D. L. Rev. at 27, 29.

The growing conflict between religion and nondiscrimination principles emerges in many contexts.  *Defending the First Amendment From Antidiscrimination*, 82 N.C. L. Rev. at 224-225.  Employers may find themselves in a conundrum—protecting one group of employees while alienating another. Solutions are difficult to craft, particularly in the wake of expanding privacy rights.

11

But even if private sexual conduct is legally protected from government intrusion, that protection does not trump the First Amendment rights of those who cannot conscientiously endorse it—*let alone finance it*.

### B.   Many Decisions Necessitate Selection Criteria.

Discrimination may or may not be invidious—and thus rightly prohibited—depending on the context and identity of the person or group that discriminates.

Everyone experiences discrimination.  Employers "discriminate" when they select employees from a pool of applicants.  Students experience "discrimination"—admissions, honor rolls, sports teams, or activities requiring a certain grade point average.  *Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 871 (2d Cir. 1996).  Where selection criteria are truly irrelevant, it may be wise to enact protection.  But it is impossible to eradicate all discrimination.

### C.   Where "Discrimination" Is Integrally Related To The Exercise Of A Core Constitutional Right, It Is Not Arbitrary, Irrational, Or Unreasonable.

Action motivated by conscience and deeply held religious convictions is not the arbitrary, irrational, or unreasonable discrimination the Constitution prohibits.

The law may proscribe the refusal to conduct business with an entire group based on personal animosity or stereotypes.  But the First Amendment demands that courts seriously consider religious motivation.  In the unemployment cases, the Supreme Court warned that "to consider a religiously motivated resignation to be

'without good cause' tends to exhibit hostility, not neutrality, towards religion." *Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 142 (1987); *Thomas v. Review Bd. of Ind. Emp't*, 450 U.S. 707, 708 (1981). Similarly, this Court would exhibit hostility toward religion by equating Hobby Lobby's religious objections to the Mandate with unlawful "discrimination."

Motivation is a key factor. A person who deliberately refuses medical treatment, desiring to die, commits suicide. But a person who wants to live, yet refuses treatment based on religious convictions, does not. Gerard V. Bradley, *Beguiled: Free Exercise Exemptions And The Siren Song of Liberalism*, 20 Hofstra L. Rev. 245, 263-264 (1991). Killing another person in self-defense is justifiable homicide. But the same act—premeditated with malice aforethought—is first degree murder. The former carries no legal penalties, while the latter warrants severe consequences.

Cutting through the fog demands examination of the circumstances. Anti-discrimination laws rightly protect against refusing a customer on the basis of a truly irrelevant personal characteristic. But a deli owner's refusal to deliver food to an abortion clinic was *not* unlawful discrimination under applicable state law, because he opposed their practice of performing abortions. *Rasmussen v. Glass,* 498 N.W.2d at 510-511.

13

### D.  A Narrowly Crafted Exemption Would Not Constitute The Arbitrary, Unreasonable Discrimination The Constitution Rightly Prohibits.

This case involves no allegations that Plaintiffs discriminate against women in hiring, compensation, or other policies.  But they cannot comply with the Mandate without sacrificing allegiance to their owners' core convictions.  General anti-discrimination principles should not be applied so expansively as to eviscerate First Amendment rights.  The Mandate extends far beyond the "meal at the inn" promised by common law and encroaches on a private employer's right to conduct business without a mandate to violate conscience.  When the Supreme Court rejected a 400-member dining club's facial challenge to a state anti-discrimination law, it recognized that the state could not prohibit the exclusion of members whose views conflicted with positions advocated by an expressive association.  What the club could not do is use characteristics like race and sex as "shorthand measures" in place of legitimate membership criteria.  *New York State Club Ass'n, Inc. v. City of New York,* 487 U.S. 1, 13 (1988).  Plaintiffs use no "shorthand" to discriminate against women—rather, they object to funding a narrow range of morally objectionable services.

### E.  Contraception Is A Gender-Neutral Term.

When the Eighth Circuit considered gender discrimination for purposes of Title VII, as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C.S.

14

§2000e(k), the Court concluded that contraception is gender-neutral. Title VII generally precludes employment decisions based on an employee's gender. *In re Union Pac. R.R. Emp't Practices Litig.,*479 F.3d 936, 944 (8th Cir. 2007). But where "an employer's action is not based on a sex classification, it is not a sex-based violation of Title VII. *See Piantanida v. Wyman Ctr., Inc.,* 116 F.3d 340, 342 (8th Cir. 1997)." *Id.* Moreover, contraception, like infertility, is "not a gender-specific term." *Id.* at 942; *see Krauel v. Iowa Methodist Med. Ctr.,* 95 F.3d 674, 680 (8th Cir. 1996) ("because the policy of denying insurance benefits for treatment of fertility problems applies to both female and male workers...[it] is gender-neutral"). Hobby Lobby's refusal to include contraception in its employee health insurance plan is based solely on the owners' religious objections—not the sex of any employee.

## III.  THE RIGHT TO ACCESS CONTRACEPTION DOES NOT JUSTIFY COERCED FUNDING BY UNWILLING PRIVATE EMPLOYERS.

The First Amendment protects against government coercion to endorse or subsidize a cause. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ("*Barnette*"). The government has no power to force a *speaker* to support or oppose a particular viewpoint. *Hurley*, 515 U.S. at 575. Religious liberty collapses when secular ideologies employ the strong arm of the state to advance their causes, promoting tolerance

and respect for some while ruthlessly suppressing others. *"God is Dead and We have Killed Him!"*, 1993 BYU L. Rev. at 186-188.

The Mandate directly hits the pocketbooks of individual business owners—whether the business is structured as a sole proprietorship, partnership, limited liability company, or corporation.  Every dollar that funds free contraception access is a dollar that will not be paid to the business owners—as a distribution (partnerships and pass-through entities such as "S" corporations and LLC's) or a shareholder dividend (corporations).

The Mandate grates against the Constitution, essentially banning religious believers from full participation in society.  It is tantamount to a statement that "no religious believers who refuse to [finance contraception] may be included in this part of our social life."  *Lessons From Pharaoh*, 39 Creighton L. Rev. at 573.  The Mandate's crippling financial penalties will force employers like Plaintiffs to shut down.

Even though courts have acknowledged constitutional rights to contraception and abortion, there is no corollary right to compel unwilling private employers to finance their exercise.  In the companion case to *Roe v. Wade*, 410 U.S. 113 (1973), the Supreme Court left intact Georgia's statutory protections for health care workers who object to participating in abortions.  *Doe v. Bolton*, 410 U.S. 179, 205 (1973) (quoting Ga. Crim. Code § 26-1202(e) (1968)).  The Mandate

compels a private employer to become a "de facto accomplice" to a morally objectionable agenda. Pregnant women may have a legal right to abortion, but they have no accompanying right to draft their employers as unwilling accomplices who must pay for it. In this "clash of autonomies," private employers are entitled to equal protection of their "right to choose." *Reflections on Protecting Conscience for Health Care Providers*, 15 S. Cal. Rev. L. & Social Justice at 340-341, 344.

### A.    Abortion Is A Highly Controversial, Divisive Issue.

This Court must protect the rights of *all* citizens. Americans on both sides of the abortion/contraception debate are equally entitled to constitutional protection for their respective positions. The government itself may adopt a position, but it falls off the constitutional cliff when it compels private employers to finance morally objectionable services contrary to conscience. The reproductive rights recognized in recent decades do not trump the inalienable First Amendment rights of citizens who cannot in good conscience support abortion (and/or contraception)—let alone finance it for others. Abortion is too controversial to justify this severe intrusion on the fundamental rights of opponents.

Many deeply religious people view abortion as fundamentally wrong. Concerned citizens across the country have enacted state laws to regulate it—informed consent, parental notice, waiting periods, and other statutory limitations.

The resulting legal challenges are legion. But the very fact that such restrictions have been proposed and passed is evidence that Americans are profoundly troubled and deeply divided.

Even if this case were truly about gender discrimination—rather than conscientious objection to a narrow range of services—the contentious nature of abortion distinguishes this case from *Bob Jones Univ. v. United States*, 461 U.S. 574 (1983) (tax-exempt status denied to racially discriminatory school). The activities of a charitable organization must not be "contrary to settled public policy." *Id*. at 585. There is a well-settled, "firm national policy to prohibit racial segregation and discrimination in public education." *Id*. at 593. That policy justified denial of charitable status to a racially discriminatory institution. There is no comparable established policy favoring abortion rights—instead, there is intense division and passionate emotion as the debate rages on.

**B.    Religious Freedom Is Our *First* Liberty—It Should Not Be Dismantled To Coerce Private Funding Of Abortion Rights.**

America was founded by people who risked their lives to escape religious tyranny and observe their faith free from government intrusion. Congress has ranked religious freedom "among the most treasured birthrights of every American." Sen. Rep. No. 103-111, 1st Sess., p. 4 (1993), reprinted in 1993 U.S. Code Cong. & Admin. News, at pp. 1893-1894. The Supreme Court expressed it

18

eloquently in ruling that an alien could not be denied citizenship because of his religious objections to bearing arms:

> The struggle for religious liberty has through the centuries been an effort to accommodate the demands of the State to the conscience of the individual. The victory for freedom of thought recorded in our Bill of Rights recognizes that in the domain of conscience there is a moral power higher than the State. Throughout the ages, men have suffered death rather than subordinate their allegiance to God to the authority of the State. Freedom of religion guaranteed by the First Amendment is the product of that struggle.

*Girouard v. United States*, 328 U.S. at 68. We dare not sacrifice priceless American freedoms through misguided—or even well-intentioned—government efforts to broaden access to contraception. Pro-life advocates have not forfeited their right to conduct business in a manner consistent with their convictions.

### C.   No Person Has A Constitutional Right To *Free* Access Contraception. Accommodation Of A Private Employer's Conscience Poses No Threat To Any Employee's Legal Rights.

An employer does not impose its religion on employees merely by declining to finance contraception or abortion-producing drugs. No private party is obligated to directly facilitate or fund another party's rights. Employees are free to use contraception—what they cannot do is compel their employers to pay for it. An employer pays for an employee's time and services to the business. It does not monitor—let alone endorse—every purchase the *employee* decides to make. The Mandate requires the *employer* to pay premiums that ensure *free* access to morally objectionable drugs and services.

19

Even the government is not obligated to finance contraception or abortion. On the contrary, the state may prefer childbirth and allocate scarce resources accordingly. *Harris v. McRae,* 448 U.S. 297, 315 (1980); *Rust v. Sullivan*, 500 U.S. 173, 201 (1991). The government has "no affirmative duty to 'commit any resources to facilitating abortions.'" *Id.*, quoting *Webster v. Reprod. Health Servs.,* 492 U.S. 490, 511 (1989). *See also Bowen v. Kendrick,* 487 U.S. 589, 596-597 (1988) (the Adolescent Family Life Act restricts funding to "programs or projects which do not provide abortions or abortion counseling or referral"). The government's sole obligation is not to impose "undue interference" on abortion. *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846 (1992). Accommodation of a private employer's conscience imposes no burden on any employee's rights—but the Mandate does impose "undue interference" on the employer's constitutional rights.

Private individuals and organizations have an affirmative constitutional right to oppose abortion and decline to fund it, free of government intrusion. The government cannot impose a particular view of sexual morality on religious institutions and private entrepreneurs and coerce them to facilitate it. The Constitution bars any public official from prescribing orthodoxy in religion. *Barnette*, 319 U.S. at 642. The Mandate guts the First Amendment, brazenly exhibiting the "callous indifference" to religion never intended by the

Establishment Clause. *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984), citing *Zorach v. Clauson,* 343 U.S. 306, 314 (1952). The Constitution "affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." *Id.*

Some advocates argue that courts must balance conflicting interests and not necessarily accommodate religion where the rights of third parties are detrimentally affected. *Catholic Charities of Sacramento, Inc. v. Superior Court*, 32 Cal.4th 525, 565 (2004); *Catholic Charities of Diocese of Albany v. Seri*, 7 N.Y.3d 510, 518 (N.Y. 2006) (same). Some earlier free exercise cases did not implicate third party rights, so it was unnecessary to balance rights. *Sherbert v. Verner*, 374 U.S. 398 (and other unemployment cases); *Wisconsin v. Yoder*, 406 U.S. 205 (parental rights to educate children). In other cases, courts have denied religious exemptions where accommodation would endanger minor children and/or community health. *Reynolds v. United States*, 98 U.S. 145 (1878) (polygamy); *Prince v. Massachusetts*, 321 U.S. 158 (child labor); *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) (vaccination); *Walker v. Superior Court,* 47 Cal.3d 112 (1988) (parental failure to seek medical treatment for child). In these cases, the restriction on religious liberty was narrow and the religious conduct "invariably posed some substantial threat to public safety, peace or order." *Sherbert v. Verner*, 374 U.S. at 403. In other cases, courts have balanced conflicting rights. Sometimes the nature

and extent of infringement on the relevant rights is a key factor in the outcome. The Jaycees and Rotary lost free association claims because they could not show that admitting female members would actually hinder their organizational expression. *Roberts v. United States Jaycees*, 468 U.S. 609, 624 (1984); *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 548 (1987).

More recently, First Amendment rights to free association have trumped statutory anti-discrimination rights. *Hurley*, 515 U.S. 557; *Boy Scouts of Am. v. Dale*, 530 U.S. 640. This Court cannot brush aside Plaintiffs' conscientious objections to the Mandate without flouting these precedents. Protection of reproductive rights does not justify compelling employers to disregard their deepest convictions when operating a business or ministry—risking financial ruin or professional displacement. That is particularly true in the absence of any employee's right to free contraception financed by her employer.

### D. Other Cases Limiting Religious Freedom In The Commercial Sphere Left The Objector With A Viable Choice. The HHS Mandate Does Not.

Cases involving comparable legal mandates provide some avenue of escape:

- Religious charities required to include contraception in their prescription drug plan could simply discontinue drug coverage.

  - *Catholic Charities of Sacramento*, 32 Cal. 4th at 540 ("[T]he WCEA implicitly permits any employer to avoid covering contraceptives by not offering coverage for prescription drugs.);

- ○ *Catholic Charities of Diocese of Albany*, 7 N.Y.3d at 527 ("WHWA does not literally *compel* them to purchase contraceptive coverage for their employees, in violation of their religious beliefs; it only requires that policies that provide prescription drug coverage include coverage for contraceptives. ")

- The Ninth Circuit suggested that a religious school could discontinue its employee health insurance program altogether in order to comply with its religious conviction that only male employees should be offered this benefit. *EEOC v. Fremont Christian Sch.*, 781 F.2d 1362 (9th Cir. 1986).

- A religious school offering supplemental pay to heads of household could discontinue the program and maintain lower salaries for all employees. *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389 (4th Cir. 1990).

- A religious school could continue to operate, but without the benefits of tax-exempt status. *Bob Jones Univ. v. United States*, 461 U.S. at 603-604 ("Denial of tax benefits will inevitably have a substantial  impact on the operation of private religious schools, but will not prevent those schools from observing their religious tenets.")

- Students who object to using mandatory registration fees for student health insurance covering abortion could presumably enroll in another institution. *Goehring v. Brophy*, 94 F.3d 1294 (9th Cir. 1996); *Erzinger v. Regents of Univ. of Cal.*, 137 Cal. App. 3d 389 (Cal. Ct. App. 1982).

- Two plaintiffs who objected to the individual health insurance mandate could make the shared responsibility payment instead. *Mead v. Holder*, 766 F. Supp. 2d 16 (D.D.C. 2011), *aff'd, Seven-Sky v. Holder*, 661 F.3d 1, 42 (D.C. Cir. 2011).

These "solutions" are counter-productive, harming numerous third parties and restricting access to goods and services.  Elimination of medical insurances harms *all* employees, including the women who desired contraceptive coverage in

23

the *Catholic Charities* cases and the female employees in *Fremont Christian School*.

But these alternatives—undesirable as they are—pale in comparison to the draconian HHS Mandate, which leaves larger employers with virtually no escape hatch. As the D.C. District Court recently observed:

> Unlike the plaintiffs in *Mead*, the only alternative offered to the plaintiffs here is noncompliance with the contraceptive coverage mandate and its attendant risk of suit and enormous financial penalties. The availability of a reasonable alternative for the plaintiffs in *Mead* eliminated the pressure on them to violate their religious beliefs; the plaintiffs here have no such alternative, and therefore, the pressure to violate their religious beliefs remains undiminished.

*Tyndale*, at *46-47. Employers may avoid the Mandate only by cutting the work force—resulting in a loss of jobs and insurance benefits—contrary to the primary purpose of the Affordable Care Act. The Mandate will ultimately restrict access to goods and services and stall economic growth by forcing conscientious employers to restrict the size of their operations or shut down altogether.

## IV.  BELIEVERS DO NOT FORFEIT THEIR CONSTITUTIONAL RIGHTS WHEN THEY ENTER THE COMMERCIAL SPHERE.

The Mandate squeezes people of faith out of full participation in civic life. *Lessons From Pharaoh*, 39 Creighton L. Rev. at 561-563. Religion does not end where daily business begins. Moral precepts cannot be ejected from the public realm. If religion is shoved to the private fringes of life, constitutional guarantees ring hollow. *"God is Dead and We have Killed Him!"*, 1993 BYU L. Rev. at 176.

24

Some of the recent District Court decisions cite persuasive authority for protecting the religious freedom of individuals who conduct business in corporate form. *See, e.g.*, *Legatus v. Sebelius*, No. 2:12-cv-12061-RHC, 2012 U.S. Dist. LEXIS 156144, *12-13 (E.D. Mich. Oct. 31, 2012), citing *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1120 (9th Cir. 2009) and *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 619 (9th Cir. 1988) (closely held corporation may assert the religious rights of its owners). The Supreme Court's protection of corporate free speech rights also bolsters the argument. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 883 (2010); *First Nat'l Bank v. Bellotti,* 435 U.S. 765, 784 (1978).

## A. Free Exercise Cases Commonly Arise In The Context Of Commercial Activity.

The state actively regulates commerce but has minimal control over the internal affairs of religious entities. Conflicts between religion and regulation typically occur in commercial settings:

- *Braunfeld v. Brown,* 366 U.S. 599 (1961) (Sunday closing);
- *Sherbert v. Verner,* 374 U.S. 398  (and other unemployment cases);
- *United States v. Lee*, 455 U.S. 252 (1982) (Amish business);
- *Roberts v. United States Jaycees*, 468 U.S. 609 (commercial association);
- *Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290 (1985);
- *State ex rel. McClure v. Sports & Health Club, Inc.,* 370 N.W.2d 844, 853 (Minn. 1985) (hiring);
- *Rasmussen v. Glass,* 498 N.W.2d 508 (food delivery);
- *Swanner v. Anchorage Equal Rights Comm'n,* 874 P.2d 274 (Alaska 1994) (housing);
- *Attorney Gen. v. Desilets*, 418 Mass. 316, 636 N.E.2d 233 (1994) (same);
- *Catholic Charities of Sacramento*, 32 Cal.4th at 565.

Some claimants succeeded (*Sherbert, Rasmussen, Desilets*), while others did not (*Braunfeld, Lee, Roberts, Alamo Found., McClure, Swanner, Catholic Charities*). The "commercial" factor does not dictate the outcome.

> *But with the advent of the draconian HHS Mandate to finance contraception and abortion-inducing drugs, even the church sanctuary provides no safe haven from the strong arm of the state*.

*United States v. Lee* is often cited to oppose religious exemptions in the commercial sphere. *Catholic Charities of Sacramento,* 32 Cal.4th at 565. But *Lee* does not hold that believers forfeit their constitutional rights in the business world. Note the context of the often cited language:

> Congress and the courts have been sensitive to the needs flowing from the Free Exercise Clause, but *every* person cannot be shielded from *all* the burdens incident to exercising *every* aspect of the right to practice religious beliefs. When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.

*United States v. Lee*, 455 U.S. at 261 (emphasis added). Religious freedom is more limited in the commercial realm—but not abrogated altogether.

## B.    The Government Discriminates *Against* Employers Who Hold Conscientious Objections To Contraception.

The Mandate's onerous financial penalties threaten the livelihood of employers, like Plaintiffs, who cannot in good conscience comply. But "[n]o

person can be punished for entertaining or professing religious beliefs or disbeliefs...." *Everson v. Bd. of Educ. of Ewing*, 330 U.S. 1, 15-16 (1947). A citizen may not be excluded from a profession by unconstitutional criteria. *Baird v. State Bar of Arizona*, 401 U.S. 1, 6-7 (1971) (attorney); *Keyishian v. Bd. of Regents*, 385 U.S. 589, 607 (1967) (professor). **This is itself a form of discrimination**. It is equally unconstitutional to jeopardize a citizen's livelihood, regardless of the business form—sole proprietorship, partnership, or corporation. This Court has a "duty to guard and respect that sphere of inviolable conscience and belief which is the mark of a free people." *Lee v. Weisman*, 505 U.S. 577, 592 (1992). The Establishment Clause demands government neutrality so that each religious creed may "flourish according to the zeal of its adherents and the appeal of its dogma." *Zorach v. Clauson*, 343 U.S. at 313. The Framers intentionally protected "the integrity of individual conscience in religious matters." *McCreary County, KY v. ACLU*, 545 U.S. 844, 876 (2005).

## V.    IRONICALLY, THE MANDATE WEAKENS CONSTITUTIONAL PROTECTION FOR EVERYONE—INCLUDING THOSE WHO ADVOCATE IMPOSING IT ON UNWILLING PRIVATE EMPLOYERS.

The right to freely access contraception and abortion is a relatively recent judicial development. Advocates accomplished this dramatic social and political transformation by exercising rights to free speech, press, association, and the political process generally. The status of various minority groups has improved

dramatically because the Constitution guarantees free expression and facilitates the advocacy of new ideas. *Defending the First Amendment From Antidiscrimination*, 82 N.C. L. Rev. at 232. But no group can demand for itself what it would deny to others—otherwise, the constitutional foundation will crumble and all Americans will suffer. Overly aggressive assertion of particular rights can erode protection for other liberties. Here, the Mandate directly attacks the freedom of employers who object to contraception and/or abortion. The rights of women to access reproductive services do not trump the rights of everyone else, particularly since no person has a right to coerced funding from either public or private sources.

This Court needs to preserve the constitutional liberties guaranteed to *all* citizens. Americans who want to expand their own civil rights must grant equal respect to opponents—not crush them with debilitating legal penalties:

> The price of freedom of religion or of speech or of the press is that we must put up with, and even pay for, a good deal of rubbish.

*United States v. Ballard*, 322 U.S. 78, 95 (1944).

> If Americans are going to preserve their civil liberties...they will need to develop thicker skin. One price of living in a free society is toleration of those who intentionally or unintentionally offend others. The current trend, however, is to give offended parties a legal remedy, as long as the offense can be construed as "discrimination." ... Preserving liberalism, and the civil liberties that go with it, requires a certain level of virtue by the citizenry. Among those necessary virtues is tolerance of those who intentionally or unintentionally offend, and sometimes, when civil liberties are implicated, who blatantly discriminate. A society that undercuts civil liberties in pursuit of the "equality" offered by a statutory right to be free

28

> from all slights will ultimately end up with neither equality nor civil liberties.

*Defending the First Amendment From Antidiscrimination*, 82 N.C. L. Rev. at 245.

This principle cuts across all viewpoints and all constitutional rights. The First Amendment protects a broad spectrum of expression, popular or not. In fact, the increasing popularity of an idea makes it all the more essential to protect dissenting voices. *Boy Scouts of Am. v. Dale*, 530 U.S. at 660. Censorship spells death for a free society. "Once used to stifle the thoughts that we hate...it can stifle the ideas we love." *Gay Alliance of Students v. Matthews*, 544 F.2d 162, 167-168 (4th Cir. 1976). Justice Black said it well in a case about the Communist Party, which advocated some of the most dangerous ideas of the twentieth century:

> "I do not believe that it can be too often repeated that the freedoms of speech, press, petition and assembly guaranteed by the First Amendment must be accorded to the ideas we hate or sooner or later they will be denied to the ideas we cherish." *Communist Party v. SACB,* 367 U.S. 1, 137 (dissenting opinion) (1961).

*Healy v. James*, 408 U.S. 169, 187-188 (1972). *Healy* is about association rights—not reproductive rights. But upholding the Mandate will not ultimately advance the cause of any group seeking enhanced constitutional protection. On the contrary, the liberty of all Americans will suffer irreparable harm if a judicially manufactured right to coerced *funding* of reproductive rights is allowed to stifle rights of religion and conscience. Non-discrimination principles should never be

applied in a discriminatory, unequal manner that squelches the First Amendment rights of others.

## CONCLUSION

This Court should affirm the District Court ruling.

Dated:  February 15, 2013                    Respectfully submitted,


 /s/ Deborah J. Dewart                
Deborah J. Dewart NC Bar No. 30602
620 E. Sabiston Drive
Swansboro, NC    28584-9674
Telephone:  (910) 326-4554
Facsimile:   (877) 326-4585
E-mail:       debcpalaw@earthlink.net

*Counsel for Amicus Curiae*
*Liberty, Life, and Law Foundation*

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(d) because:

This brief contains 6,898 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), as calculated by the word-counting function of Microsoft Office 2010.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point Times New Roman.


DATED:    February 15, 2013        /s/ Deborah J. Dewart
                                   Deborah J. Dewart
                                   Counsel for *Amici Curiae*
                                   *Liberty, Life, and Law Foundation*

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2013, I electronically filed the foregoing *amici curiae* brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


DATED:     February 15, 2013          /s/ Deborah J. Dewart
                                      Deborah J. Dewart
                                      Counsel for *Amici Curiae*
                                      *Liberty, Life, and Law Foundation*

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made;

(2) the hard copies submitted to the clerk are exact copies of the ECF submission;

(3) The digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, Symantec Endpoint Protection, v.12.1.1000.157 RU1, updated February 15, 2013, and according to the program is free of viruses.

DATED:     February 15, 2013            /s/Deborah J. Dewart_____
                                        Deborah J. Dewart
                                        Counsel for *Amici Curiae*

33

**Deborah J. Dewart, Attorney**

| | |
|---|---|
| **From:** | Kyle Duncan [kduncan@becketfund.org] |
| **Sent:** | Monday, January 07, 2013 9:36 AM |
| **To:** | Deborah J. Dewart, Attorney; michelle.bennett@usdoj.gov |
| **Subject:** | RE: Amicus Request Hobby Lobby 10th Cir. 12-6294 |

Deborah,

The appellants consent to your filing.

Thanks,
Kyle

---

**From:** Deborah J. Dewart, Attorney [mailto:debcpalaw@earthlink.net]
**Sent:** Monday, January 07, 2013 9:34 AM
**To:** Kyle Duncan; michelle.bennett@usdoj.gov
**Subject:** Amicus Request Hobby Lobby 10th Cir. 12-6294

Counsel:

I represent Liberty, Life, and Law Foundation, a non-profit entity interested in filing an amicus brief in *Hobby Lobby Stores v. Sebelius*, Tenth Circuit Case No. 12-6294. We are supporting Plaintiff-Appellants, and we are writing to seek the required consent letters. We are aware that the Appellant's Opening Brief is due on February 11, 2013, and our amicus brief will be timely filed on February 18, 2013.

Thank you for your prompt response.

Deborah J. Dewart

**Deborah J. Dewart**
**Attorney at Law**
**North Carolina, California, U.S. Supreme Court**
**All Federal Circuits**
**620 E. Sabiston Drive**
**Swansboro, NC   28584-9674**
**(910) 326-4554 telephone**
**(877) 326-4585 facsimile**

1

**Deborah J. Dewart, Attorney**

| | |
|---|---|
| **From:** | Klein, Alisa (CIV) [Alisa.Klein@usdoj.gov] |
| **Sent:** | Monday, January 07, 2013 10:54 AM |
| **To:** | Bennett, Michelle (CIV); Deborah J. Dewart, Attorney; kduncan@becketfund.org |
| **Subject:** | RE: Amicus Request Hobby Lobby 10th Cir. 12-6294 |

Deborah, you have our consent in Hobby Lobby too (as well as Newland).

Alisa

**From:** Bennett, Michelle (CIV)
**Sent:** Monday, January 07, 2013 10:50 AM
**To:** Deborah J. Dewart, Attorney; kduncan@becketfund.org
**Cc:** Klein, Alisa (CIV)
**Subject:** RE: Amicus Request Hobby Lobby 10th Cir. 12-6294

Deborah,

Alisa Klein will be handling this case on appeal for defendants. I have copied her here so she can respond to your request.

Thanks,
Michelle

**From:** Deborah J. Dewart, Attorney [mailto:debcpalaw@earthlink.net]
**Sent:** Monday, January 07, 2013 9:34 AM
**To:** kduncan@becketfund.org; Bennett, Michelle (CIV)
**Subject:** Amicus Request Hobby Lobby 10th Cir. 12-6294

Counsel:

I represent Liberty, Life, and Law Foundation, a non-profit entity interested in filing an amicus brief in *Hobby Lobby Stores v. Sebelius*, Tenth Circuit Case No. 12-6294. We are supporting Plaintiff-Appellants, and we are writing to seek the required consent letters. We are aware that the Appellant's Opening Brief is due on February 11, 2013, and our amicus brief will be timely filed on February 18, 2013.

Thank you for your prompt response.

Deborah J. Dewart

**Deborah J. Dewart**
**Attorney at Law**
**North Carolina, California, U.S. Supreme Court**
**All Federal Circuits**
**620 E. Sabiston Drive**
**Swansboro, NC   28584-9674**