[ORAL ARGUMENT REQUESTED]

No. 12-6294

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

---

HOBBY LOBBY STORES, INC.; MARDEL, INC.; DAVID GREEN; BARBARA GREEN; STEVE GREEN; MART GREEN; and DARSEE LETT,

Plaintiffs-Appellants,

v.

KATHLEEN SEBELIUS, in her official capacity as Secretary of Health and Human Services, *et al.*,

Defendants-Appellees.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA (No. 5:12-cv-01000) (Hon. Joe Heaton)

---

**BRIEF FOR THE APPELLEES**

---

STUART F. DELERY
*Principal Deputy Assistant Attorney General*

SANFORD C. COATS
*United States Attorney*

BETH S. BRINKMANN
*Deputy Assistant Attorney General*

MARK B. STERN
ALISA B. KLEIN
*(202) 514-1597*
*Attorneys, Appellate Staff*
*Civil Division, Room 7235*
*U.S. Department of Justice*
*950 Pennsylvania Ave., N.W.*
*Washington, D.C. 20530*

## TABLE OF CONTENTS

**Page**


STATEMENT OF JURISDICTION....................................................................1

STATEMENT OF THE ISSUES....................................................................1

STATEMENT OF THE CASE....................................................................1

STATEMENT OF FACTS....................................................................3

A. Statutory and Regulatory Background....................................................................3

B. Factual Background and District Court Proceedings....................................................................8

SUMMARY OF ARGUMENT....................................................................10

STANDARD OF REVIEW....................................................................14

ARGUMENT....................................................................15

I. RFRA Does Not Allow A For-Profit, Secular Corporation To Deny Employee Benefits On The Basis Of Religion....................................................................16

A. Hobby Lobby Is Not A Person Engaged In The Exercise Of Religion Within The Meaning Of RFRA....................................................................17

B. The Obligation To Cover Contraceptives Lies With The Hobby Lobby Plan, Not With The Corporations' Shareholders....................................................................23

C. Decisions That Employees Make About How To Use Their Compensation Cannot Properly Be Attributed To The Corporation Or Its Shareholders....................................................................29

D. The Contraceptive-Coverage Requirement Is Narrowly Tailored To Advance Compelling Governmental Interests....................................................................34

II. Plaintiffs Fail To State A Claim Under The First Amendment....................................................................41

CONCLUSION........................................................................................................47

REQUEST FOR ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE WITH
FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases:** **Page**

*Abdullhaseeb v. Calbone*,
600 F.3d 1301 (10th Cir. 2010) ........................................................28

*Annex Medical, Inc. v. Sebelius*,
__ F. Supp. __, 2013 WL 101927 (D. Minn. Jan. 8, 2013),
*appeal pending*, No. 13-1118 (8th Cir.) ................................................33

*Attorney Gen. of Okla. v. Tyson Foods, Inc.*,
565 F.3d 769 (10th Cir. 2009) ..........................................................15

*Autocam Corp. v. Sebelius*,
No. 12-2673 (6th Cir. Dec. 28, 2012) ....................................................33

*Autocam Corp. v. Sebelius*,
2012 WL 6845677 (W.D. Mich. Dec. 24, 2012),
*appeal pending*, No. 12-2673 (6th Cir.) ....................................10, 12, 13, 23, 24,
25, 26, 29, 30, 33

*Board of Regents of Univ. of Wis. Sys. v. Southworth*,
529 U.S. 217 (2000) ...........................................................................31

*Braunfeld v. Brown*,
366 U.S. 599 (1961) ...........................................................................28

*Briscoe v. Sebelius*,
No. 13-285 (D. Colo. Feb. 27, 2013) ..............................................22, 33

*Catholic Charities of Sacramento, Inc. v. Superior Court*,
85 P.3d 67 (Cal. 2004)....................................................................41, 46

*Cedric Kushner Promotions, Ltd. v. King*,
533 U.S. 158 (2001) ...........................................................................24

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ..........................................................15

*Chicano Police Officer's Ass'n v. Stover*,
526 F.2d 431 (10th Cir. 1975), *vacated on other grounds*,
426 U.S. 944 (1976) ....................................................................28

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ....................................................................20, 42, 44

*Citizens United v. FEC*,
130 S. Ct. 876 (2010)....................................................................18

*City of Boerne v. Flores*,
521 U.S. 507 (1997) ....................................................................11, 16

*Colorado Christian University v. Weaver*,
534 F.3d 1245 (10th Cir. 2008)....................................................................46

*Conestoga Wood Specialties Corp. v. Sebelius*,
__ F. Supp. 2d __, 2013 WL 140110 (E.D. Pa. Jan. 11, 2013),
*appeal pending*, No. 13-1144 (3d Cir.) ....................................................................10, 26, 33

*Conestoga Wood Specialties Corp. v. Sebelius*,
No. 13-1144 (3d Cir. Feb. 7, 2013) ....................................................................12, 22, 33

*Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*,
483 U.S. 327 (1987) ....................................................................19, 20, 23

*DeArment v. Harvey*,
932 F.2d 721 (8th Cir. 1991)....................................................................33

*Donovan v. Tony & Susan Alamo Foundation*,
722 F.2d 397 (8th Cir. 1984), *aff'd*, 471 U.S. 290 (1985)....................................................................33

*EEOC v. Townley Eng'g & Mfg. Co.*,
859 F.2d 610 (9th Cir. 1988)....................................................................28

*Eisenstadt v. Baird*,
405 U.S. 438 (1972) ....................................................................34, 35

*Employment Div., Dep't of Human Resources of Ore. v. Smith*,
494 U.S. 872 (1990) ....................................................................17, 41

*Fraternal Order of Police v. City of Newark*,
170 F.3d 359 (3d Cir. 1999) ....................................................................44

*Gilardi v. Sebelius*,
No. 13-104 (D.D.C. March 3, 2013),
*appeal pending*, No. 13-5069 (D.C. Cir.) ............................. 10, 25, 26, 27, 28, 33

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006) ....................................................................20

*Griswold v. Connecticut*,
381 U.S. 479 (1965) ....................................................................34, 35

*Grote Industries, LLC v. Sebelius*,
__ F. Supp. 2d __, 2012 WL 6725905 (S.D. Ind. Dec. 27, 2012),
*appeal pending*, No. 13-1077 (7th Cir.) ....................................................10, 33

*Grote v. Sebelius*,
__ F.3d __, 2013 WL 362725 (7th Cir. Jan. 30, 2013) ......................13, 14, 24, 25
30, 32, 33

*Heideman v. South Salt Lake City*,
348 F.3d 1182 (10th Cir. 2003) ....................................................................15

*Hobby Lobby Stores, Inc. v. Sebelius*,
133 S. Ct. 641 (2012) (Sotomayor, J., in chambers) ..............................2, 9, 26, 27

*Hobby Lobby Stores, Inc. v. Sebelius*,
870 F. Supp. 2d 1278 (W.D. Okla. 2012),
*appeal pending*, No. 12-6294 (10th Cir.) ...................................2, 9, 22, 34, 42, 45

*Hobby Lobby Stores, Inc. v. Sebelius*,
No. 12-6294, 2012 WL 6930302 (10th Cir. Dec. 20, 2012) ..........................15, 32

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
132 S. Ct. 694 (2012) ....................................................................12, 18, 19, 20

*Kennedy v. St. Joseph's Ministries, Inc.*,
657 F.3d 189 (4th Cir. 2011) ....................................................................20

*Korte v. HHS*,
__ F. Supp. 2d __, 2012 WL 6553996 (S.D. Ill. Dec. 14, 2012),
*appeal pending*, No. 12-3841 (7th Cir.) ............................................33, 42, 43, 45

*LeBoon v. Lancaster Jewish Community Center Ass'n*,
503 F.3d 217 (3d Cir. 2007) ......................................................................20

*Legatus v. Sebelius*,
__ F. Supp. 2d __, 2012 WL 5359630 (Oct. 31, 2012),
*appeal pending*, No. 13-1092 (6th Cir.) ........................................................40, 43

*Little v. Jones*,
607 F.3d 1245 (10th Cir. 2010) ...................................................................14

*McNeilly v. Land*,
684 F.3d 611 (6th Cir. 2012) ......................................................................15

*Mead v. Holder*,
766 F. Supp. 2d 16 (D.D.C. 2011), *aff'd*, *Seven-Sky v. Holder*,
661 F.3d 1 (D.C. Cir. 2011), *cert. denied*, 133 S. Ct. 63 (2012)..........................35

*Mitchell v. Helms*,
530 U.S. 793 (2000) ...................................................................................21

*Newland v. Sebelius*,
No. 12-1380 (10th Cir.) .................................................................................2

*NLRB v. Catholic Bishop of Chicago*,
440 U.S. 490 (1979) ...................................................................................19

*O'Brien v. HHS*,
__F. Supp. 2d __, 2012 WL 4481208 (E.D. Mo. Sept. 28, 2012),
*appeal pending*, No. 12-3357 (8th Cir.) ..........................................10, 14, 33, 42,
43, 44, 45, 46

*Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*,
450 F.3d 1295 (11th Cir. 2006) ...................................................................20

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) ....................................................................................36

*RoDa Drilling Co. v. Siegal*,
552 F.3d 1203 (10th Cir. 2009)....................................................................15

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) ....................................................................................31

*Sautbine v. Keller*,
423 P.2d 447 (Okla. 1966) ..........................................................................24

*Seitsinger v. Dockum Pontiac Inc.*,
894 P.2d 1077 (Okla. 1995) ........................................................................24

*Sherbert v. Verner*,
374 U.S. 398 (1963) ...............................................................................17, 27

*Spencer v. World Vision, Inc.*,
633 F.3d 723 (9th Cir. 2011)...................................................................20, 21

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009).....................................................................28

*Thomas v. Review Board*,
450 U.S. 707 (1981) ....................................................................................27

*Torco Oil Co. v. Innovative Thermal Corp.*,
763 F. Supp. 1445 (N.D. Ill. 1991)..........................................................13, 25

*United States v. Lee*,
455 U.S. 252 (1982) ...........................................................................26, 27, 44

*United States v. SCRAP*,
412 U.S. 669 (1973) ....................................................................................28

*Universidad Central de Bayamon v. NLRB*,
793 F.2d 383 (1st Cir. 1985) .......................................................................21

*University of Great Falls v. NLRB*,
278 F.3d 1335 (D.C. Cir. 2002)....................12, 20, 21

*Walz v. Tax Commission of the City of New York*,
397 U.S. 664 (1970) ....................45

*Winter v. Natural Res. Def. Council*,
555 U.S. 7 (2008) ....................15

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) ....................17, 27

*Zelman v. Simmons-Harris*,
536 U.S. 639 (2002) ....................30, 31

**Statutes:**

1 U.S.C. § 1....................18

26 U.S.C. § 45R ....................39

28 U.S.C. § 1292(a)(1)....................1

28 U.S.C. § 1331....................1

29 U.S.C. § 201 et seq....................3

29 U.S.C. § 1001 et seq....................3

29 U.S.C. § 1185d....................4

42 U.S.C. § 300gg-13....................4, 35, 39

42 U.S.C. § 300gg-13(a)(1) ....................4

42 U.S.C. § 300gg-13(a)(2) ....................4

42 U.S.C. § 300gg-13(a)(3) ....................4

42 U.S.C. § 300gg-13(a)(4) ....................4

42 U.S.C. § 2000e et seq....3

42 U.S.C. § 2000e-1(a)....19

42 U.S.C. § 2000bb(b)(1)....17

42 U.S.C. § 2000bb-1(a)....12, 16, 29

42 U.S.C. § 2000bb-1(b)....16, 34

42 U.S.C. § 12113(d)(1)....19

42 U.S.C. § 12113(d)(2)....19

42 U.S.C. § 18011....39

**Regulations:**

45 C.F.R. § 46.202(f)....9

45 C.F.R. § 147.130(a)(1)(iv)(B)....6, 44

45 C.F.R. § 147.140(g)....40

62 Fed. Reg. 8610 (Feb. 25, 1997)....9

75 Fed. Reg. 34,538 (June 17, 2010)....39

77 Fed. Reg. 8725 (Feb. 15, 2012)....6, 37, 38

78 Fed. Reg. 8456 (Feb. 6, 2013)....7, 44, 45

**Legislative Materials:**

139 Cong. Rec. S14350-01 (daily ed. Oct. 26, 1993)........................................16, 17

146 Cong. Rec. S7774–01 (daily ed. July 27, 2000)................................................17

155 Cong. Rec. S12021-02 (daily ed. Dec. 1, 2009)................................................43

155 Cong. Rec. S12106-02 (daily ed. Dec. 2, 2009)..........................................36, 37

155 Cong. Rec. S12265 (daily ed. Dec. 3, 2009) ......................................................43

## STATEMENT OF RELATED APPEALS

This case presents the question whether, under the Religious Freedom Restoration Act, a for-profit corporation may deny its employees federally required health insurance benefits, if the corporation's controlling shareholders assert a religious objection to providing such employee benefits. The same issue is pending before this Court in *Newland v. Sebelius*, No. 12-1380 (10th Cir.), and before other courts of appeals in the following cases:

*Conestoga Wood Specialties Corp. v. Sebelius*, No. 13-1144 (3d Cir.);

*Autocam Corp. v. Sebelius*, No. 12-2673 (6th Cir.);

*Legatus v. Sebelius*, No. 13-1092 (6th Cir.);

*Korte v. HHS*, No. 12-3841 (7th Cir.);

*Grote Industries, LLC v. Sebelius*, No. 13-1077 (7th Cir.);

*Triune Health Group, Inc. v. Sebelius*, No. 13-1478 (7th Cir.);

*O'Brien v. HHS*, No. 12-3357 (8th Cir.);

*Annex Medical, Inc. v. Sebelius*, No. 13-1118 (8th Cir.);

*Gilardi v. Sebelius*, No. 13-5069 (D.C. Cir.).[1]

---

[1] The *Gilardi* plaintiffs argued that *Gilardi* and *Tyndale House Publishers, Inc. v. Sebelius*, __ F. Supp. 2d __, 2012 WL 5817323 (D.D.C. Nov. 16, 2012), *appeal pending*, No. 13-5018 (D.C. Cir.), should be treated as related cases, but the district court rejected that contention.

## GLOSSARY

| | |
|---|---|
| FDA | Food and Drug Administration |
| HHS | U.S. Department of Health and Human Services |
| HRSA | Health Resources and Services Administration |
| IUD | Intrauterine device |
| RFRA | Religious Freedom Restoration Act |

## STATEMENT OF JURISDICTION

The district court has jurisdiction under 28 U.S.C. § 1331. The court denied a preliminary injunction on November 19, 2012. Plaintiffs filed a notice of appeal the same day. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the Religious Freedom Restoration Act ("RFRA") claim fails because RFRA does not allow a for-profit, secular corporation to deny federally required employee benefits on the basis of religion.

2. Whether the First Amendment claim fails because the contraceptive-coverage requirement is a neutral requirement of general applicability.

## STATEMENT OF THE CASE

**1.** Plaintiffs are the for-profit corporations Hobby Lobby Stores, Inc., and Mardel, Inc., (collectively, "Hobby Lobby") and the controlling shareholders of these corporations (collectively, "the Greens"). Hobby Lobby operates hundreds of retail stores throughout the nation and has more than 13,000 full-time employees. Hobby Lobby employees receive health coverage for themselves and their family members through the Hobby Lobby group health plan, as part of their compensation packages that include wages and non-wage benefits.

The Greens allege that they regard certain forms of contraception as contrary to their religious beliefs. The corporations, however, do not hire employees on the

basis of their religion, and the employees thus are not required to share the religious beliefs of the Greens.

In this action, Hobby Lobby and the Greens contend that, under RFRA and the Free Exercise Clause of the First Amendment, the Hobby Lobby group health plan is entitled to an exemption from the federal regulatory requirement that the plan cover all forms of Food and Drug Administration ("FDA")-approved contraceptives, as prescribed by a health care provider. The district court denied plaintiffs' request for a preliminary injunction, holding that plaintiffs failed to establish a likelihood of success on the merits of their claims. *See Hobby Lobby Stores, Inc. v. Sebelius*, 870 F. Supp. 2d 1278 (W.D. Okla. 2012).

This Court denied plaintiffs' motion for an injunction pending appeal. *See* No. 12-6294, 12/20/12 Order (Lucero and Ebel, JJ.). Plaintiffs then applied to the Supreme Court for an injunction pending appeal, which was denied by Justice Sotomayor. *See Hobby Lobby Stores, Inc. v. Sebelius*, 133 S. Ct. 641 (2012) (Sotomayor, J., in chambers).[1]

[1] The same issue is pending before this Court in *Newland v. Sebelius*, No. 12-1380 (10th Cir.), and is also pending before other circuits. *See* Statement of Related Appeals, *supra*.

## STATEMENT OF FACTS

### A. Statutory and Regulatory Background

**1.** Federal law regulates many aspects of the employer-employee relationship, including wages and non-cash benefits. In addition to regulating wages and overtime pay in the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., Congress has regulated employee benefits such as group health plans, pension plans, disability benefits, and life insurance benefits through the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., and other statutes. Under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., an employer cannot discriminate on the basis of religion in setting the terms or conditions of employment, including employee compensation, unless the employer qualifies for Title VII's religious exemption.

The federal government heavily subsidizes the form of employee compensation that is provided through employment-based group health plans. Most notably, employees typically do not pay taxes on their employer's contributions to their health coverage, which are generally excluded from taxable compensation. *See* Congressional Budget Office, *Key Issues in Analyzing Major Health Insurance Proposals* 30 (2008). These federal tax subsidies totaled $246 billion in 2007. *See id*. at 31. As a result of this longstanding federal support, employment-based group health plans are by far the predominant form of private

health coverage. In 2009, employment-based plans covered about 160 million people. *See id*. at 4 & Table 1-1.

Congress has long regulated employment-based group health plans, and, in 2010, the Patient Protection and Affordable Care Act ("Affordable Care Act") established certain additional minimum standards for such plans. As relevant here, the Affordable Care Act provides that a non-grandfathered plan must cover certain preventive health services without cost-sharing, that is, without requiring plan participants and beneficiaries to make co-payments or pay deductibles. *See* 42 U.S.C. § 300gg-13. This provision applies to employment-based group health plans covered by ERISA. *See* 29 U.S.C. § 1185d.

These preventive health services include immunizations recommended by the Advisory Committee on Immunization Practices, *see id*. § 300gg-13(a)(2); items or services that have an "A" or "B" rating from the U.S. Preventive Services Task Force, *see id*. § 300gg-13(a)(1); preventive care and screenings for infants, children and adolescents as provided in guidelines of the Health Resources and Services Administration ("HRSA"), a component of the Department of Health and Human Services ("HHS"), *see id*. § 300gg-13(a)(3); and certain additional preventive services for women as provided in HRSA guidelines, *see id*. § 300gg-13(a)(4). The preventive health services coverage provision requires coverage of a

wide array of recommended services such as immunizations, cholesterol screening, blood pressure screening, mammography, and cervical cancer screening.[2]

**2.** When the Affordable Care Act was enacted, there were no existing HRSA guidelines relating to preventive care and screening for women. Accordingly, HHS asked the Institute of Medicine ("Institute" or "IOM") to develop recommendations to help the Departments implement this aspect of the preventive health services coverage requirement. *See* Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* 2 (2011) ("IOM Report").[3]

Consistent with the Institute's recommendations, the guidelines developed by HRSA ensure coverage for annual well-woman visits, screening for gestational diabetes, human papillomavirus testing, counseling for sexually transmitted infections, HIV counseling and screening, breastfeeding support and supplies, and

---

[2] Coverage is also required for services such as colorectal cancer screening, alcohol misuse counseling, screening for iron deficiency anemia, bacteriuria screening for pregnant women, breastfeeding counseling, screening for sexually transmitted infections, depression screening for adolescents, hearing loss screening for newborns, tobacco use counseling and interventions, and vision screening for young children. *See generally* http://www.cdc.gov/vaccines/pubs/ACIP-list.htm; http://www.uspreventiveservicestaskforce.org/uspstf/uspsabrecs.htm; http://brightfutures.aap.org/pdfs/Guidelines_PDF/20-Appendices_PeriodicitySchedule.pdf.

[3] The Institute of Medicine, which was established by the National Academy of Sciences in 1970, is funded by Congress to provide expert advice to the federal government on matters of public health. *See* IOM Report iv.

domestic violence counseling.[4] In addition, the guidelines require coverage for "'[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity,' as prescribed by a provider." 77 Fed. Reg. 8725 (Feb. 15, 2012) (quoting the guidelines). FDA-approved contraceptive methods include oral contraceptive pills, diaphragms, injections and implants, emergency contraceptive drugs, and intrauterine devices ("IUDs").[5]

The implementing regulations authorize an exemption from the contraceptive-coverage requirement for the group health plan of any organization that qualifies as a religious employer. In their current form, the regulations define a religious employer as an organization that (1) has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a non-profit organization described in a provision of the Internal Revenue Code that refers to churches, their integrated auxiliaries, conventions or associations of churches, and to the exclusively religious activities of any religious order. *See* 45 C.F.R. § 147.130(a)(1)(iv)(B).

---

[4] *See* HRSA, Women's Preventive Services: Required Health Plan Coverage Guidelines, *available at* http://www.hrsa.gov/womensguidelines.

[5] *See* Birth Control Guide, FDA Office of Women's Health, *available at* http://www.fda.gov/downloads/ForConsumers/ByAudience/ForWomen/FreePublications/UCM282014.pdf (last updated Aug. 2012).

The Departments that issued the preventive health services coverage regulations have proposed an amendment that would simplify the exemption by eliminating the first three requirements set out above and clarify that the exemption is available to all non-profit organizations that fall within the scope of the relevant Internal Revenue Code provision. *See* 78 Fed. Reg. 8456, 8461 (Feb. 6, 2013) (notice of proposed rulemaking). In addition, the Departments have set out proposals to accommodate religious objections to the provision of contraceptive coverage that have been raised by other non-profit, religious organizations. *See id*. at 8461-62.

The proposed accommodations do not extend to for-profit, secular corporations such as the plaintiff corporations in this case. *See id*. at 8462. The Departments explained that "[r]eligious accommodations in related areas of federal law, such as the exemption for religious organizations under Title VII of the Civil Rights Act of 1964, are available to nonprofit religious organizations but not to for-profit secular organizations." *Ibid*. Consistent with this longstanding federal law, the Departments proposed to limit the definition of organizations eligible for the accommodations "to include nonprofit religious organizations, but not to include for-profit secular organizations." *Ibid*.

### B. Factual Background and District Court Proceedings

**1.** Hobby Lobby Stores, Inc., is a for-profit, Oklahoma corporation that operates retail craft stores throughout the country. *See* Verified Complaint ¶ 2 (JA 13a). Mardel, Inc., is a for-profit bookstore and educational supply company headquartered in Oklahoma. *See id*. ¶ 3 (JA 13a). Hobby Lobby Stores, Inc., operates more than 500 retail stores in more than 40 states and has more than 13,000 full-time employees. *See id*. ¶ 2 (JA 13a). Mardel, Inc., operates 35 stores in seven states and has 372 full-time employees. *See id*. ¶ 3 (JA 13a).

The Greens are individuals who, through various trusts, together hold a controlling interest in the corporations. *See id*. ¶ 2 (JA 31a). The Greens allege that certain FDA-approved contraceptives are contrary to their religious beliefs. *See id*. ¶¶ 107-108 (JA 35a). The corporations, however, do not hire employees on the basis of their religion, and the employees thus are not required to share the religious beliefs of the Greens. *See id*. ¶ 51 (JA 25a-26a) ("Hobby Lobby welcomes employees of all faiths or no faith").

The Hobby Lobby group health plan provides health coverage as one of the non-cash benefits that Hobby Lobby employees receive as part of their compensation packages. *See id*. ¶ 52 (JA 26a). "Recently, after learning about the nationally prominent HHS mandate controversy, Hobby Lobby re-examined its insurance policies," discovered that its policies covered certain FDA-approved

contraceptives to which the Greens object, and proceeded to exclude those contraceptives from the Hobby Lobby plan. *Id*. ¶ 55 (JA 26a-27a).

In this action, Hobby Lobby and the Greens contend that, under RFRA and the First Amendment, the Hobby Lobby group health plan must be exempted from the requirement to cover all forms of FDA-approved contraceptives, as prescribed by a health care provider. The exemption that plaintiffs demand would encompass certain IUDs and the drugs Plan B and Ella. *See id*. ¶¶ 107-108 (JA 35a).[6]

**2.** The district court denied plaintiffs' motion for a preliminary injunction, holding that plaintiffs failed to establish a likelihood of success on their RFRA or First Amendment claim. *See Hobby Lobby Stores, Inc. v. Sebelius*, 870 F. Supp. 2d 1278 (W.D. Okla. 2012). This Court denied plaintiffs' motion for an injunction pending appeal. *See* No. 12-6294, 12/20/12 Order (Lucero and Ebel, JJ.). Plaintiffs then applied to the Supreme Court for an injunction pending appeal, which was denied by Justice Sotomayor. *See Hobby Lobby Stores, Inc. v. Sebelius*, 133 S. Ct. 641 (2012) (Sotomayor, J., in chambers).

---

[6] Although plaintiffs describe IUDs, Plan B, and Ella as abortion-causing devices and drugs, *see* Verified Complaint ¶¶ 106-108 (JA 35a), these devices and drugs are not abortifacients within the meaning of federal law. *See*, *e.g.*, 62 Fed. Reg. 8610, 8611 (Feb. 25, 1997) ("Emergency contraceptive pills are not effective if the woman is pregnant; they act by delaying or inhibiting ovulation, and/or altering tubal transport of sperm and/or ova (thereby inhibiting fertilization), and/or altering the endometrium (thereby inhibiting implantation)."); 45 C.F.R. § 46.202(f) ("Pregnancy encompasses the period of time from implantation until delivery.").

## SUMMARY OF ARGUMENT

The Hobby Lobby plaintiffs are for-profit corporations that operate hundreds of retail stores throughout the country. Hobby Lobby has more than 13,000 full-time employees. People employed by Hobby Lobby receive health coverage for themselves and their family members through the Hobby Lobby group health plan, as part of their compensation packages that include wages and non-wage benefits.

In this suit, plaintiffs contend that the Hobby Lobby group health plan must be exempted from the federal regulatory requirement to cover all forms of FDA-approved contraceptives, as prescribed by a health care provider. Plaintiffs argue that this exemption is mandated by RFRA because the individuals who together own a controlling share of the corporations have asserted a religious objection to the plan's coverage of certain contraceptives. Comparable claims have been asserted in other litigation by for-profit corporations engaged in a wide variety of secular pursuits such as the manufacture and sale of wood cabinets, fuel systems, vehicle safety systems, mineral and chemical products, and fresh produce.[7] The

---

[7] *See, e.g.*, *Conestoga Wood Specialties Corp. v. Sebelius*, __ F. Supp. 2d __, 2013 WL 140110 (E.D. Pa. Jan. 11, 2013), *appeal pending*, No. 13-1144 (3d Cir.) (wood cabinets); *Autocam Corp. v. Sebelius*, 2012 WL 6845677 (W.D. Mich. Dec. 24, 2012), *appeal pending*, No. 12-2673 (6th Cir.) (fuel systems); *Grote Industries, LLC v. Sebelius*, __ F. Supp. 2d __, 2012 WL 6725905 (S.D. Ind. Dec. 27, 2012), *appeal pending*, No. 13-1077 (7th Cir.) (vehicle safety systems); *O'Brien v. HHS*, __F. Supp. 2d __, 2012 WL 4481208 (E.D. Mo. Sept. 28, 2012), *appeal pending*, No. 12-3357 (8th Cir.) (mineral and chemical products); *Gilardi v. Sebelius*,

*Continued on next page.*

plaintiffs' theory in these cases is that, if the controlling shareholders of a for-profit, secular corporation assert a religious objection to federal laws that regulate the corporation, then the federal laws must be subjected to strict scrutiny. On this reasoning, for-profit, secular corporations would have the "right to ignore anti-discrimination laws, refuse to pay payroll taxes, violate OSHA requirements, etc. in the name of religious freedom," unless these requirements survive strict scrutiny, which is "'the most demanding test known to constitutional law.'" *Korte v. Sebelius*, No. 12-3841 (7th Cir.), Pl. Br. 46, 47 (filed 1/28/13) (quoting *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997)).

Congress, however, took pains to avoid that result. Congress has long distinguished between religious organizations and for-profit, secular corporations, and Congress has granted religious organizations alone the latitude to discriminate on the basis of religion in setting the terms and conditions of employment, including compensation. No court has ever found a for-profit company to be a religious organization for purposes of federal law. To the contrary, courts have emphasized that an entity's for-profit status is an objective criterion that allows courts to distinguish a secular company from a potentially religious organization, without conducting an intrusive inquiry into the entity's religious beliefs. *See, e.g.*,

---

No. 13-104 (D.D.C. March 3, 2013), *appeal pending*, No. 13-5069 (D.C. Cir.) (fresh produce).

*University of Great Falls v. NLRB*, 278 F.3d 1335, 1343-44 (D.C. Cir. 2002) (organization qualifies for a religious exemption if, among other things, it is "organized as a 'nonprofit'" and holds itself out as religious).

RFRA, which was enacted against the background of these federal employment statutes, carried forward this distinction between non-profit, religious organizations and for-profit, secular companies by requiring a plaintiff to demonstrate a substantial burden on "a person's exercise of religion." 42 U.S.C. § 2000bb-1(a). "[F]or-profit corporate entities, unlike religious non-profit organizations, do not—and cannot—legally claim a right to exercise or establish a 'corporate' religion under the First Amendment or the RFRA." *Conestoga Wood Specialties Corp. v. Sebelius*, No. 13-1144, slip op. 6 (3d Cir. Feb. 7, 2013) (Garth, J., concurring) (emphases omitted). The distinction between non-profit, religious organizations and for-profit, secular companies is rooted in "the text of the First Amendment," *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 706 (2012), and embodied in federal law.

Plaintiffs cannot circumvent this distinction by asserting that the contraceptive-coverage requirement is a substantial burden on the Greens' personal exercise of religion. "The mandate does not compel the [Greens] as individuals to do anything." *Autocam Corp. v. Sebelius*, 2012 WL 6845677, *7 (W.D. Mich. Dec. 24, 2012), *appeal pending*, No. 12-2673 (6th Cir.). "It is only the legally

separate entities they currently own that have any obligation under the mandate." *Ibid*. It is Hobby Lobby that acts as the employing party; it is Hobby Lobby that sponsors the group health plan for employees and their family members; and "it is that health plan which is now obligated by the Affordable Care Act and resulting regulations to provide contraceptive coverage." *Grote v. Sebelius*, __ F.3d __, 2013 WL 362725, *6 (7th Cir. Jan. 30, 2013) (Rovner, J., dissenting). "So long as the business's liabilities are not the [Greens'] liabilities—which is the primary and 'invaluable privilege' conferred by the corporate form, *Torco Oil Co. v. Innovative Thermal Corp.*, 763 F. Supp. 1445, 1451 (N.D. Ill. 1991) (Posner, J., sitting by designation)—neither are the business's expenditures the [Greens'] own expenditures." *Ibid*. The money used to pay for health coverage under the Hobby Lobby group health plan "belongs to the company, not to the [Greens]." *Ibid*.

Moreover, even apart from this central flaw in plaintiffs' argument, their RFRA claim fails because an employee's decision to use her health coverage to pay for a particular item or service cannot properly be attributed to her employer, much less to the corporation's shareholders. In other First Amendment contexts, the Supreme Court has repeatedly held that a person or entity that provides a source of funding may not be deemed responsible for the decisions that another person or entity makes in using those funds. Hobby Lobby provides employees with a compensation package that includes both wages and non-wage benefits.

Just as a Hobby Lobby employee may choose to use her wages to pay for contraceptives, she also may choose to use her health coverage to pay for contraceptives. "To the extent the [Greens] themselves are funding anything at all—and . . . one must disregard the corporate form to say that they are—they are paying for a plan that insures a comprehensive range of medical care that will be used in countless ways" by Hobby Lobby's 13,000 full-time employees and their family members. *Grote*, 2013 WL 362725, *13 (Rovner, J., dissenting). "No individual decision by an employee and her physician—be it to use contraception, treat an infection, or have a hip replaced—is in any meaningful sense the [Greens'] decision or action." *Ibid*. "RFRA does not protect against the slight burden on religious exercise that arises when one's money circuitously flows to support the conduct of other free-exercise-wielding individuals who hold religious beliefs that differ from one's own." *O'Brien v. HHS*, __F. Supp. 2d __, 2012 WL 4481208, *6 (E.D. Mo. Sept. 28, 2012), *appeal pending*, No. 12-3357 (8th Cir.).

**STANDARD OF REVIEW**

This Court reviews the denial of a preliminary injunction for an abuse of discretion and reviews questions of law de novo. *See Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010).

## ARGUMENT

A preliminary injunction is an "extraordinary remedy." *Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009). "To obtain a preliminary injunction, the moving party must demonstrate: '(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest.'" *Ibid*. (quoting *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008))). The district court correctly held that plaintiffs failed to establish a likelihood of success on the merits of their RFRA claim or First Amendment claim.[8]

---

[8] Even assuming that the "serious question" standard that plaintiffs cite survives *Winter*, *see* Pl. Br. 13-14, plaintiffs must establish a likelihood of success because they seek "'to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme,'" *Hobby Lobby Stores, Inc. v. Sebelius*, 2012 WL 6930302, *2 (10th Cir. Dec. 20, 2012) (quoting *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)), and because their asserted harm (a substantial burden on religious exercise) depends on their likelihood of success on the merits. *See, e.g.*, *McNeilly v. Land*, 684 F.3d 611, 621 (6th Cir. 2012) ("Because [plaintiff] does not have a likelihood of success on the merits . . . his argument that he is irreparably harmed by the deprivation of his First Amendment rights also fails."); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 304 (D.C. Cir. 2006) (similar).

## I. RFRA Does Not Allow A For-Profit, Secular Corporation To Deny Employee Benefits On The Basis Of Religion.

RFRA provides that the federal government "shall not substantially burden a person's exercise of religion" unless that burden is the least restrictive means to further a compelling governmental interest. 42 U.S.C. § 2000bb-1(a), (b). Plaintiffs contend that, in enacting this statute, Congress gave for-profit, secular corporations the right to demand religion-based exemptions from federal laws that regulate the corporations. On plaintiffs' reasoning, a controlling shareholder's religious objection could make any corporate regulation subject to strict scrutiny, which, plaintiffs emphasize, is "'the most demanding test known to constitutional law.'" Pl. Br. 39 (quoting *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997)).

Congress, however, was careful to avoid that result. First, by requiring a plaintiff to show that a regulation substantially burdens "a person's exercise of religion," Congress carried forward the existing distinction between non-profit, religious organizations, which may engage in the exercise of religion, and for-profit, secular corporations, which may not. Second, by amending the initial version of RFRA to add the word "substantially," Congress "ma[de] it clear that the compelling interest standard[] set forth in the act" applies "only to Government actions [that] place a substantial burden" on a person's exercise of religion. 139 Cong. Rec. S14350-01, S14352 (daily ed. Oct. 26, 1993) (statement of Sen. Kennedy); *see also ibid*. (text of Amendment No. 1082). Third, by restoring the

legal framework "set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)," 42 U.S.C. § 2000bb(b)(1), Congress made clear that courts should look to these and other Supreme Court cases that pre-date *Employment Div., Dep't of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990), to determine whether a regulation substantially burdens a person's religious exercise. *See* 139 Cong. Rec. S14350-01, S14352 (daily ed. Oct. 26, 1993) (statement of Sen. Kennedy) ("The amendment we will offer today is intended to make it clear that the pre-*Smith* law is applied under the RFRA in determining whether" a governmental burden on religion "must meet the test."); *cf*. 146 Cong. Rec. S7774–01, 7776 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy) (under the parallel language of RLUIPA, "[t]he term 'substantial burden' . . . is not intended to be given any broader interpretation than the Supreme Court's articulation of the concept of substantial burden or religious exercise"). No pre-*Smith* case held—or even suggested—that the regulation of for-profit, secular corporations is subject to strict scrutiny.

### A. Hobby Lobby Is Not A Person Engaged In The Exercise Of Religion Within The Meaning Of RFRA.

**1.** RFRA requires a plaintiff to show, as a threshold matter, that a challenged regulation is a substantial burden on "a person's exercise of religion." 42 U.S.C. § 2000bb-1(a), (b). Plaintiffs cannot make that showing because the Hobby Lobby is not a "person" engaged in the "exercise of religion" within the

meaning of RFRA or other federal statutes that provide accommodations for an organization's religious beliefs.

It is common ground that the term "person" can include a corporation as well as an individual. *See* Pl. Br. 38 (citing the Dictionary Act, 1 U.S.C. § 1). It is also common ground that secular corporations enjoy certain First Amendment rights, such as the freedoms of speech and association. *See* Pl. Br. 36 (citing *Citizens United v. FEC*, 130 S. Ct. 876 (2010) (freedom of speech)).

But, whereas the First Amendment freedoms of speech and association are "right[s] enjoyed by religious and secular groups alike," the First Amendment's Free Exercise Clause "gives special solicitude to the rights of religious organizations." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,* 132 S. Ct. 694, 706 (2012). That special solicitude for religious organizations is rooted in "the text of the First Amendment." *Ibid*.

Congress likewise has shown a special solicitude for religious organizations in federal statutes that regulate the relationship between employers and their employees. At the same time, however, Congress has not permitted for-profit, secular corporations to invoke religion as a basis to defeat the requirements of federal employment law.

Under Title VII of the Civil Rights Act of 1964, an employer cannot discriminate on the basis of religion in the terms or conditions of employment,

including employee compensation, unless the employer is "a religious corporation, association, educational institution, or society." 42 U.S.C. § 2000e-1(a) (collectively, "religious organization"). Similarly, the Americans with Disabilities Act ("ADA"), which prohibits employment discrimination on the basis of disability, includes specific exemptions for religious organizations. *See* 42 U.S.C. § 12113(d)(1), (2); *Hosanna-Tabor*, 132 S. Ct. at 701 n.1 (discussing the ADA exemptions). And the National Labor Relations Act ("NLRA"), which gives employees collective bargaining and other rights, has been interpreted to exempt church-operated educational institutions from the jurisdiction of the National Labor Relations Board. *See NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979).

The organizations found to qualify for these religious exemptions all have been non-profit, religious organizations, as in *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 339 (1987). There, the Supreme Court held that a gymnasium run by the Mormon Church was free to discharge a building engineer who failed to observe the Church's standards in such matters as regular church attendance, tithing, and abstinence from coffee, tea, alcohol, and tobacco. *See id*. at 330 & n.4. In so

holding, the Court stressed that the Church did not operate the gym on a for-profit basis. *See id*. at 339.[9]

Similarly, in the RFRA and free exercise cases on which plaintiffs rely, the claimants were non-profit, religious organizations. *See* Pl. Br. 37 (citing *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006) (RFRA claimant was a religious sect); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 525 (1993) ("Church of the Lukumi Babalu Aye, Inc. (Church), is a not-for-profit corporation organized under Florida law"); *Hosanna-Tabor Evangelical Lutheran Church & School*, 132 S. Ct. at 699 (church-operated school)).

The Supreme Court and courts of appeals have emphasized that for-profit status is an objective criterion that allows courts to distinguish a secular company from a potentially religious organization, without making intrusive inquiries into an entity's religious beliefs. "As the *Amos* Court noted, it is hard to draw a line between the secular and religious activities of a religious organization." *University*

[9] *See also, e.g., LeBoon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217, 221 (3d Cir. 2007) (non-profit Jewish community center); *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 190 (4th Cir. 2011) (non-profit nursing-care facility run by an order of the Roman Catholic Church); *Spencer v. World Vision, Inc.*, 633 F.3d 723, 724-725 (9th Cir. 2011) (per curiam) (non-profit Christian humanitarian organization); *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295, 1300 (11th Cir. 2006) (non-profit Hispanic Baptist congregation affiliated with the Southern Baptist Convention).

*of Great Falls v. NLRB*, 278 F.3d 1335, 1344 (D.C. Cir. 2002). By contrast, "it is relatively straight-forward to distinguish between a non-profit and a for-profit entity." *Ibid*.

Thus, the D.C. Circuit held that an organization qualifies for the religious exemption in the NLRA if, among other things, the organization is "organized as a 'nonprofit'" and holds itself out as religious. *Id*. at 1343 (quoting *Universidad Central de Bayamon v. NLRB,* 793 F.2d 383, 400, 403 (1st Cir. 1985) (en banc) (opinion of then-Judge Breyer)). The D.C. Circuit explained that this bright-line distinction prevents courts from "'trolling through a person's or institution's religious beliefs.'" *Id*. at 1341-42 (quoting *Mitchell v. Helms,* 530 U.S. 793, 828 (2000) (plurality opinion)). The D.C. Circuit stressed that the "prohibition on such intrusive inquiries into religious beliefs underlay" the Supreme Court's interpretation of the Title VII religious exemption in *Amos*. *Id*. at 1342.

Similarly, in *Spencer v. World Vision, Inc.,* 633 F.3d 723, 734 (9th Cir. 2011), Judge O'Scannlain explained that the Title VII religious exemption must "center[] on neutral factors (i.e., whether an entity is a nonprofit and whether it holds itself out as religious)," "[r]ather than forcing courts to 'troll[ ] through the beliefs of [an organization], making determinations about its religious mission.'" *Id*. at 734 (O'Scannlain, J., concurring) (quoting *Great Falls,* 278 F.3d at 1342).

In enacting RFRA, Congress carried forward the background principles reflected in pre-existing federal employment statutes, by requiring a plaintiff to show a substantial burden on a person's exercise of religion. Under RFRA, as under these pre-existing federal statutes, an entity's for-profit status is an objective criterion that allows courts to distinguish a secular corporation from a potentially religious organization. "[F]or-profit corporate entities, unlike religious non-profit organizations, do not—and cannot—legally claim a right to exercise or establish a 'corporate' religion under the First Amendment or the RFRA." *Conestoga Wood Specialties Corp. v. Sebelius*, No. 13-1144, slip op. at 6 (3d Cir. Feb. 7, 2013) (Garth, J., concurring) (emphases omitted); *see also Hobby Lobby Stores*, 870 F. Supp. 2d at 1288 ("Plaintiffs have not cited, and the court has not found, any case concluding that secular, for-profit corporations . . . have a constitutional right to the free exercise of religion."); *Briscoe v. Sebelius*, No. 13-285, slip op. 8 (D. Colo. Feb. 27, 2013) ("Secular, for-profit corporations neither exercise nor practice religion.").

Plaintiffs do not claim that Hobby Lobby qualifies for the religious exemptions in Title VII, the ADA, the NLRA, or any other federal statute that regulates the employment relationship. Likewise, RFRA provides no basis to exempt Hobby Lobby from the regulations that govern the health coverage under

the Hobby Lobby group health plan, which is a significant aspect of employee compensation.

Plaintiffs underscore their misunderstanding of the issue before the Court when they emphasize that "[c]ompany profits provide millions per year to Christian ministries around the world." Pl. Br. 4. Federal law does not prohibit for-profit corporations from donating profits to religious charities. But Hobby Lobby does not claim that it could compel *its employees* to donate to religious charities or to tithe their salaries. Only a religious organization, like that at issue in *Amos*, can require its employees to tithe. *See Amos*, 483 U.S. at 330 & n.4. Hobby Lobby is not a religious organization, and it therefore must afford its secular workforce the employee benefits that are required by federal law.

### B. The Obligation To Cover Contraceptives Lies With The Hobby Lobby Plan, Not With The Corporations' Shareholders.

**1.** Plaintiffs cannot circumvent the distinction between religious organizations and secular corporations by attempting to shift the focus of the RFRA inquiry from Hobby Lobby to its shareholders. Federal law does not require the shareholders of Hobby Lobby to provide health coverage to Hobby Lobby employees, or to satisfy the myriad other requirements that federal law places on Hobby Lobby. These obligations lie with the corporation itself.

The contraceptive-coverage requirement "does not compel the [Greens] as individuals to do anything." *Autocam Corp. v. Sebelius*, 2012 WL 6845677, *7

(W.D. Mich. Dec. 24, 2012), *appeal pending*, No. 12-2673 (6th Cir.). "It is only the legally separate entities they currently own that have any obligation under the mandate." *Ibid*. It is Hobby Lobby that acts as the employing party; it is Hobby Lobby that sponsors the group health plan for employees and their family members; and "it is that health plan which is now obligated by the Affordable Care Act and resulting regulations to provide contraceptive coverage." *Grote v. Sebelius*, __ F.3d __, 2013 WL 362725, *6 (7th Cir. Jan. 30, 2013) (Rovner, J., dissenting).

The Hobby Lobby corporations are legal entities that are "separate and distinct" from their shareholders. *Seitsinger v. Dockum Pontiac Inc.*, 894 P.2d 1077, 1079-80 (Okla. 1995); *see also Sautbine v. Keller*, 423 P.2d 447, 451 (Okla. 1966) ("even a family corporation is a separate and distinct legal entity from its shareholders"). Although plaintiffs seek to elide this distinction, the Supreme Court has stressed that "incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001); *see also Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003) ("A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities.").

“As corporate owners, the [Greens] quite properly enjoy the protections and benefits of the corporate form.” *Autocam Corp.*, 2012 WL 6845677, *7. But the “corporate form brings obligations as well as benefits.” *Ibid*. “The owners of an LLC or corporation, even a closely-held one, have an obligation to respect the corporate form, on pain of losing the benefits of that form should they fail to do so.” *Grote*, 2013 WL 362725, *6 (Rovner, J., dissenting) (citations omitted). The Greens “are not at liberty to treat the company’s bank accounts as their own; co-mingling personal and corporate funds is a classic sign that a company owner is disregarding the corporate form and treating the business as his alter ego.” *Ibid*. (citation omitted).

“So long as the business’s liabilities are not the [Greens’] liabilities—which is the primary and ‘invaluable privilege’ conferred by the corporate form, *Torco Oil Co. v. Innovative Thermal Corp.*, 763 F. Supp. 1445, 1451 (N.D. Ill. 1991) (Posner, J., sitting by designation)—neither are the business’s expenditures the [Greens’] own expenditures.” *Ibid*. The money used to pay for health coverage under the Hobby Lobby group health plan “belongs to the company, not to the [Greens].” *Ibid*.

“The [Greens] have chosen to conduct their business through corporations, with their accompanying rights and benefits and limited liability.” *Gilardi v. Sebelius*, No. 13-104, slip op. 10 (D.D.C. March 3, 2013), *appeal pending*, No. 13-

5069 (D.C. Cir.). "They cannot simply disregard that same corporate status when it is advantageous to do so." *Id*. at 11. "The law protects that separation between the corporation and its owners for many worthwhile purposes." *Autocam Corp*., 2012 WL 6845677, *7. "Neither the law nor equity can ignore the separation when assessing claimed burdens on the individual owners' free exercise of religion caused by requirements imposed on the corporate entities they own." *Ibid*.; *see also Conestoga Wood Specialties Corp. v. Sebelius*, __ F. Supp. 2d __, 2013 WL 140110, *8 (E.D. Pa. Jan. 11, 2013) ("It would be entirely inconsistent to allow the [individual plaintiffs] to enjoy the benefits of incorporation, while simultaneously piercing the corporate veil for the limited purpose of challenging these regulations."), *appeal pending*, No. 13-1144 (3d Cir.).

**2.** None of the pre-*Smith* Supreme Court cases that formed the background to RFRA held or even suggested that a requirement that a corporation provide certain employee benefits could be a substantial burden on its controlling shareholders' exercise of religion. The one pre-*Smith* free exercise case that involved employee benefits, *United States v. Lee*, 455 U.S. 252 (1982), considered a free exercise claim raised by an individual employer, not by a corporation or its shareholders. Moreover, *Lee* rejected the "free exercise claim brought by [an] individual Amish employer who argued that paying Social Security taxes for his employees interfered with his exercise of religion." *Hobby Lobby Stores, Inc. v.*

*Sebelius*, 133 S. Ct. 641, 643 (2012) (Sotomayor, J., in chambers). Even with respect to that individual employer, the Supreme Court stressed that, "[w]hen followers of a particular sect enter into commercial activities as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." *Lee*, 455 U.S. at 261. The Court explained that "[g]ranting an exemption from social security taxes to an employer operates to impose the employer's religious faith on the employees," *ibid.*, who would be denied their social security benefits if the employer did not pay the social security taxes.

The two cases cited in RFRA itself—*Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)—did not involve either corporate regulation or employee benefits. In *Sherbert*, the Supreme Court held that a state government could not deny unemployment compensation to an individual who lost her job because her religious beliefs prevented her from working on a Saturday. And, in *Yoder*, the Court held that a state government could not compel Amish parents to send their children to high school. Plaintiffs rely on *Thomas v. Review Board*, 450 U.S. 707 (1981), *see* Pl. Br. 15, 17, but, there, the Supreme Court simply applied *Sherbert*'s reasoning to hold that a state government could not deny unemployment compensation to an individual who lost his job because of his religious beliefs. *See also Gilardi v. Sebelius*, No. 13-104,

slip op. 23 (D.D.C. March 3, 2013) ("Plaintiffs misread *Thomas*." "In that case, . . . the burden of the denial of benefits rested with the person exercising his religion, not a separate person or corporate entity, as is the case here."), *appeal pending*, No. 13-5089 (D.C. Cir.). Plaintiffs also cite *Braunfeld v. Brown*, 366 U.S. 599 (1961), *see* Pl. Br. 34, 35, but, there, the Court rejected the free exercise claim of individuals who faced criminal penalties if they operated their stores on a Sunday.

Plaintiffs rely heavily on this Court's decision in *Abdullhaseeb v. Calbone*, 600 F.3d 1301 (10th Cir. 2010), *see* Pl. Br. 21-22, 24, but that case considered a prisoner's request for halal foods and is clearly inapposite here. Plaintiffs are equally mistaken to suggest that two Ninth Circuit decisions held that the regulation of a corporation was a substantial burden on the free exercise rights of its controlling shareholders. *See* Pl. Br. 34. Those cases held only that corporations had "*standing* to assert the free exercise right of [their] owners." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1120 (9th Cir. 2009) (citing *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 620 n.15 (9th Cir. 1988)) (emphasis added). The injury in fact that is necessary to establish standing need not be large; an "identifiable trifle" is enough. *Chicano Police Officer's Ass'n v. Stover*, 526 F.2d 431, 436 (10th Cir. 1975) (quoting *United States v. SCRAP*, 412 U.S. 669, 689 n.14 (1973)), *vacated on other grounds*, 426 U.S. 944 (1976). The issue of standing to assert a First Amendment claim is thus distinct from the question of

whether a plaintiff has stated a violation of RFRA, which requires a plaintiff to show that a federal regulation "*substantially* burden[s]" a person's exercise of religion. 42 U.S.C. § 2000bb-1(a) (emphasis added). Even assuming that the Ninth Circuit's standing rulings were correct (an issue not presented here because the Greens are plaintiffs and therefore can assert their own rights), the decisions provide no support for plaintiffs' RFRA claim.

### C. Decisions That Employees Make About How To Use Their Compensation Cannot Properly Be Attributed To The Corporation Or Its Shareholders.

For the reasons discussed above, plaintiffs' attempt to conflate Hobby Lobby and its shareholders cannot salvage their RFRA claim. Even apart from this central flaw in plaintiffs' argument, their claim fails because an employee's decision to use her health coverage for a particular item or service cannot properly be attributed to her employer, much less to the corporations' shareholders.

Hobby Lobby's 13,000 full-time employees are free to use the wages they receive from the corporation to pay for contraceptives. Plaintiffs do not suggest that these individual decisions by Hobby Lobby employees can be attributed to the corporation or to its shareholders. "Implementing the challenged mandate will keep the locus of decision-making in exactly the same place: namely, with each employee, and not" the corporation or its shareholders. *Autocam Corp.*, 2012 WL 6845677, *6. "It will also involve the same economic exchange at the corporate

level: employees will earn a wage or benefit with their labor, and money originating from [Hobby Lobby] will pay for it." *Ibid*.

A group health plan "covers many medical services, not just contraception." *Grote*, 2013 WL 362725, *13 (Rovner, J., dissenting). "To the extent the [Greens'] themselves are funding anything at all—and . . . one must disregard the corporate form to say that they are—they are paying for a plan that insures a comprehensive range of medical care that will be used in countless ways" by the employees and their family members who participate in the Hobby Lobby group health plan. *Ibid*. The decision as to what specific "services will be used is left to the employee and her doctor." *Ibid*. "No individual decision by an employee and her physician—be it to use contraception, treat an infection, or have a hip replaced—is in any meaningful sense the [Greens'] decision or action." *Ibid*.

Plaintiffs' contrary position is at odds with the analysis used by the Supreme Court in other First Amendment contexts. In analyzing Establishment Clause challenges, the Supreme Court has recognized that a state does not, by providing a source of funding, necessarily become responsible for an individual's decisions in using those funds. In *Zelman v. Simmons–Harris*, 536 U.S. 639 (2002), for example, the Court rejected an Establishment Clause challenge to a state school voucher program. Of the more than 3,700 students who participated in the program during one school year, 96% of them used the vouchers to enroll at

religiously affiliated schools. *See id*. at 647. Nonetheless, the Supreme Court held that the flow of voucher funds to religiously affiliated schools was not properly attributable to the State. The Court reasoned that "[t]he incidental advancement of a religious mission, or the perceived endorsement of a religious message, is reasonably attributable to the individual recipient, not to the government, whose role ends with the disbursement of benefits." *Id*. at 652. And it explained that "no reasonable observer would think a neutral program of private choice, where state aid reaches religious schools solely as a result of the numerous independent decisions of private individuals, carries with it the imprimatur of government endorsement." *Id*. at 655.

The Supreme Court employed similar reasoning in *Board of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217 (2000), to reject a First Amendment challenge to a student activity fee that required the complaining students "to pay fees which are subsidies for speech they find objectionable, even offensive." *Id*. at 230. The Court noted that the funds were distributed to student groups on a view-point neutral basis, and explained that this system prevented "'any mistaken impression that the student [groups] speak for the University'" or the objecting students. *Id*. at 233 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 841 (1995)).

It would be equally inappropriate to attribute an employee's decision to use her comprehensive health coverage for a particular item or service to the employer that pays for or contributes to the plan. An "employer, by virtue of paying (whether in part or in whole) for an employee's health care, does not become a party to the employee's health care decisions: the employer acquires no right to intrude upon the employee's relationship with her physician and participate in her medical decisions, nor, conversely, does it incur responsibility for the quality and results of an employee's health care if it is not actually delivering that care to the employee." *Grote*, 2013 WL 362725, *13 (Rovner, J., dissenting). Indeed, "the Privacy Rule incorporated into the regulations promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") imposes a wall of confidentiality between an employee's health care decisions (and the plan's financial support for those decisions) and the employer." *Id*. at *6.

The connection between an employee's medical decisions and the corporation's shareholders is even more attenuated than the connection between an employee's medical decisions and the corporation. To hold that "a company shareholder's religious beliefs and practices are implicated by the autonomous health care decisions of company employees, such that the obligation to insure those decisions, when objected to by a shareholder, represents a substantial burden on that shareholder's religious liberties" would be "an unusually expansive

understanding of what acts in the commercial sphere meaningfully interfere with an individual's religious beliefs and practices." *Id*. at *14. "RFRA does not protect against the slight burden on religious exercise that arises when one's money circuitously flows to support the conduct of other free-exercise-wielding individuals who hold religious beliefs that differ from one's own." *O'Brien v. HHS*, __F. Supp. 2d __, 2012 WL 4481208, *6 (E.D. Mo. Sept. 28, 2012), *appeal pending*, No. 12-3357 (8th Cir.). *See also Conestoga Wood Specialties Corp. v. Sebelius*, No. 13-1144 (3d Cir. Feb. 7, 2013); *Autocam Corp. v. Sebelius*, No. 12-2673 (6th Cir. Dec. 28, 2012); *Conestoga Wood Specialties Corp. v. Sebelius*, __ F. Supp. 2d __, 2013 WL 140110 (E.D. Pa. Jan. 11, 2013), *appeal pending*, No. 13-1144 (3d Cir.); *Autocam Corp. v. Sebelius*, 2012 WL 6845677 (W.D. Mich. Dec. 24, 2012), *appeal pending*, No. 12-2673 (6th Cir.); *Korte v. HHS*, __ F. Supp. 2d __, 2012 WL 6553996 (S.D. Ill. Dec. 14, 2012), *appeal pending*, No. 12-3841 (7th Cir.); *Grote Industries, LLC v. Sebelius*, __ F. Supp. 2d __, 2012 WL 6725905 (S.D. Ind. Dec. 27, 2012), *appeal pending*, No. 13-1077 (7th Cir.); *Annex Medical, Inc. v. Sebelius*, __ F. Supp. __, 2013 WL 101927, *5 (D. Minn. Jan. 8, 2013), *appeal pending*, No. 13-1118 (8th Cir.); *Briscoe v. Sebelius*, No. 13-285 (D. Colo. Feb. 27, 2013); *Gilardi v. Sebelius*, No. 13-104 (D.D.C. March 3, 2013), *appeal pending*, No. 13-5069 (D.C. Cir.).[10]

---

[10] Indeed, even church-operated enterprises are required to pay employees

*Continued on next page.*

### D. The Contraceptive-Coverage Requirement Is Narrowly Tailored To Advance Compelling Governmental Interests.

Because the contraceptive-coverage requirement does not impose a substantial burden on any exercise of religion by Hobby Lobby or the Greens, there is no reason to consider whether such a burden is justified as the least restrictive means of furthering a compelling governmental interest. *See* 42 U.S.C. § 2000bb-1(b). In any event, plaintiffs' argument fails on this secondary inquiry as well, because the contraceptive-coverage requirement is narrowly tailored to advance compelling governmental interests in public health and gender equality. Indeed, the particular health services at issue here relate to an interest—a woman's control over her procreation—that is so compelling as to be constitutionally protected from state interference. *See Hobby Lobby Stores*, 870 F. Supp. 2d at 1296; *see also Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972) ("If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."); *Griswold v.*

---

the minimum wage. *See Donovan v. Tony & Susan Alamo Foundation*, 722 F.2d 397, 403 (8th Cir. 1984) (rejecting free exercise challenge to the Fair Labor Standards Act because "enforcement of wage and hour provisions cannot possibly have any direct impact on appellants' freedom to worship and evangelize as they please"), *aff'd*, 471 U.S. 290 (1985); *DeArment v. Harvey*, 932 F.2d 721, 722 (8th Cir. 1991) (holding that the FLSA applies to church-run schools and that "any minimal free exercise burden was justified by the compelling governmental interest in enforcing the minimum wage and equal pay provisions of the FLSA").

*Connecticut*, 381 U.S. 479 (1965) (state law that banned use of contraceptives unconstitutionally intrudes upon the right of marital privacy).

**1.** "[T]he Government clearly has a compelling interest in safeguarding the public health by regulating the health care and insurance markets." *Mead v. Holder*, 766 F. Supp. 2d 16, 43 (D.D.C. 2011), *aff'd*, *Seven-Sky v. Holder*, 661 F.3d 1 (D.C. Cir. 2011). The Affordable Care Act increases access to recommended preventive health services by requiring that these services be covered without cost sharing, that is, without requiring plan participants and beneficiaries to make co-payments or pay deductibles. *See* 42 U.S.C. § 300gg-13.

Even small increments in cost sharing have been shown to reduce the use of recommended preventive health services. *See* IOM Report 108-109. "Cost barriers to use of the most effective contraceptive methods are important because long-acting, reversible contraceptive methods and sterilization have high up-front costs." *Id*. at 108. "A recent study conducted by Kaiser Permanente found that when out-of-pocket costs for contraceptives were eliminated or reduced, women were more likely to rely on more effective long-acting contraceptive methods." *Id*. at 109.

In addition to protecting a woman's compelling interest in autonomy over her procreation, *see Eisenstadt*, 405 U.S. at 453, access to contraceptives is a crucial public health protection because an unintended pregnancy can have major

negative health consequences for both the woman and the developing fetus. The Institute of Medicine described the harms to the woman and fetus that can occur when pregnancies are unintended. *See* IOM Report 103. For example, short intervals between pregnancies are associated with low birth weight and prematurity. *See ibid.* When a pregnancy is unintended, a woman may delay prenatal care or prolong behaviors that present risks for the developing fetus. *See ibid*. And, for women with certain medical conditions (such as diabetes), pregnancy can pose serious health risks. *See id*. at 103-104.

The requirement to cover women's recommended preventive health services without cost sharing also protects the distinct compelling interest in gender equality. The Supreme Court has recognized the "importance, both to the individual and to society, of removing the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups, including women." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 626 (1984). "Assuring women equal access to . . . goods, privileges, and advantages clearly furthers compelling state interests." *Ibid*. In enacting the Affordable Care Act's preventive health services coverage requirement, Congress found that "women have different health needs than men, and these needs often generate additional costs." 155 Cong. Rec. S12106-02, S12114 (daily ed. Dec. 2, 2009) (Sen. Feinstein). "Women of childbearing age spend 68 percent more in out-of-pocket

health care costs than men." *Ibid.* And this disproportionate burden on women creates "financial barriers . . . that prevent women from achieving health and well-being for themselves and their families." IOM Report 20. The women's preventive health services coverage requirement is designed to equalize preventive health services coverage for women and men, through, among other things, increased access to family planning services for women. *See, e.g.*, 155 Cong. Rec. at S12114 (Sen. Feinstein); *see also* 77 Fed. Reg. at 8728.

**2.** There is no doubt that the exemption that plaintiffs demand here would undermine Congress's objectives. Whereas Congress sought to increase access to women's recommended preventive health services by requiring that these services be covered without cost sharing, plaintiffs seek to exclude coverage of certain contraceptives entirely from the Hobby Lobby plan. Thus, plaintiffs would require that Hobby Lobby employees pay for these contraceptives with their wages rather than with the health coverage that they earn as an employee benefit.

Plaintiffs do not explain what legal principle requires that Hobby Lobby employees pay for contraceptives by using their cash compensation rather than their non-cash health coverage benefits. Plaintiffs' demand to exclude coverage of these contraceptives from the Hobby Lobby plan would protect no one's religious practices and would impose a wholly unwarranted burden on individual employees and their family members.

Plaintiffs emphasize that they seek to exclude only a "subset" of FDA-approved contraceptives—certain prescription drugs and IUDs—from the Hobby Lobby plan, and they assert that these contraceptives are not important to women's health. Pl. Br. 6, 42. But the decision about which form of contraceptive to use, if any, is a personal medical decision that is made by a woman in consultation with her doctor. "For women with certain medical conditions or risk factors, some contraceptive methods may be contraindicated." IOM Report 105. For example, for some women, hormonal contraceptives (like birth control pills) may be contraindicated because of certain risk factors, such as uncontrolled hypertension or coronary artery disease, so the doctor may instead prescribe a copper IUD, which does not contain hormones. The guidelines adopted by HRSA, which accepted the recommendations made by the Institute of Medicine, encompass coverage for all FDA-approved contraceptive methods "as prescribed by a provider." 77 Fed. Reg. 8725 (Feb. 15, 2012). The guidelines thus ensure that the decision about which contraceptive method (if any) to use is made by a woman and her doctor—not by her employer.

Plaintiffs also assert that the exemption they demand would not undermine the government's compelling interests because certain plans that collectively cover millions of employees are not subject to the statutory requirement to cover recommended preventive health services without cost sharing. *See* Pl. Br. 42-43.

But, contrary to plaintiffs' suggestion, plans offered by small employers are not exempt from that requirement. Small businesses that elect to offer non-grandfathered health coverage to their employees are required to provide coverage for recommended preventive health services without cost sharing. *See* 42 U.S.C. § 300gg-13. Moreover, small employers have business incentives to offer health coverage to their employees, and an otherwise eligible small employer would lose eligibility for certain tax benefits if it did not do so. *See* 26 U.S.C. § 45R.

Plaintiffs are likewise mistaken to assume that all or most grandfathered plans exclude contraceptive coverage. The Institute of Medicine found that "[c]ontraceptive coverage has become standard practice for most private insurance." IOM Report 108. In any event, the Affordable Care Act's grandfathering provision, 42 U.S.C. § 18011, does not have the effect of providing the type of permanent exemption from a coverage requirement that plaintiffs demand here. Although grandfathered plans are not subject to certain requirements, including the requirement to cover recommended preventive health services without cost sharing, the grandfathering provision is transitional in effect, and it is expected that a majority of plans will lose their grandfathered status by the end of 2013. *See* 75 Fed. Reg. 34,538, 34,552 (June 17, 2010).[11]

---

[11] Plaintiffs overstate the number of individuals covered under grandfathered plans. Their figures are drawn from the total number of individuals covered under

*Continued on next page.*

Changes to a group health plan such as the elimination of certain benefits, an increase in cost-sharing requirements, or a decrease in employer contributions can cause a plan to lose its grandfathered status. *See* 45 C.F.R. § 147.140(g). The grandfathering provision is "a reasonable plan for instituting an incredibly complex health care law while balancing competing interests." *Legatus v. Sebelius*, __ F. Supp. 2d __, 2012 WL 5359630, *9 (Oct. 31, 2012), *appeal pending*, No. 13-1092 (6th Cir.). "To find the Government's interests other than compelling only because of the grandfathering rule would perversely encourage Congress in the future to require immediate and draconian enforcement of all provisions of similar laws, without regard to pragmatic considerations, simply in order to preserve 'compelling interest' status." *Ibid*.

**3.** Plaintiffs alternatively contend that regulating the terms of group health plans is not the least restrictive means to accomplish the government's objectives. They assert that, instead, the government should "[p]rovide a tax credit to employees who purchase emergency contraceptives with their own funds";

---

health plans in existence at the start of 2010, and they disregard the fact that the number of grandfathered plans is steadily declining. *See*, *e.g.*, Kaiser Family Foundation and Health Research & Educational Trust, Employer Health Benefits 2012 Annual Survey at 7-8, 190, *available at* http://ehbs.kff.org/pdf/2012/8345.pdf (last visited February 23, 2013) (indicating that 58 percent of firms had at least one grandfathered health plan in 2012, down from 72 percent in 2011, and that 48 percent of covered workers were in grandfathered health plans in 2012, down from 56 percent in 2011).

"[d]irectly provide the drugs at issue, or directly provide insurance coverage for them through the state and federal health exchanges"; "[e]mpower willing actors—for instance, physicians, pharmaceutical companies, or various interest groups—to deliver the drugs and sponsor education about them"; and "[u]se their own resources to inform the public that these drugs are available in a wide array of publicly-funded venues." Pl. Br. 47.

These proposals—which would require federal taxpayers to pay the cost of contraceptive services for the employees of for-profit, secular companies—reflect a fundamental misunderstanding of RFRA and the "least restrictive means" test that it incorporates. That test has never been interpreted to require the government to create or expand programs in order to "subsidize private religious practices." *Catholic Charities of Sacramento, Inc. v. Superior Court*, 85 P.3d 67, 94 (Cal. 2004) (rejecting challenge to a state-law requirement that certain health insurance policies cover prescription contraceptives).

## II. Plaintiffs Fail To State A Claim Under The First Amendment.

The First Amendment's Free Exercise Clause is not implicated when the government burdens a person's religious exercise through laws that are neutral and generally applicable. *See Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 879 (1990). Even assuming *arguendo* that plaintiffs' free exercise rights are burdened by the contraceptive-coverage requirement, there is no

Free Exercise Clause violation because the requirement is neutral and generally applicable. *See Hobby Lobby Stores*, 870 F. Supp. 2d at 1288-90; *O'Brien*, 2012 WL 4481208, *6-9; *Korte*, __ F. Supp. 2d at __, 2012 WL 6553996, *7-8 (S.D. Ill. Dec. 14, 2012).

"Neutrality and general applicability are interrelated," and "failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). A law is not neutral "if the object of the law is to infringe upon or restrict practices because of their religious motivation." *Id*. at 533. A law is not generally applicable if it "in a selective manner impose[s] burdens only on conduct motivated by religious belief." *Id*. at 543.

A law need not be universal to be generally applicable. Exemptions undermining "general applicability" are those that disfavor religion. For example, the ordinance regulating animal slaughter in *Lukumi* was not generally applicable because it applied only to the religious practice of animal sacrifice, and not to hunting or other secular practices to which the asserted concerns of animal cruelty and public health applied with equal force. *See id*. at 542-46.

The requirement to cover women's recommended preventive health services was established, not with the object of interfering with religious practices, but to improve women's access to recommended health care and lessen the disparity

between men's and women's health care costs. *See O'Brien*, 2012 WL 4481208, *7. "This is evident from both the inclusion of the religious employer exemption, as well as the legislative history of the ACA's Women's Health Amendment." *Ibid*. (citing 2009 WL 4405642; 155 Cong. Rec. S12265, S12271 (daily ed. Dec. 3, 2009) (statement of Sen. Franken) ("The problem [with the current bill] is, several crucial women's health services are omitted. [The Women's Health Amendment] closes this gap."); 2009 WL 4280093; 155 Cong. Rec. S12021-02, S12027 (daily ed. Dec. 1, 2009) (statement of Sen. Gillibrand) ("... in general women of childbearing age spend 68 percent more in out-of-pocket health care costs than men.... This fundamental inequity in the current system is dangerous and discriminatory and we must act.")).

Plaintiffs' reliance on the Affordable Care Act's grandfathering provision is misplaced for reasons already discussed. The grandfathering provision is "a reasonable plan for instituting an incredibly complex health care law while balancing competing interests." *Legatus*, 2012 WL 5359630, *9. This "gradual transition" does not "undercut[] the neutral purpose or general applicability of the mandate" to cover recommended preventive health services. *Korte*, 2012 WL 6553996, *7. That requirement applies to group health plans in general, and the provisions that address grandfathered plans apply to religious and secular employers alike.

Nor does the religious employer exemption from the contraceptive-coverage requirement "compromise the neutrality of the regulations by favoring certain religious employers over others." *O'Brien*, 2012 WL 4481208, *8. Rather, "the religious employer exemption presents a strong argument in favor of neutrality, demonstrating that the 'object of the law' was not 'to infringe upon or restrict practices because of their religious motivation.'" *Ibid*. (quoting *Lukumi*, 508 U.S. at 533); *see also Lee*, 455 U.S. at 260 (noting that "Congress granted an exemption" from social security taxes, "on religious grounds, to self-employed Amish and others").

Clearly, the Free Exercise Clause permits the government to provide an exemption for non-profit, religious institutions such as churches and their integrated auxiliaries, *see* 45 C.F.R. § 147.130(a)(1)(iv)(B), and to address religious objections raised by additional non-profit, religious organizations, *see* 78 Fed. Reg. 8456 (Feb. 6, 2013), without also extending such measures to for-profit, secular corporations. That is not a "'value judgment in favor of secular motivations, but not religious motivations.'" Pl. Br. 50 (quoting *Fraternal Order of Police v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999)).

The religious employer exemption "does not differentiate between religions, but applies equally to all denominations." *O'Brien*, 2012 WL 4481208, *9. "The religious employer exemption, by necessity, distinguishes between religious and

secular employers, and HHS has selected a logical bright line between the two." *Id*. at *10. Plaintiffs "see no difference between" a for-profit, secular corporation and a non-profit, religious organization. *Korte*, 2012 WL 6553996, *8. As discussed above, however, "[r]eligious accommodations in related areas of federal law, such as the exemption for religious organizations under Title VII of the Civil Rights Act of 1964, are available to nonprofit religious organizations but not to for-profit secular organizations." 78 Fed. Reg. at 8461-62. Consistent with this longstanding federal law, the Departments proposed to make certain accommodations for "nonprofit religious organizations, but not to include for-profit secular organizations." *Id*. at 8462.

"Using well established criteria to determine eligibility for an exemption based on religious belief, such as the nonsecular nature of the organization and its nonprofit status, the [Affordable Care Act], through its implementing rules and regulations, both recognizes and protects the exercise of religion." *Hobby Lobby Stores,* 870 F. Supp. 2d at 1289. "The fact that the exceptions do not extend as far as plaintiffs would like does not make the mandate nonneutral." *Ibid*.; *see also Walz v. Tax Commission of the City of New York*, 397 U.S. 664, 666 (1970)

(upholding property tax exemptions for real property owned by non-profit, religious organizations and used exclusively for religious worship).[12]

The Supreme Court has made clear that the government "may encourage the free exercise of religion by granting religious accommodations, even if not required by the Free Exercise Clause, without running afoul of the Establishment Clause." *O'Brien*, 2012 WL 4481208, *10 (citing cases). "'Such legislative accommodations would be impossible as a practical matter'" if, as plaintiffs contend, the government could not distinguish between non-profit, religious organizations and for-profit, secular corporations. *Ibid*. (quoting *Catholic Charities of Sacramento, Inc. v. Superior Court*, 85 P.3d 67, 79 (Cal. 2004)).

[12] These criteria bear no resemblance to the state law invalidated in *Colorado Christian University v. Weaver*, 534 F.3d 1245, 1250 (10th Cir. 2008), cited at Pl. Br. 53, which authorized scholarships "to eligible students who attend any accredited college in the state—public or private, secular or religious—other than those the state deems 'pervasively sectarian.'"

## CONCLUSION

The denial of a preliminary injunction should be affirmed.

Respectfully submitted,

STUART F. DELERY
*Principal Deputy Assistant Attorney General*

SANFORD C. COATS
*United States Attorney*

BETH S. BRINKMANN
*Deputy Assistant Attorney General*

/s/ Alisa B. Klein

ALISA B. KLEIN
MARK B.STERN
*(202) 514-1597*
*Attorneys, Appellate Staff*
*Civil Division, Room 7235*
*U.S. Department of Justice*
*950 Pennsylvania Ave., N.W.*
*Washington, D.C.  20530*

MARCH 2013

## REQUEST FOR ORAL ARGUMENT

This case presents the question whether, under the Religious Freedom Restoration Act, a for-profit, secular corporation may deny its employees federally required health coverage benefits, if the corporation's controlling shareholders assert a religious objection to providing such employee benefits. The same issue is pending before other circuits. Given the importance of the issue, the government respectfully requests oral argument.

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that the certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font. I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,601 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

/s/ Alisa B. Klein
Alisa B. Klein

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2013, I electronically filed the foregoing brief with the Clerk of this Court by using the appellate CM/ECF system and caused seven hard copies of the brief to be sent to this Court by Federal Express, overnight delivery. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ Alisa B. Klein
Alisa B. Klein