**ORAL ARGUMENT REQUESTED**

**No. 12-6294**

# In the United States Court of Appeals for the Tenth Circuit

HOBBY LOBBY STORES, INC., MARDEL, INC., DAVID GREEN, BARBARA GREEN, STEVE GREEN, MART GREEN, AND DARSEE LETT,

*Appellants*,

v.

KATHLEEN SEBELIUS, Secretary of the United States Department of Health and Human Services, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, HILDA SOLIS, Secretary of the United States Department of Labor, UNITED STATES DEPARTMENT OF LABOR, TIMOTHY GEITHNER, Secretary of the United States Department of the Treasury, and UNITED STATES DEPARTMENT OF THE TREASURY,

*Appellees*.

**On Appeal from the United States District Court**
**for the Western District of Oklahoma, No. 5:12-cv-01000**
**Judge Joe Heaton, Presiding**

## REPLY BRIEF OF APPELLANTS


S. Kyle Duncan
Luke W. Goodrich
Mark L. Rienzi
Eric S. Baxter
Lori H. Windham
Adèle Auxier Keim
THE BECKET FUND FOR RELIGIOUS LIBERTY
3000 K Street, N.W., Suite 220
Washington, D.C. 20007
(202) 349-7209
kduncan@becketfund.org
*Attorneys for Appellants*


Dated: March 29, 2013

## TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

ARGUMENT .......... 2

I. The Mandate violates RFRA. .......... 2

A. The Mandate substantially burdens the Greens. .......... 2

1. Hobby Lobby's corporate form does not immunize the Greens from government pressure to violate their religion. .......... 4

2. Supreme Court jurisprudence strongly supports finding a substantial burden. .......... 8

3. The Greens draw a clear moral distinction between offering specific insurance coverage and paying employee wages. .......... 11

4. The Greens' objection to the Mandate is about their own conduct, not their employees' conduct. .......... 13

B. The Mandate substantially burdens Hobby Lobby. .......... 15

1. The First Amendment protects religious exercise by profit-makers. .......... 16

2. RFRA protects religious exercise by profit-makers .......... 18

C. The Mandate fails strict scrutiny. .......... 21

1. The government can demonstrate no compelling interest. .......... 21

2. The Mandate is not the least restrictive means of advancing the government's interests. .......... 25

II. The Mandate violates the Free Exercise Clause .......... 26

A. The Mandate is not generally applicable. .......... 26

B. The Mandate is not neutral. .......... 28

CONCLUSION ........................................................................................................ 29
CERTIFICATE OF SERVICE ................................................................................... 30
CERTIFICATE OF COMPLIANCE ........................................................................ 31

## TABLE OF AUTHORITIES

**Cases**

*Abdulhaseeb v. Calbone*,
600 F.3d 1301 (10th Cir. 2010) .................................................. 3, 4, 5

*Abood v. Detroit Bd. of Ed.*,
431 U.S. 209 (1977)..........................................................................15

*Amber Pyramid, Inc. v. Buffington Harbor Riverboats, L.L.C.*,
129 Fed. Appx. 292 (7th Cir. 2005).......................................................8

*Austin v. Mich. Chamber of Comm.*,
494 U.S. 652 (1990)............................................................................7

*Autocam Corp. v. Sebelius*,
2012 WL 6845677 (W.D. Mich. Dec. 24, 2012)..................................4

*Ballinger v. C.I.R.*,
728 F.2d 1287 (10th Cir. 1984) ........................................................10

*Bd. of Regents v. Southworth*,
529 U.S. 217 (2000)..........................................................................15

*Braunfeld v. Brown*,
366 U.S. 599 (1961)..........................................................................10

*Brown v. Entm't Merchs. Ass'n*,
131 S. Ct. 2729 (2011).......................................................................24

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993)................................................ 22, 26, 27, 28, 29

*Citizens United v. FEC*,
130 S. Ct. 876 (2010)...................................................................... 6, 7, 17

*Civil Liberties for Urban Believers v. City of Chicago*,
342 F.3d 752 (7th Cir. 2003) ..............................................................3

*Colorado Christian Univ. v. Weaver*,
534 F.3d 1245 (10th Cir. 2008) ........................................................28

*EEOC v. Townley Eng'g & Mfg. Co.*,
859 F.2d 610 (9th Cir. 1988) .......... 5, 20

*Eisenstadt v. Baird*,
405 U.S. 438 (1972) .......... 24

*Employment Div. v. Smith*,
494 U.S. 872 (1990) .......... 9, 11, 12, 13, 14

*First National Bank of Boston v. Bellotti*,
435 U.S. 765 (1978) .......... 17

*Friedman v. Bd. of Cnty. Com'rs of Bernalillo Cnty.*,
781 F.2d 777 (10th Cir. 1985) .......... 10

*Gonzales v. O Centro Beneficiente Uniao do Vegetal*,
546 U.S. 418 (2006) .......... 9, 10, 22, 23

*Great Falls v. NLRB*,
278 F.3d 1335 (D.C. Cir. 2002) .......... 19

*Griswold v. Connecticut*,
381 U.S. 479 (1965) .......... 24

*Grutter v. Bollinger*,
539 U.S. 306 (2003) .......... 26

*Harris v. McRae*,
448 U.S. 297 (1980) .......... 13, 25

*Hernandez v. C.I.R.*,
490 U.S. 680 (1989) .......... 10

*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*,
132 S. Ct. 694 (2012) .......... 16, 17

*In re Union Pacific Emp'ment Prac. Lit.*,
479 F. 3d 936 (8th Cir. 2007) .......... 20

*Keller v. State Bar of Cal.*,
496 U.S. 1 (1990) .......... 15

*Knox v. Serv. Employees Int'l Union*,
132 S. Ct. 2277 (2012)....................15

*LeBoon v. Lancaster Jewish Comty. Ctr. Ass'n*,
503 F.3d 217 (3rd Cir. 2007)....................20

*Moore Mill & Lumber Co. v. Foster*,
336 P.2d 39 (Or. 1959)....................19

*Newland v. Sebelius*,
881 F. Supp. 2d 1287 (D. Colo. 2012)....................22

*NLRB v. Catholic Bishop*,
440 U.S. 490 (1979)....................19

*NLRB v. Greater Kansas City Roofing*,
2 F.3d 1047 (10th Cir. 1993)....................7

*Robinson v. Cheney*,
876 F.2d 152 (D.C. Cir. 1989)....................4

*Sherbert v. Verner*,
374 U.S. 398 (1963).................... 9, 11

*Sherwin Manor Nursing Cent., Inc. v. McAuliffe*,
37 F.3d 1216 (7th Cir. 1994)....................8

*Shrum v. City of Coweta, Okla.*,
449 F.3d 1132 (10th Cir. 2006)....................27

*Spencer v. World Vision, Inc.*,
633 F.3d 723 (9th Cir. 2010)....................19

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009)....................5

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
309 F.3d 144 (3d Cir. 2002)....................28

*Thomas v. Metro. Life Ins. Co.*,
631 F.3d 1153 (10th Cir. 2011)....................19

*Thomas v. Review Bd.*,
450 U.S. 707 (1981)........................................................................... *passim*

*UFCW Local 1776 v. Eli Lilly & Co.*,
620 F.3d 121 (2d Cir. 2010) ......................................................................12

*United States v. Friday*,
525 F.3d 938 (10th Cir. 2008) ................................................................ 17, 22

*United States v. Hardman*,
297 F.3d 1116 (10th Cir. 2002) ................................................................ 10, 24

*United States v. Lee*,
455 U.S. 252 (1982)..................................................................... 9, 10, 12, 14

*Wisconsin v. Yoder*,
406 U.S. 205 (1972)........................................................................... 9, 11

*Zelman v. Simmons-Harris*,
536 U.S. 639 (2002)...........................................................................14

**Constitutional Provisions**

U.S. Const. amend. I ........................................................................... *passim*

**Statutes**

Health Insurance Portability and Accountability Act of 1996,
Pub. L. No. 104-191, §§ 261-64 ..................................................................15

Patient Protection and Affordable Care Act,
Pub. L. No. 111-148.......................................................................... 12, 23

Religious Freedom Restoration Act,
42 U.S.C. § 2000bb *et seq.* ...................................................................... *passim*

Title VII of the Civil Rights Act of 1964,
42 U.S.C. § 2000e *et seq.*......................................................................... *passim*

1 U.S.C. § 1 ..........................................................................................20

42 U.S.C. § 300gg-13 ..................................................................................4

42 U.S.C. § 12113 ....................................................................................19

42 U.S.C. § 18011 .......... 23, 27

42 U.S.C. § 18023 .......... 13

42 U.S.C. § 2000e-1 .......... 19

42 U.S.C. § 2000e-2 .......... 19

Okla. Stat. Ann. tit. 18 §§ 865-68 .......... 6

Okla. Stat. Ann. tit. 18 § 1005 .......... 7

Okla. Stat. Ann. tit. 18 § 1006 .......... 6

Okla. Stat. Ann. tit. 18 § 1016 .......... 6

**Regulations**

32 C.F.R. § 199.4 .......... 13

42 C.F.R. § 136a.53 .......... 13

42 C.F.R. § 441.202 .......... 13

42 C.F.R. § 457.10 .......... 2

42 C.F.R. § 457.475 .......... 13

45 C.F.R. § 46.202 .......... 2

45 C.F.R. § 147.130 .......... 6

45 C.F.R. § 147.140 .......... 23, 27

76 Fed. Reg. 46621 .......... 28

77 Fed. Reg. 16501 .......... 12, 25

78 Fed. Reg. 8456 .......... 6, 12, 28

**Other Authorities**

S. Rep. No. 103-111 .......... 9

H.R. Rep. No. 103-88 .......... 9

Amicus Brief of Oklahoma ........................................................................7

Amicus Brief of Planned Parenthood ........................................................20

Amicus Brief of Sen. Orrin Hatch, *et al.* ..................................................18

Brief for Respondent Cheryl Perich, *Hosanna-Tabor v. EEOC*,
132 S. Ct. 694 (2012) (No. 10-553).......................................................17

Congressional Research Service, Laws Affecting the Federal Employees
Health Benefits Program (2013)............................................................13

EEOC Compliance Manual..........................................................................20

Internal Revenue Service, Tax Guide for Churches and Religious
Organizations ..........................................................................................6

HealthCare.gov,
Keeping the Health Plan You Have (June 14, 2010)....................... 22, 23, 26, 27

Douglas Laycock, *The Religious Freedom Restoration Act*,
1993 B.Y.U. L. Rev. 221 (1993) ..........................................................18

Richard A. Posner, Economic Analysis of the Law ...................................6

Mark Rienzi, *God and the Profits:*
*Is There Religious Liberty for Money-Makers?*,
__ George Mason Law Review __ (forthcoming fall 2013) ..............................21

U.S. Population Clock...............................................................................26

**Treatises**

18 C.J.S. Corporations, § 14 .....................................................................7

## INTRODUCTION

The regulation at issue ("the Mandate") forces the Green family either to violate their faith by providing and paying for emergency contraceptives or to expose their business, Hobby Lobby, to massive fines. This severe burden cannot conceivably meet strict scrutiny, *infra* I.C, and thus violates the Religious Freedom Restoration Act ("RFRA") and the First Amendment. Understandably seeking to avoid strict scrutiny, the government's brief denies that the Mandate places any real burden on the Greens at all.

The government's arguments are groundless. First, the government ignores that forcing the Greens to choose between their faith and their business is a paradigm "substantial burden" under governing law. *Infra* I.A & I.A.2. Second, the idea that only Hobby Lobby must comply with the Mandate, and not the Greens, overlooks that Hobby Lobby acts only at the Greens' direction. *Infra* I.A.1. Third, the theory that providing and paying for insurance is just like paying employee wages not only re-defines the Greens' beliefs, but contradicts the treatment of insurance in numerous federal laws (including the Mandate itself). *Infra* I.A.3. Finally, far from seeking to interfere with employee healthcare decisions, the Greens simply ask not to be involved in providing and paying for emergency contraceptives. *Infra* I.A.4.

Most unsettling of all, however, is the radical surgery the government proposes for the First Amendment. The government would deem all profit-making

businesses "secular" and sever them from the religious liberty protections in the First Amendment and RFRA. This would contradict decades of Supreme Court jurisprudence and would ignore the plain text of RFRA. *Infra* I.B.

The district court denied preliminary injunctive relief based on these kinds of purely legal errors. The Court should reverse the district court's decision and enjoin the Mandate. Hobby Lobby needs that relief quickly. The Mandate's severe fines will take effect against it on July 1, in less than four months' time.[1]

## ARGUMENT

### I. THE MANDATE VIOLATES RFRA.

#### A. The Mandate substantially burdens the Greens.

The Greens' faith prohibits them from providing and paying for insurance coverage for emergency contraceptives.[2] Br. 4-5, 18-20, 26-32. Their decision to exclude this coverage is an "exercise of religion" under RFRA. Br. 18-20; 42

---

[1] On March 29, 2013, the Court granted Hobby Lobby's motions for initial *en banc* hearing and expedited oral argument.

[2] Providing coverage would violate the Greens' religious commitment to protecting newly-conceived life because, as the government confirms, the mandated drugs "inhibit[] implantation" of a fertilized egg. Opp. 9 n.6; Br. 4. The government asserts, however, that the drugs are not "abortifacients" because federal law defines "pregnancy" to begin at "implantation." Opp. 9 n.6 (quoting 45 C.F.R. § 46.202(f)). But other federal law defines a "child" to "includ[e] the period from conception to birth." *See* 42 C.F.R. § 457.10 (State Child Health Insurance Program). In any case, the government's semantics cannot trump the Greens' beliefs. *See Thomas v. Review Bd.*, 450 U.S. 707, 715-16 (1981) (deferring to plaintiff's beliefs unless claim is "so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection").

U.S.C. § 2000cc-5(7)(A). The government disputes none of this. It argues, however, that the Mandate—which forces the Greens to provide and pay for emergency contraceptives or pay massive fines—is not a "substantial burden" on their religious exercise. Opp. 23-33.

Yet the government ignores this Circuit's governing standard, which holds that a substantial burden occurs when a law "requires participation" in religiously-objectionable activity or "places substantial pressure" on a believer to participate. *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1315 (10th Cir. 2010) (quotations omitted); Br. 20-21 & n.14. Under that standard, the Mandate qualifies as a substantial burden: it requires the Greens to violate their religion by providing and paying for emergency contraceptives in Hobby Lobby's health plan, or else suffer millions in fines. Br. 21-22.

The government also does not mention, or try to justify, the district court's invention of a new substantial burden standard that violates Circuit and Supreme Court precedent. Drawing on a controversial Seventh Circuit decision, the district court concocted a standard that recognizes only "direct" burdens. *See* JA 223a (relying on "direct [and] primary" test from *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) (*CLUB*)); Br. 23. This standard violates Circuit precedent, which rejects any distinction between "direct" and "indirect" burdens. *Abdulhaseeb*, 600 F.3d at 1315-16 ("'While the compulsion

may be indirect, the infringement upon free exercise is nonetheless substantial.'") (quoting *Thomas*, 450 U.S. at 717-18); *see also* Br. 23-24 & nn.15-16.

The government mentions none of this, failing to engage the "critical question," JA 221a, in this case: whether the Mandate substantially burdens the Greens' religious exercise under Circuit law. Instead, the government proposes various theories to explain away the Mandate's severe burdens. None has any validity.

***1. Hobby Lobby's corporate form does not immunize the Greens from government pressure to violate their religion.***

The government argues that, because the Mandate operates only on Hobby Lobby and its health plan, the Mandate "does not compel the [Greens] as individuals to do anything." Opp. 23 (quoting *Autocam Corp. v. Sebelius*, 2012 WL 6845677, at *7 (W.D. Mich. Dec. 24, 2012)). This is patently false. While the Mandate expressly addresses "group health plan[s]," 42 U.S.C. § 300gg-13(a), the Greens alone decide how Hobby Lobby and its health plan operate. *Robinson v. Cheney*, 876 F.2d 152, 159 (D.C. Cir. 1989) ("[A] corporation cannot act except through the human beings who may act for it."). Even the district court acknowledged that businesses take "religiously-motivated actions" by "the intention and direction of their individual actors." JA 219a.

This simple point shows why Hobby Lobby's corporate form does not insulate the Greens from the Mandate. Hobby Lobby can comply with the Mandate only if the Greens, against their consciences, make it comply. *See Abdulhaseeb*, 600 F.3d

at 1315 (substantial burden if law "requires participation" in prohibited activities). If the Greens instead resist because of their faith, their family business faces huge fines. *See id.* (substantial burden if law "places substantial pressure" on believers to engage in prohibited activities). That Hobby Lobby is a "separate and distinct" entity, Opp. 24, does not alter the reality that the Mandate's pressure falls directly on the Greens.

Contrary to the government's theory, the Ninth Circuit has twice ruled that laws regulating a corporation can substantially burden its owners' religious exercise. In both *EEOC v. Townley Engineering & Manufacturing Co.*, 859 F.2d 610 (9th Cir. 1988), and *Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009), the court ruled that laws regulating a mining company and a pharmacy, respectively, could burden the free exercise rights of the corporations' owners. *See Townley*, 859 F.2d at 613 ("We . . . hold . . . that Jake and Helen Townley have certain rights under the Free Exercise Clause that Title VII cannot infringe."); *Stormans*, 586 F.3d at 1120 (holding that a pharmacy's free exercise claim was really a claim on behalf of its owners) (citing *Townley*). The government mistakenly claims these cases were "only" about standing. Opp. 28. To the contrary, both recognized that laws regulating corporations can impose burdens on the owners' religious exercise.[3]

---

[3] Indeed, one frequent goal of holding a corporation liable for anything is to incentivize—that is, pressure—its owners to act in a certain way. *See, e.g.*, Richard A. Posner, Economic Analysis of the Law 397-98 (3d ed. 1986).

Additionally, the government's "corporate form" argument is inconsistent with its own actions. Unlike those who operate for-profit corporations, the government recognizes that individuals who operate churches and religious non-profits need protection from the Mandate. *See* 45 C.F.R. § 147.130(a)(1)(iv)(B) (exemption for houses of worship); 78 Fed. Reg. 8456, 8461 (Feb. 6, 2013) (proposing "accommodation" for religious non-profits). But non-profits receive the same "special advantages—such as limited liability, perpetual life, and favorable treatment of the accumulation and distribution of assets," *Citizens United v. FEC*, 130 S. Ct. 876, 905 (2010)—as for-profits. *See, e.g.*, Okla. Stat. Ann. tit. 18 §§ 865-68 (providing limited liability for directors of non-profits); *Id*. § 1016(1) (providing perpetual succession); *Id*. § 1006(A)(7) (non-profit and for-profit entities both organize under the same Oklahoma General Corporation Act). The government's "corporate form" theory cannot explain its different treatment of for-profit and non-profit organizations.[4]

The government also wrongly asserts that the Greens cannot vindicate their rights without disregarding Hobby Lobby's corporate form or piercing the corporate veil. Opp. 25-26. The government misunderstands the limitations of the

[4] Not even the IRS regards the non-profit/for-profit distinction as categorical. *See* IRS, Tax Guide for Churches and Religious Organizations at 16, *available at* http://www.irs.gov/pub/irs-pdf/p1828.pdf (last visited March 29, 2013) ("Churches and religious organizations, like other tax-exempt organizations, may engage in income-producing activities unrelated to their tax-exempt purposes.").

corporate form. Under Oklahoma law, for example, corporate business owners remain free to pursue "any lawful business or purposes," Okla. Stat. Ann. tit. 18 § 1005(B), including "religious exercise and practice." Amicus Br. of Okla. at 7. There is no basis for the *federal* government to claim that RFRA silently adopts a view of Oklahoma corporations that—inconsistent with Oklahoma's own view—curtails their owners' religious liberty. Nor would the First Amendment condone such a strained reading of RFRA. "'It is rudimentary that [a] State cannot exact as the price of those special advantages [granted corporations] the forfeiture of First Amendment rights.'" *Citizens United*, 130 S. Ct. at 905 (quoting *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 680 (1990) (Scalia, J., dissenting)). Likewise, the federal government cannot manipulate the state-created corporate form to exact the same kind of forbidden forfeiture.

Contrary to the government's suggestion, Opp. 25-26, this conclusion does not require a foray into the doctrine of corporate veil-piercing. Veil-piercing prevents abuses of the corporate form that would perpetuate fraud or injustice. *NLRB v. Greater Kansas City Roofing*, 2 F.3d 1047, 1052-55 (10th Cir. 1993) ("Informality in the operation of a closely held corporation will not lead to disregard of the corporate entity if the informality neither prejudices nor misleads plaintiff.") (quoting 18 C.J.S. Corporations, § 14 at 284). Far from abusing the corporate form, the Greens merely seek to use it in a way Oklahoma deems perfectly permissible:

operating their business in accordance with their faith. It is outrageous to compare the Green's efforts to do so with "treat[ing] the company's bank accounts as their own"; "co-mingling personal and corporate funds"; or "disregarding the corporate form and treating [Hobby Lobby] as [an] alter ego." Opp. 25.

If a corporation's owner challenged a business regulation that discriminated against him on the basis of race, gender, or national origin, presumably the government would not say the corporate form bars that claim. *Cf. Sherwin Manor Nursing Cent., Inc. v. McAuliffe,* 37 F.3d 1216, 1221 (7th Cir. 1994) (holding that "nursing care facility, owned and operated by orthodox Jews" presented "a cognizable equal protection claim since it allege[d] that it was subjected to differential treatment by the state surveyors based upon the surveyors' anti-Semitic animus"); *see also Amber Pyramid, Inc. v. Buffington Harbor Riverboats, L.L.C.*, 129 Fed. Appx. 292, 295 (7th Cir. 2005) (holding that a "minority-owned corporation, like Amber Pyramid, assumes an 'imputed racial identity' from its shareholders"). Likewise here, the corporate form does not bar the Greens from challenging the Mandate as a violation of their religious liberty.

### *2. Supreme Court jurisprudence strongly supports finding a substantial burden.*

The government also says the Greens cannot show a substantial burden because the jurisprudence that "formed the background" of RFRA never "held or even suggested that a requirement that a corporation provide certain employee benefits

could be a substantial burden on its controlling shareholders' exercise of religion." Opp. 26. This argument is flawed.

First, the government overlooks the basic proposition that RFRA "is not a codification of any prior free exercise decision but rather the restoration of the legal standard that was applied in those decisions." H.R. REP. NO. 103-88 (1993); *see also* S. REP. NO. 103-111, at 9 (1993), *reprinted at* 1993 U.S.C.C.A.N. 1892, 1898. RFRA's purpose was simply to restore "the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)." 42 U.S.C. § 2000bb(b)(1); *see also Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418, 424 (2006) ("*O Centro II*") (explaining that RFRA restored the compelling interest test rejected in *Smith*). Contrary to the government's suggestion, RFRA's protection is not confined to the specific holdings of previous free exercise cases. *See* S. REP. NO. 103-111 at 8-9 (noting that prior free exercise cases would provide "guidance" in applying RFRA, while "express[ing] neither approval nor disapproval of that case law").

Second, the government is mistaken about the Supreme Court's free exercise jurisprudence, which strongly supports finding a substantial burden here. For instance, in *United States v. Lee*, the Court held that requiring an Amish employer to pay social security taxes "interfere[d] with [his] free exercise rights." *See* 455 U.S. 252, 257 (1982) ("Because the payment of the taxes or receipt of benefits

violates Amish religious beliefs, compulsory participation in the social security system interferes with their free exercise rights"). Both the Supreme Court and this Court have agreed that *Lee* recognized a substantial burden.[5] The government's lengthy discussion of *Lee* omits this dispositive point. Opp. 26-27. It also fails to mention that *Lee*'s outcome turned, not on substantial burden, but on the government's compelling interest in "enforcing participation in the social security system." *United States v. Hardman*, 297 F.3d 1116, 1127 (10th Cir. 2002) (en banc) (discussing *Lee*).[6] Thus, the government's theory of RFRA's "background" stumbles right out of the blocks. *Lee*—which the government admits is "[t]he one

---

[5] *See, e.g., Hernandez v. C.I.R.*, 490 U.S. 680, 699-700 (1989) (explaining that "*Lee* establishes that *even a substantial burden* would be justified by the 'broad public interest in maintaining a sound tax system'"); *Friedman v. Bd. of Cnty. Comm'rs of Bernalillo Cnty.*, 781 F.2d 777, 791 (10th Cir. 1985) (observing that in *Lee* "compulsory participation in social security system *burdened [the] free exercise of Amish religion*"); *Ballinger v. C.I.R.*, 728 F.2d 1287, 1291 (10th Cir. 1984) (observing that, "*[e]ven though the tax placed a burden on the employer's free exercise of religion*, [*Lee*] upheld the tax's application because of the government's overriding interest in maintaining the financial stability of the social security system") (emphases added).

[6] *See, e.g., O Centro II*, 546 U.S. at 435 (explaining that *Lee* "show[s] that the Government can demonstrate a compelling interest in uniform application of a particular program"). The government makes the same error with respect to *Braunfeld v. Brown*, 366 U.S. 599 (1961). *See* Opp. 28 (stating *Braunfeld* "rejected the free exercise claim of individuals who faced criminal penalties if they operated their stores on a Sunday"). Like *Lee*, *Braunfeld* turned on the government's "compelling interest in uniform application" of the law, *O Centro II*, 546 U.S. at 435, and not on the absence of a substantial burden.

pre-*Smith* free exercise case that involved employee benefits," Opp. 26—recognized that taxing a business could substantially burden its owner's faith.

Strangely, the government asserts that key cases like *Sherbert*, *Yoder*, and *Thomas* are irrelevant because they involved "individual[s]" and not "corporate regulation or employee benefits." Opp. 27. But the Greens are "individuals" too. And, just as in those cases, the government here "conditions" compliance with the law "upon conduct proscribed by a religious faith, . . . thereby putting substantial pressure on [the Greens] to modify [their] behavior and to violate [their] beliefs." *Thomas*, 450 U.S. at 717-18. Nor is the pressure on the Greens any less onerous than in those cases. There, the government pressured believers by imposing a five-dollar fine (*Yoder*) and cutting off unemployment benefits (*Sherbert* and *Thomas*). Here, it pressures the Greens by threatening their businesses with enormous fines unless they cease exercising religion while running those businesses. Br. 21-22.

***3. The Greens draw a clear moral distinction between offering specific insurance coverage and paying employee wages.***

The government asserts that, because insurance is a "form of employee compensation," Opp. 3, complying with the Mandate burdens the Greens no more than paying salaries with which employees may buy the mandated drugs. *Id*. at 29-30. The Greens, however, have a different understanding of their religious beliefs. They morally distinguish between funding specific insurance benefits on the one hand, and paying salaries on the other. Br. 4-5, 26-32. The government is not

entitled to redefine those religious beliefs. *Employment Div. v. Smith*, 494 U.S. 872, 887 (1990); *Thomas*, 450 U.S. at 715-16; *Lee*, 455 U.S. at 256-57.

On its own terms, however, the government's conflation of wages and insurance falls apart. The government has pledged to "accommodat[e] [the] religious liberty interests" of certain *non-profit* entities by "protect[ing]" them from "having to contract, arrange, or pay for contraceptive coverage." 77 Fed. Reg. 16501, 16503 (March 21, 2012); 78 Fed. Reg. 8456, 8458-59 (Feb. 6, 2013). That accommodation makes no sense if offering health coverage is just like paying wages. To the contrary, the government's promise to "accommodate" non-profit entities shows that it realizes that providing insurance directly implicates companies in a way that paying wages does not. This is particularly true for self-funded plans like Hobby Lobby's, where the employer itself finances and creates the plan, including what drugs are covered. *See UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 126 (2d Cir. 2010) (noting that plans "typically pay for a prescribed medication only if the drug is authorized under their formulary, a list of medications approved for payment").

Congress too recognizes the moral implications of providing health insurance. For instance, the Patient Protection and Affordable Care Act ("ACA") prohibits health plans in state exchanges from using federal subsidies to fund most abortions, and also requires plans covering abortions to pay for them from a segregated

account. 42 U.S.C. § 18023(b)(2). Abortion coverage is also excluded from Medicaid,[7] the Indian Health Service,[8] and every other federally-created insurance program.[9] *See also Harris v. McRae*, 448 U.S. 297, 318 (1980) (upholding federal ban on abortion funding). The federal government acts no differently when it is an employer: plans offered in the military health program Tricare and the Federal Employees' Health Benefits program also exclude most abortions.[10]

These longstanding exclusions belie the government's claim that there is no moral difference between paying someone a wage and providing them with insurance benefits. In any event, what matters is that the Greens draw a different line. *Smith*, 494 U.S. 872, 887.

#### 4. *The Greens' objection to the Mandate is about their own conduct, not their employees' conduct.*

The government also argues that the Mandate cannot substantially burden the Greens because "an employee's decision to use her health coverage for a particular item or service cannot properly be attributed to her employer, much less to the corporation's shareholders." Opp. 29. But the Greens' objection to the Mandate does not depend on the strange notion that employee health care decisions are

---

[7] 42 C.F.R. § 441.202.

[8] 42 C.F.R. § 136a.53.

[9] *See, e.g.*, 42 C.F.R. § 457.475 (State Children's Health Insurance Program).

[10] 32 C.F.R. § 199.4(e) (Tricare); *see also* Congressional Research Service, Laws Affecting the Federal Employees Health Benefits Program 4 (2013).

“attributable” to them. The Mandate is objectionable not because Hobby Lobby employees might access emergency contraceptives, but because it forces the Greens to facilitate and fund the transaction. Br. 19-20, 26-32.

The government also misses the mark by drawing an analogy to Establishment Clause case law. The government argues that because parents may elect to use neutrally-allocated vouchers at religious schools without offending the Establishment Clause, Hobby Lobby should not be concerned when its employees’ use the health insurance it created and paid for to purchase emergency contraceptives. Opp. 30-31 (citing *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002)). What the Establishment Clause allows in terms of school funding is a secular matter properly determined by federal courts. What the Greens’ faith allows in terms of their involvement with emergency contraception, by contrast, is a matter of religious belief “not within ‘the judicial function and judicial competence.’” *Lee*, 455 U.S. at 257 (quoting *Thomas*, 450 U.S. at 716). Moreover, *Zelman* is a poor analogy even on its own terms, because it involved fungible dollars that parents could direct to schools of their choosing. *Zelman*, 536 U.S. at 653 (observing that “[p]rogram benefits are available to participating families on neutral terms, with no reference to religion”). The Mandate, by contrast, requires the Greens to provide and pay for coverage for specific emergency contraceptives prohibited by their faith.

The government also mistakenly relies on *Board of Regents v. Southworth*, 529 U.S. 217 (2000), which involved students' First Amendment objections to a university-created funding scheme for student organizations. Opp. 32. *Southworth*, however, cuts against the government's argument: the Court recognized that the scheme burdened the students' free speech rights not to be compelled to subsidize someone else's expression. *Id.* at 230-31 (citing *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209 (1977); *Keller v. State Bar of Cal.*, 496 U.S. 1 (1990)); *see also Knox v. Serv. Employees Int'l Union*, 132 S. Ct. 2277, 2295-96 (2012) (noting "serious risk" to First Amendment "if the government [could] compel a particular citizen . . . to pay special subsidies for speech on the side that [the government] favors") (internal quotations omitted). *Southworth*'s outcome turned instead on the narrow tailoring of the University's speech forum. 529 U.S. at 231.[11]

**B. The Mandate substantially burdens Hobby Lobby.**

In addition to burdening the Greens, the Mandate also burdens Hobby Lobby and Mardel by coercing them to engage in activities prohibited by sincere religious belief. *See* Br. 36-39. The government's response is to propose radical surgery on

[11] Equally irrelevant is the argument that HIPAA's "Privacy Rule . . . imposes a wall of confidentiality between an employee's health care decisions . . . and the employer." Opp. 32. The Greens are not suing to stop their employees from exercising their rights to purchase and use emergency contraceptives. They are suing to avoid being forced to offer and pay for these drugs.

the First Amendment and RFRA by categorically excluding all "for-profit, secular corporations" from their protection. Opp. 16-23.

The government concedes that for-profit corporations are "persons" under federal law entitled to certain constitutional rights, *id.* at 18, but claims that such persons cannot exercise religion, *id.* at 22. The government insists this profit-based distinction is "rooted in the text of the First Amendment." *Id.* at 12, 18. It also says Congress "took pains" to "embod[y]" this purported distinction "in federal law" and deliberately "carried [it] forward" into RFRA. Opp. 11-12.

Every step of the government's argument is flawed.

***1. The First Amendment protects religious exercise by profit-makers.***

The government's assertion that a profit-distinction is "rooted in the text of the First Amendment," Opp. 12, 18, is obviously wrong. The First Amendment's text makes no distinctions about *who* may exercise religion; it simply forbids *Congress* from "prohibiting the free exercise [of religion]." U.S. CONST. amend. I. The lone source for the government's claim about the First Amendment's "text"—the Supreme Court's *Hosanna-Tabor* decision—has nothing to do with a free exercise claimant's profit-making status. Opp. 12, 18 (relying on *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 132 S. Ct. 694 (2012)). Indeed, the respondent in *Hosanna-Tabor* repeatedly emphasized the "commercial" nature

of the Lutheran school to minimize its protection under the religion clauses.[12] The Supreme Court's unanimous opinion ignored this tactic.

The decisions in *Citizens United*, 130 S. Ct. 876, and *First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978), reject the categorical limitations the government urges here. *Bellotti* explained that "[t]he proper question . . . is not whether corporations 'have' First Amendment rights and, if so, whether they are coextensive with those of natural persons. Instead, the question must be whether [the challenged law] abridges expression that the First Amendment was meant to protect." 435 U.S. at 776. *Citizens United* explained that "political speech does not lose First Amendment protection simply because its source is a corporation," and that the same rule applies to government "limits on the political speech of nonprofit or for-profit corporations." 130 S. Ct. at 913 (quotations omitted). The Court thus squarely rejected the attempt to create different free speech rights for different corporations. *See also id.* at 906 (rejecting special treatment of "media corporations" because "[t]his differential treatment cannot be squared with the First Amendment."). The same attempt should also be rejected in the context of religious exercise. *See, e.g.*, *United States v. Friday*, 525 F.3d 938, 950 (10th Cir. 2008) ("'Freedom of religion, no less than freedom of speech, is a promise of the

---

[12] *See* Br. for Respondent Cheryl Perich, *Hosanna-Tabor*, 132 S. Ct. 694 (2012) (No. 10-553) 2011 WL 3380507 (referring to Lutheran school as "a commercial enterprise" and using the term "commercial" 28 times).

First Amendment . . . essential to the common quest for truth and the vitality of society as a whole.'") (citation omitted).

***2. RFRA protects religious exercise by profit-makers.***

The government makes an equally spurious claim that Congress excluded profit-making entities from RFRA. Opp. 16-23. But Congress cannot possibly have "t[aken] pains" to "embod[y]" this exclusion in RFRA, Opp. 11-12, without even mentioning it in RFRA's text. To the contrary, RFRA enacts a universal standard. 42 U.S.C. § 2000bb-3 (RFRA "applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993"). It protects "any exercise of religion," 42 U.S.C. 2000cc-5(7), by any "person," *id.* § 2000bb-1(a), under one legal standard, strict scrutiny, *id.* § 2000bb-1(b). *See* Douglas Laycock, *The Religious Freedom Restoration Act*, 1993 B.Y.U. L. Rev. 221, 235 (1993) ("Like the Free Exercise Clause itself, RFRA is universal in its scope. RFRA singles out no claims for special advantage or disadvantage."); Br. 37-38.[13]

RFRA does not "carr[y] forward" language from other statutes distinguishing for-profits from non-profits. Opp. 16. The government tries to import into RFRA

[13] Congress even resisted creating a different standard for prisoners. *See* Amicus Br. of Sen. Orrin Hatch, *et al.*, at 16 ("RFRA's statutory structure—a single rule with a single exception—reflects the principle that Government should apply the same protective standard to all exercises of religion, by all persons."). It is hard to imagine that Congress simultaneously intended RFRA to exclude all law-abiding businesses and their owners, simply because they earn profits.

quite different language from Title VII and the ADA that exempts a "religious corporation, association, educational institution, or society." *See* 42 U.S.C. § 2000e-1(a) (Title VII); *id.* § 12113(d)(1) (ADA); Opp. 18-19. This cannot work. First, courts may not use other laws to change RFRA's plain terms. *See, e.g.*, *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1161 (10th Cir. 2011) ("If the statutory language is clear, our analysis ends and we must apply its plain meaning."). The government cannot use Title VII and the ADA to *introduce* ambiguity into RFRA. *See Moore Mill & Lumber Co. v. Foster*, 336 P.2d 39, 52 (Or. 1959) ("Resort to the rules of statutory construction is never permitted to introduce ambiguity into language which is understandable.").[14] Second, courts have made non-profit status a factor in the Title VII exemption simply because they are construing the distinctive phrase "religious corporation." *See, e.g.*, *Spencer v. World Vision, Inc.*, 633 F.3d 723, 734-35 (9th Cir. 2010) (O'Scannlain, J., concurring).[15] But there is no reason to similarly interpret the broad term

[14] Courts have also considered non-profit status when applying the constitutional avoidance rule announced in *NLRB v. Catholic Bishop*, 440 U.S. 490 (1979). *See, e.g.*, *Great Falls v. NLRB*, 278 F.3d 1335, 1340, 1344 (D.C. Cir. 2002). Here, however, the government is relying on non-profit status not to avoid difficult constitutional issues, but to foreclose the Greens' free exercise rights altogether.

[15] From this, the government wrongly infers that Title VII categorically bars for-profits from exercising religion. Opp. 18-19. To the contrary, Title VII recognizes "businesses" may exercise religion by allowing some of them to consider religion in hiring. *See* 42 U.S.C. § 2000e-2(e) (allowing "[b]usinesses" to hire on the basis

"person" in RFRA, which presumptively includes "corporations . . . as well as individuals." 1 U.S.C. § 1; Br. 38.

It is easy to imagine an organization that may not be a "religious corporation" under Title VII, but that nonetheless engages in particular acts that are "exercises of religion" under RFRA. Hobby Lobby is a perfect example. Whether or not Hobby Lobby would qualify as a Title VII "religious corporation"—something not relevant to this case—Hobby Lobby unquestionably "exercises religion" under RFRA, for instance, by placing Christmas and Easter ads inviting readers to "know Jesus as Lord and Savior," and by excluding emergency contraceptives from its health plan.[16] Br. at 3-5, 39.

---

of religion "where religion . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise").

The government's position is also more extreme than the EEOC's, which considers profit-making as only one factor in the "religious organization" exemption. EEOC Compliance Manual, Section 12, http://www.eeoc.gov/policy/docs/religion.html#_Toc203359493 (last visited March 29, 2013) (stating "[a]ll significant religious and secular characteristics" must be considered and "no one factor is dispositive."). Courts also do not use profit-making as a categorical bar. *See, e.g.*, *LeBoon v. Lancaster Jewish Comty. Ctr. Ass'n*, 503 F.3d 217 (3rd Cir. 2007) (while profit-making is one factor, "[a]ll significant religious and secular characteristics" should be considered); *Townley*, 859 F.2d at 618 (same).

[16] The government nowhere suggests that Hobby Lobby's exclusion of emergency contraceptives violates Title VII. Its amicus Planned Parenthood, however, says the exclusion amounts to sex discrimination. Amicus Br. of Planned Parenthood at 25-26. Planned Parenthood fails to note that the only circuit decision to have addressed this argument rejected it. *In re Union Pac. Employment Prac. Lit.*, 479 F. 3d 936, 944-45 (8th Cir. 2007).

RFRA universally protects any "person's" religious exercise, and, unlike other statutes, is not limited to "religious corporations."[17] The government lacks any basis for reading a categorical bar on profit-making entities into RFRA's plain text.

## C. The Mandate fails strict scrutiny.

Through grandfathering, special provisions for small employers, various exemptions for religious groups, and proposed accommodations for certain non-profits, the government does not require health plans covering millions of Americans to comply with the Mandate. Br. 7-8, 42-43. It also spends billions of dollars annually facilitating access to contraceptives for Americans without coverage. The government thus lacks a compelling interest in forcing religious objectors like Hobby Lobby to pay for emergency contraceptives, particularly considering other existing avenues for directly providing access.

### *1. The government can demonstrate no compelling interest.*

The biggest hole in the government's compelling interest argument—one it fails to address—is that the Mandate is honeycombed with exemptions that leave more

[17] In this regard, RFRA fits comfortably within the broad sweep of our legal system's treatment of for-profit and non-profit entities. *See* Mark Rienzi, *God and the Profits: Is There Religious Liberty for Money-Makers?*, *forthcoming* George Mason Law Review (fall 2013), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2229632 (last visited March 29, 2013) (analyzing treatment of profit-making businesses and religious exercise by profit-makers across varying contexts).

than 100 million policies unaffected. Br. 16-17, 42-45.[18] "An interest cannot be 'compelling' where the government 'fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort.'" *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 522 (1993); *Friday*, 525 F.3d at 958. In *O Centro*, an exemption for one religious group was enough to doom the government's argument—despite its critical interest in enforcing the nation's drug laws. *O Centro II*, 546 U.S. at 433 (peyote exemption for Native Americans); *see also* Br. 43-44. Similarly, no matter how important the government's interests in public health or gender equality are in the abstract, they cannot be compelling in this case. "Under the more focused inquiry required by RFRA and the compelling interest test, the [g]overnment's mere invocation of the general characteristics" of public health or gender parity "cannot carry the day." *O Centro II*, 546 U.S. at 432.

The government claims that the grandfathering regulation is irrelevant because it is temporary, and that a contrary ruling would "require immediate and draconian

---

[18] Hobby Lobby's opening brief refers to plans covering 87 million people, which counts large employers alone. Br. 7, 42. Including midsize employers, the small business exemption, and religious employers, the number is over 100 million. *See* HealthCare.gov, Keeping the Health Plan You Have (June 14, 2010), http://www.healthcare.gov/news/factsheets/2010/06/keeping-the-health-plan-you-have-grandfathered.html (last visited March 29, 2013) ("Grandfathering Factsheet") (estimating that plans covering as many as 109 million Americans will remain grandfathered in 2013); *Newland v. Sebelius*, 881 F. Supp. 2d 1287, 1298 (D. Colo. 2012) (total number of exemptions is 190 million).

enforcement" of future laws. Opp. 39-40. This vastly overstates both the facts and the stakes. First, the grandfathering regulation is not transitional, but open-ended. It contains no sunset provision, permits plans to expand by adding new enrollees, and is keyed to medical inflation. *See* 42 U.S.C. § 18011 (no end date, dependents and new employees may join); 45 C.F.R. § 147.140 (medical inflation, no end date); Grandfathering Factsheet, *supra* n.18 (same).[19] Second, the government remains free to regulate as it sees fit. Hobby Lobby is not asking to strike down the ACA, nor even the preventive care mandate; it seeks only a narrow exemption, similar to those already provided to grandfathered plans and religious employers that collectively insure large numbers of people. *See* Br. 7-8, 41-42.

The government's remaining exemption arguments are equally unavailing. It makes no difference if many grandfathered plans and small employers already provide contraceptive services. Opp. 39. An exemption does not cease to exist because some people may choose to forego it. The existence of the exemptions, not their popularity, is determinative. *See O Centro II*, 546 U.S. at 433 (relying on fact of peyote exemption alone). Moreover, the government's brief is silent on whether these grandfathered plans exclude particular drugs from their formularies, as

[19] The government abandons its own projections regarding grandfathering in favor of an outside report, presumably because it contains lower estimates. Opp. 39 n.11. But even the lowest estimates show that, in 2012, nearly half of workers with insurance coverage had grandfathered plans. *See id.*

Hobby Lobby does, or require some form of cost-sharing, as most prescription drug plans do. *See* Opp. 39. The government forcefully argues against such cost-sharing, saying it impairs gender equality, Opp. 36, but sees no need to eliminate such cost-sharing in grandfathered plans. *Id.* at 35-36.

Even without the myriad exceptions, the government's argument that it has a compelling interest in denying religious exemptions is devoid of evidence. The government asserts public health is advanced by access to contraception generally, but offers no evidence to explain why its goal is undermined if Hobby Lobby is exempt from covering a narrow subset of contraceptives. Br. 41-42; *see also Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2741 n.9 (2011) (noting "the government does not have a compelling interest in each marginal percentage point by which its goals are advanced"). Strict scrutiny demands "hard evidence" of an "actual problem." *Hardman*, 297 F.3d at 1132; *Brown*, 131 S. Ct. at 2738; Br. 44-45. The government has adduced no evidence of any problem.

Indeed, rather than produce evidence of a contraceptive coverage crisis, the government simply points out that women have rights to use contraception and make private medical decisions. Opp. 34-35 (relying on *Eisenstadt v. Baird*, 405 U.S. 438 (1972); *Griswold v. Connecticut*, 381 U.S. 479 (1965)). This is perfectly true, and perfectly irrelevant. The government mistakes the constitutional right to take a particular action free from "state interference," Opp. 34, for a right to force a

private party to facilitate and fund that action. But if the government is not constitutionally required to subsidize these services, *see, e.g.*, *McRae*, 448 U.S. at 318, surely the same is true of private business owners. Hobby Lobby's employees remain free to make whatever medical and procreative decisions they desire. The Greens are simply asserting their own rights not to be compelled to offer and pay for them.

#### ***2. The Mandate is not the least restrictive means of advancing the government's interests.***

The government has numerous less restrictive means available to advance its interests. Emergency contraceptives are widely available through a variety of means, including online pharmacies and vending machines, and the government already spends billions subsidizing contraceptive services. Br. 47-48. Hobby Lobby detailed five different less restrictive options available to the government, Br. 45-49; in response, the government cites no evidence to demonstrate why any would be unworkable. Instead, it resorts to hyperbole, claiming these options would force it "to subsidize private religious practices." Opp. 41. This argument is puzzling, given the government already spends billions on family planning programs, Br. 48, given its claims that contraceptive services are cost-neutral,[20] and given its exemptions and accommodations for other religious objectors. Br. 42-

[20] *See* 77 Fed. Reg. 16501, 16503 (March 21, 2012) (asserting "[a]ctuaries and experts" have found contraceptive coverage "at least cost neutral").

43. The least restrictive means test entails "serious, good faith consideration of workable . . . alternatives," *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003), which the government fails to undertake here.

## II. THE MANDATE VIOLATES THE FREE EXERCISE CLAUSE.

The Mandate is also subject to strict scrutiny under the Free Exercise Clause, because it is neither generally applicable nor neutral. Laws fail the generally applicable standard when they penalize religious conduct while allowing similar secular conduct. *See id*. Laws fail the neutrality standard when they discriminate along religious lines. The Mandate fails both standards.

### A. The Mandate is not generally applicable.

Hobby Lobby advances one simple proposition: when a law exempts one-third of the U.S. population, it is not generally applicable. Br. 49-52.[21] In response, the government (1) claims that laws are generally applicable unless they specifically target religion, and (2) asks the Court to discount the exemptions that cover more than one-third of the population. To do so would depart from *Lukumi*, the decisions of other circuits, and the decisions of this Court.

The government conflates general applicability, non-neutrality, and anti-religious animus. Opp. 42-45; *cf.* Br. 49-54 (distinguishing concepts). But "the

---

[21] *See also* Grandfathering Factsheet, *supra* n.18 (109 million employees exempt under grandfathering regulation alone); U.S. Population Clock, http://www.census.gov/main/www/popclock.html (last visited March 29, 2013) (population: 315 million).

Free Exercise Clause has been applied numerous times when government officials interfered with religious exercise not out of hostility or prejudice, but for secular reasons, such as saving money . . . ." *Shrum v. City of Coweta, Okla.*, 449 F.3d 1132, 1144-45 (10th Cir. 2006) (collecting cases); *see also* Br. 51-52 (same). Under *Lukumi*, the relevant question is whether the law "fail[s] to prohibit nonreligious conduct that endangers these interests in a similar or greater degree than [the religious conduct] does." *Lukumi*, 520 U.S. at 543. The Mandate does exactly that. Br. 50-52.

The government claims the grandfathering regulation is irrelevant because it is a "gradual transition." Opp. 43. Not so. The exemption has no end date.[22] The law permits grandfathered plans not only to continue, but to grow by adding dependents and new employees. *See* 42 U.S.C. § 18011 (b)-(c). It is flexible by design, its limitations indexed to medical inflation so that they may endure year after year.[23] The government predicts that many plans will eventually relinquish grandfathered status, Opp. 39, but this would still leave millions on grandfathered plans. Br. 7-8, 42-43; *see also supra* n.18. Finally the government claims that the sheer number is irrelevant because most employers already offer contraceptive coverage. Opp. 39. But this undermines the government's argument: if most

---

[22] *See* 42 U.S.C. § 18011; 45 C.F.R. § 147.140; Grandfathering Factsheet, *supra* n.18.

[23] *See* 45 C.F.R. § 147.140; Grandfathering Factsheet, *supra* n.18.

women already have the coverage, then the Mandate serves little purpose other than to penalize religious objectors.

These broad exemptions undermine the regulatory purpose. The Court need not decide today whether one hundred or one million such exemptions is too many. Here, there are one hundred million. If the Mandate is generally applicable, the term is meaningless.

**B. The Mandate is not neutral.**

The Mandate is likewise not neutral. It distinguishes not only between the secular and religious, but also among classes of religious objectors. Br. 53-54. The Government ignores *Colorado Christian University v. Weaver*, 534 F.3d 1245, 1257 (10th Cir. 2008) and *Tenafly Eruv Association v. Borough of Tenafly*, 309 F.3d 144, 167 (3d Cir. 2002)—both of which held that laws distinguishing between types of religious believers were not neutral. Instead, it resurrects its parade of horribles and argues that recognizing the claims here would make religious accommodations unworkable. Opp. 44-46. Yet *Weaver* and *Tenafly* (not to mention *Lukumi*) have been good law for years, and the horribles have never paraded.

The government knew the Mandate would provoke religious objections. *See* 76 Fed. Reg. 46621, 46623 (Aug. 3, 2011); 78 Fed. Reg. 8456. Yet it chose to penalize believers like the Greens, while exempting or accommodating many

others. The law is thus not neutral. *Cf. Lukumi*, 508 U.S. at 534-36 (law non-neutral where it permits one class of religious practices but bans another).

## CONCLUSION

The Court should reverse and enjoin the Mandate.

Respectfully submitted,

s/ *S. Kyle Duncan*

S. Kyle Duncan
Luke W. Goodrich
Mark L. Rienzi
Eric S. Baxter
Lori H. Windham
Adèle Auxier Keim
THE BECKET FUND FOR RELIGIOUS LIBERTY
3000 K Street, N.W., Suite 220
Washington, DC 20007
(202) 349-7209
kduncan@becketfund.org
*Attorneys for Appellants*

Dated: March 29, 2013

## CERTIFICATE OF SERVICE

I certify that on March 29, 2013, I caused the foregoing *Reply Brief of Appellants* to be served electronically via the Court's electronic filing system on the following parties who are registered in the system:

Michelle Renee Bennett
michelle.bennett@usdoj.gov

Alisa B. Klein
alisa.klein@usdoj.gov

Mark B. Stern
mark.stern@usdoj.gov

*Attorneys for Appellees*

All other case participants will be served via the Court's electronic filing system as well.

s/ *Adèle Auxier Keim*
Adèle Auxier Keim
THE BECKET FUND FOR RELIGIOUS LIBERTY
3000 K Street, N.W., Suite 220
Washington, D.C. 20007
(202) 349-7213
akeim@becketfund.org
*Attorney for Appellants*

Dated: March 29, 2013

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains **6,898** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using **Microsoft Office Word 2007** in **Times New Roman 14-point font**.

3. Pursuant to this Court's guidelines on the use of the CM/ECF system, I hereby certify that:

a. all required privacy redactions have been made;

b. the hard copies to be submitted to the Court are *exact* copies of the electronic filing; and

c. the electronic submission was scanned for viruses with the most recent version of Symantec Endpoint Protection (last updated March 29, 2013) and, according to the program, is free of viruses.

s/ *Adèle Auxier Keim*

Adèle Auxier Keim
THE BECKET FUND FOR RELIGIOUS LIBERTY
3000 K Street, N.W., Suite 220
Washington, D.C. 20007
(202) 349-7213
akeim@becketfund.org
*Attorney for Appellants*

Dated: March 29, 2013